**REPORTERS COMMITTEE FOR FREEDOM OF the PRESS et al., Appellants,**

v.

**AMERICAN TELEPHONE & TELEGRAPH COMPANY et al.**

No. 76–2057.

United States Court of Appeals, District of Columbia Circuit.

Argued 18 Oct. 1977.

Decided 11 Aug. 1978.

As Amended Dec. 12, 1978.

Certiorari Denied March 5, 1979. See 99 S.Ct. 1431.

---

57. *Id.* at 386, 547 F.2d at 683.

58. *Id.*

Lloyd N. Cutler, Washington, D. C., with whom David R. Anderson, Ronald J. Greene, William J. Kolasky, Jr., Washington, D. C., and Alan B. Sternstein, Rockville, Md., were on the brief, for appellants.

David Ginsburg, Washington, D. C., with whom Lee R. Marks, James E. Wesner, Washington, D. C., F. Mark Garlinghouse, New York City, James A. DeBois, San Francisco, Cal., Robert A. Levetown, and John M. Kelleher, Washington, D. C., were on the brief, for appellees American Tel. & Tel. Co. and Chesapeake & Potomac Tel. Co.

D. Jeffrey Hirschberg, Atty. Department of Justice, Washington, D. C., with whom George W. Calhoun and Stanley Dalton Wright, Attys., Department of Justice, Washington, D. C., were on the brief, for appellee United States of America. Elizabeth Gere Whitaker, Atty. Department of Justice, Washington, D. C., also entered an appearance for appellee United States of America.

Before WRIGHT, Chief Judge, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

Opinion filed by SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in part and concurring in the result.

Dissenting opinion filed by J. SKELLY WRIGHT, Chief Judge.

WILKEY, Circuit Judge:

Plaintiffs in this action are two newspaper-publishing corporations;[1] twelve individual journalists;[2] and the "Reporters' Committee for Freedom of the Press," a legal research and defense fund organization established to protect the interests of the institutional press. The defendants in this case are the American Telephone and Telegraph Company ("AT&T") and the Chesapeake and Potomac Telephone Company ("C & P"). Plaintiffs brought suit in the District Court for declaratory and injunctive relief, claiming that the First and Fourth Amendments require that prior notice be provided to them before defendants turn over their long distance telephone billing records to Government law enforcement officials. The United States intervened as a party defendant. The District Court denied plaintiffs' motion for summary judgment and granted the summary judgment motion of defendants and of the United States. With respect to plaintiffs Jack Anderson, Richard Dudman, James R. Polk, David E. Rosenbaum and Knight Newspapers, we reverse the District Court and remand the case. We affirm the District Court's grant of summary judgment against the other plaintiffs.

## I. THE FACTS

### A. *The Records in Question and Their Usefulness in Law Enforcement*

Telephone companies, like other businesses, maintain for billing purposes records of the services they provide their customers. Company billing records for local calls contain only the total number of local message units charged to a customer, but no details

concerning specific calls.[3] However, company billing records for long distance calls, referred to as "*toll calls*," contain, for *each* long distance call charged to the customer's number, a notation of the number called and the date, time, and duration of the call.[4] Telephone companies retain these "toll-call" records for a period of six (6) months.[5] Telephone subscribers are aware that these records are maintained, since they receive copies of them with their phone bills each month.

For at least the past 50 years, state and federal law enforcement officials have used information from telephone company toll-billing records in criminal investigations and prosecutions.[6] The telephone companies have generally cooperated with law enforcement efforts and, in response to official requests, have made their business records available for inspection.

The toll-call records are useful investigative tools because the information they contain sometimes provides circumstantial evidence that there has been contact between a subscriber and some other person. There are limits on the usefulness of these records, however. Because they reveal nothing regarding the content of the call, they virtually never provide direct evidence of criminality. Furthermore, it is relatively easy for subscribers to avoid recordation of their long distance calls if they desire to keep their telephonic contacts secret. Records relating to a particular subscriber reflect *only* long distance calls *charged to the subscriber's number.* Thus, they cannot be used to trace calls made to or from the subscriber's telephone but charged to some other number. Moreover, toll records are

---

1. Dow Jones & Co., Inc. and The Knight Newspaper Group of Knight-Ridder Newspapers, Inc.

2. Jack Anderson, Marquis W. Childs, Emmett Dedmon, Richard Dudman, Morton Mintz, Bruce Morton, John Pierson, James R. Polk, David E. Rosenbaum, Richard Salant, Daniel Schorr, and Frederick Taylor.

3. Joint Appendix (J.A.) 71.

4. J.A. 70.

5. J.A. 87–88. The six (6) month period is prescribed by Federal Communications Commission regulation. See 47 C.F.R. Part 42.

6. The record does not indicate precisely when the practice of inspecting toll-call records for law enforcement purposes commenced, but the first court of appeals case involving a challenge to evidence derived from such an inspection was decided in 1929. *See Blakeslee v. United States*, 32 F.2d 15 (1st Cir. 1929).

not maintained for pay phones or for individual extensions of general business telephones and thus cannot be used to trace calls from such phones. Finally, as already noted, toll-call records are maintained only for six months and are not available for inspection once that period has expired.

Despite these limitations, toll-billing records have become an invaluable law enforcement aid. They have been most successfully used in the investigation and prosecution of organized crime and major narcotics offenses.[7] Law enforcement agencies and grand juries currently issue subpoenas and summonses for toll-call records relevant to felony investigations at the rate of approximately 2,000–3,000 each month.[8]

Defendant AT&T and the associated companies of the Bell Telephone System operate a nationwide telecommunications net-

7. The critical importance of toll-call record evidence to criminal investigations was commented upon in the Affidavit of Donald E. Campbell, Assistant United States Attorney in the District of Columbia (J.A. 272–274):

At the present time, I am Chief of the Major Crimes Division of the United States Attorney's Office for the District of Columbia. . .

Telephone toll records have been not only an invaluable aid in carrying out the investigative responsibility of the Major Crimes Division, but have also been critical evidence in criminal prosecutions developed by this Division. The continued access to such records, without advance notice to subscribers, is absolutely necessary for law enforcement to successfully investigate and prosecute certain criminal activity.

Subscriber and toll information without advance notice to subscribers is critical in any major narcotic, gambling, fencing, loansharking or corruption matter or any other major ongoing conspiratorial or other criminal activity. The upper echelons of the criminal community go to great extremes to insulate themselves from detection by law enforcement. However, these upper echelon individuals must communicate with those individuals on the "street" who are doing their "bidding", and who are visible to law enforcement. For example, an individual is identified in the D.C. area as a major drug trafficker, and drugs are purchased from this individual by an undercover officer. If law enforcement has conducted a detailed and careful investigation, there will be a telephone on which this trafficker has contacted his out-of-town supplier, because no conspiracy can be carried forward without communication between the conspirators. Experience has shown that a telephone is usually used by one of the parties to the conspiracy to communicate to the principal receiver of a large shipment of drugs, the time, place, and means of arrival of the shipment. Therefore, the drug trafficker is not arrested at this time and a careful review of toll records is made. This may permit law enforcement to identify an individual in another part of the country who is known to law enforcement in that area to be involved in drugs. Then with this information as to the probable identity of the supplier, law enforcement has a chance, by using other investigative techniques, to develop a case against the suppliers. Once probable identity has been established, physical surveillance then becomes extremely important, informants and undercover officers then know who they are looking for, etc.

In every case where law enforcement considers the use of a wire interception, toll records are not only one of the critical factors in establishing probable cause, but are probably the most revealing factor as to how successful a wire intercept will be. If advance notice is given to the subscriber that law enforcement is interested in his toll records, the effectiveness of wire intercepts will be greatly reduced. Advance notice to subscribers will only serve to frustrate law enforcement in its effort to immobilize the upper echelons of the criminal community and result in more concentration on the lesser figures.

My experience indicates that prosecutors in this Office are extremely cautious in subpoenaing toll records. I know of no case in which toll records were subpoenaed by an Assistant without sufficient information being presented to that Assistant so that he could properly conclude that the individual was involved in some type of criminal conduct and that the toll records were likely to advance the criminal investigation. It has also been my experience that very few subpoenas are issued for toll records in situations where criminal acts have been completed. Toll records obtained while certain criminal activity is still ongoing are extremely valuable in that they provide guidance to law enforcement as to the possible identity of co-conspirators. With this information, other investigative techniques can then be used to establish the involvement of co-conspirators. Access to these records in the course of such an ongoing criminal conspiracy often provides law enforcement with a critical opportunity to corroborate and substantiate both the contacts between the conspirators and the illegal purposes furthered by those contacts.

8. J.A. 227.

work. Defendant C & P is an associated company of the Bell System, providing telephone services for the District of Columbia. AT&T has no telephone subscribers and thus does not maintain subscriber billing records. C & P, as an operating company, does maintain such records in the ordinary course of its business.

### B. Limitations on Disclosure Under the AT&T Policy

Before 1974 there was no uniform policy within the Bell System governing the release of company billing records to law enforcement officials. In March 1974, however, AT&T adopted throughout the System a formal policy on the release of such records. This policy, which is currently in effect, has three important provisions.

First, the policy *prohibits* the release of toll-billing records in the absence of a subpoena or summons, valid on its face, issued under the authority of a statute, court, or legislative body.[9]

Second, the policy requires that subscribers whose toll-billing records have been subpoenaed in civil suits, non-criminal investigations, and non-felony criminal investigations be *immediately notified* upon receipt of the subpoena, the same day by telephone and, in addition, by letter within 24 hours.[10] *Both the oral and written notification must include the approximate date on which the company will furnish the toll-billing records.*

Third, the policy requires that subscribers whose toll records have been subpoenaed in *felony* investigations be similarly notified, *unless* the subpoena is accompanied by a written certification stating (1) that the subpoena or summons was issued pursuant to an *official investigation of a suspected felony* or an official legislative investigation, and (2) that *notification to the subscriber could impede the investigation.*

9. J.A. 40.

10. J.A. 40.

11. J.A. 40–41.

12. J.A. 106–116; 157–162.

Such a certification is effective for 90 days, and must be renewed by further certifications in writing for successive 90-day periods. When a certification period expires, the subscriber is to be notified of the subpoena if he so requests or if he has previously submitted to the company a general request for notification.[11]

The decision to adopt this policy originated solely with AT&T; no Government official requested or prompted the action.[12] AT&T placed the new policy into effect on 1 March 1974.

### C. Impact on Journalists of Toll-Record Subpoenas Prior to the New Policy

In December 1973 plaintiffs wrote AT&T demanding assurances that their toll-billing records—and those of other journalists—would not be released to government investigative agencies without prior notice to the journalists concerned.[13] Plaintiffs also demanded from AT&T information concerning any past instances of Government access to their toll-billing records.[14] Although AT&T did provide this latter information, it refused to give plaintiffs the assurances they demanded.

Finding this response inadequate, plaintiffs filed a complaint in the District Court for the District of Columbia on 27 December 1974, alleging that defendants' policy regarding the release of toll-call records violated their First and Fourth Amendment rights.[15] The complaint sought a judicial declaration that it was unlawful for defendants to release the toll-billing records of journalists to government investigative agencies without prior notification to the journalists concerned. In addition, it prayed for an injunction barring defendants from releasing plaintiffs' records without such prior notice. The United States intervened as a party defendant.

13. J.A. 17–21.

14. J.A. 20–22.

15. J.A. 7–15.

The record developed by plaintiffs in the course of a massive discovery effort reveals that from January 1971 to March 1974, before AT&T's new policy went into effect, the Government issued *approximately 75,000–100,000* toll-record subpoenas.[16] This reflects the importance of these records as a tool in the investigation of modern crime. The record further reveals, during this same period, *only five* instances in which the toll-call records of journalists were requested. This reflects the relative impact of this investigative method on journalists.

Four of these cases involved grand jury subpoenas; one involved an Internal Revenue Service summons. *In each of these five instances, the toll-call records were sought in connection with a felony investigation.* One subpoena was issued in the course of an investigation into the suspected theft of Government documents and the receipt of stolen documents, violations of 18 U.S.C. § 641;[17] three of the subpoenas were issued in furtherance of investigations into possible violations of the espionage laws of the United States, 18 U.S.C. §§ 792–798;[18] and

16. The figure of 75,000–100,000 is calculated on the basis of the 1974–75 rate of 2,000–3,000 subpoenas each month.

17. This subpoena was issued by a grand jury in connection with an investigation into the theft and receipt of stolen United States Government documents, a violation of 18 U.S.C. § 641, which provides that any person who "steals," "converts" or "sells" any "record" or "thing of value" of the United States or who knowingly "receives" the same with intent to convert it to his own use or gain, shall be imprisoned up to 10 years or fined up to $10,000, or both.

In November 1972 several hundred American Indians occupied the U. S. Bureau of Indian Affairs building. The Washington, D. C., Metropolitan Police Department, Intelligence Section, had an undercover agent inside the building among the Indians. When the Indians eventually vacated the building, they purloined and took with them Government property, including official Government documents. The undercover agent reported to his Section that the Indians had negotiated with Jack Anderson, a journalist, for the purchase of some of these stolen documents and that an Anderson employee was scheduled to receive the documents at the home of one of the Indian leaders. This information was passed on to the FBI. The Indian leader's apartment building was placed under physical surveillance. At the scheduled time, Mr. Les Whitten, an Anderson employee, arrived at the apartment and was subsequently arrested there in apparent possession of the stolen documents. Mr. Anderson's and Mr. Whitten's toll-call records were subpoenaed to obtain further evidence in the case (J.A. 260–66).

18. In the first of these espionage cases, the toll-call record subpoena was issued by a grand jury in connection with an investigation into the unauthorized disclosure of a *classified,* "eyes only" State Department cable, a possible violation of 18 U.S.C. § 793, which provides, *inter alia,* that any person in lawful possession of any document relating to national defense, knowing that such document could be used to the advantage of any foreign nation, who will-

fully transmits the document to any person not entitled to receive it, shall be imprisoned up to 10 years or fined up to $10,000, or both.

Jack Anderson wrote and published an article reporting on the indiscretions of an A.I.D. official stationed in Kenya. Anderson claimed in the article to have gleaned the information from a *classified* State Department cable. Mr. Anderson was not authorized to receive classified information. This circumstance suggested that a Government employee with access to sensitive diplomatic cable traffic was conveying classified information to unauthorized persons. The FBI commenced an investigation to determine the identity of the Government employee. During the investigation the Government subpoenaed Mr. Anderson's toll records in an effort to determine whether any State Department employees who had access to the cable had contacted Mr. Anderson prior to the article's appearance. (J.A. 219–26).

The second and third espionage cases related to the investigation of Daniel Ellsberg for the unauthorized disclosure of *classified* Government documents known as the "Pentagon Papers." The FBI received independent information indicating that "Knight Newspapers" and employees of the St. Louis Post Dispatch may have obtained information from those classified documents and may have been in telephonic contact with the person who made the unauthorized disclosure. On the basis of this information, the FBI obtained grand jury subpoenas for the toll-call records of "Knight Newspapers" and two employees of the St. Louis Post Dispatch. In his deposition, Richard Dudman, one of the Dispatch's employees, bears out the accuracy of the Bureau's lead:

There are cases, too, where an informant may have reason to fear criminal prosecution because of what he tells us. This was the situation when we were trying to find someone who would give us copies of the Pentagon Papers, which were classified top secret. Our eventual source for some of those documents telephoned us anonymously from pay stations, and we never did learn his identity. (J.A. 174).

one summons was issued in an investigation concerning possible unauthorized disclosure of income tax return information by an employee of the Internal Revenue Service in violation of 26 U.S.C. § 7213.[19]

### D. Impact on Journalists of Toll-Record Subpoenas After the New Policy

Since AT&T adopted its new toll-record policy in March 1974—over four years ago—approximately 100,000–150,000 toll-record subpoenas have been issued by the Government in criminal investigations. The record reflects no instance during this period in which the toll records of a journalist have been sought. Moreover, there is no clear indication in the record that, under AT&T's new policy, a journalist would not receive timely notice of any future subpoena directed at his records.

The dissent has attempted to expand the issues presented in this case by suggesting that plaintiffs' toll records are presently subject to subpoena without prior notification in a broad range of civil and administrative proceedings. This is pure speculation, and the propriety of any such practice, if it does exist, is simply not raised in the case at bar. The record indicates only that certain plaintiffs have had their toll records subpoenaed in felony investigations. Indeed, we do not find any evidence in the record that it is Government practice to subpoena toll-call records in non-law enforcement matters. Not only does the record fail to reveal any instance—before or after AT&T's new policy went into effect—in which a journalist's toll records have been subpoenaed in connection with something other than a felony investigation, but it even fails to reveal an instance in which any person's toll-call records have been subpoenaed in connection with a non-law enforcement proceeding. The record evidence strongly suggests that virtually all toll-call record subpoenas are issued in the course of felony investigations. While the dissent grandly enumerates 47 agencies that have subpoena power, the record shows that only four agencies have actually subpoenaed toll records—the Department of Justice, the Internal Revenue Service, the Securities Exchange Commission, and the Department of the Treasury—and these subpoenas appear to have been issued in furtherance of law enforcement investigations.[20]

The Ellsberg investigation resulted in an indictment; however, the charges were dismissed during the trial. (J.A. 145).

**19.** This summons was issued by the Internal Revenue Service in an investigation into possible violations of 26 U.S.C. § 7213 and 18 U.S.C. § 1905 by an IRS employee. The former statute makes it a felony for any U. S. employee to disclose income tax return information to any person not authorized to receive it; the latter statute makes it a felony for any U. S. employee to disclose to an unauthorized person financial and other confidential information contained in reports filed with the Government.

In 1973, information came to the attention of the IRS indicating that an IRS employee was divulging to a newspaper reporter sensitive information regarding the criminal tax fraud investigation of a prominent taxpayer then being conducted by the Service's Intelligence Division. Mr. David Rosenbaum, a reporter for The New York Times, had contacted the taxpayer and told him that he knew that a "full scale" fraud investigation was underway. The taxpayer's attorney later contacted Mr. Rosenbaum, and Mr. Rosenbaum recited particulars concerning the investigation and cited specific issues raised during the audit. The taxpayer complained to the IRS that his tax affairs were being leaked to the newspaperman. Other evidence surfaced indicating that the investigation was being compromised. The IRS issued a summons for the reporter's toll records in order to identify the culpable IRS employee. (J.A. 241–248).

**20.** J.A. 151–53. Moreover, even if the Government does subpoena toll records in civil and administrative matters, there is no evidence that the notice procedures provided under AT&T's new policy do not give a customer sufficient opportunity to challenge government inspection of the records. By its terms, the policy requires immediate telephonic notice upon receipt of a subpoena and written notice within 24 hours of receipt. The notification must include the approximate date on which the company "will" comply with the subpoena. This strongly suggests that notice will usually be prior to or contemporaneous with company release of records, or, if not, at least within sufficient time to give a customer the opportunity effectively to challenge government inspection of the records. This was clearly the intent of AT&T's policy, and there is no evidence that the policy does not work this way in practice with respect to non-law enforcement cases.

Thus, the central issue in this case is *not* whether plaintiffs are entitled to prior notice of subpoenas issued in civil or administrative proceedings, but rather whether plaintiffs are entitled to prior notice of subpoenas issued in the course of criminal investigations.

On 17 August 1976 the District Court granted defendants' motion for summary judgment, rejecting plaintiffs' First as well as their Fourth Amendment claims. This appeal followed.

## II. STATE ACTION

Before proceeding to the merits of plaintiffs' claims, we confront, in the case of AT&T, the threshold question of "state action." Plaintiffs have maintained, and AT&T has vigorously denied,[21] that the latter's cooperation with the Government in unannounced releases of plaintiffs' toll-billing records has so enmeshed AT&T in official action as to assimilate its own conduct to that of the Government. The problem ought not detain us, however, because resolution of the governmental-action issue is by no means essential to the outcome of this appeal or to progress of the case on remand. We see no occasion, then, to adjudicate the knotty constitutional question this aspect of the litigation tenders.

In several material respects, governmental action is unquestionably involved in the practice plaintiffs challenge. The Government, through its agencies, itself seeks the toll records; the Government itself shuns notice and judicial pre-clearance thereof; and the Government's potential utilization of the acquired records—not AT&T's—is

the consequence feared, by reporter and confidential source alike. Governmental action thus pervades any clandestine turnover to a degree more than ample to call for constitutional scrutiny.

It is evident, too, that AT&T's role in this controversial scenario, however collaborative, is but complementary and secondary to that of the Government. As the Government is a defendant in the case, any relief that plaintiffs conceivably might secure can, and in our view should, be exacted from it. Were the propriety of advance notice of the demand for a particular reporter's toll records ever established, certainly the Government could give it. Just as clearly, were *ex parte* judicial approval to become a prerequisite in any circumstances to release of the records, the Government necessarily would be the initiating party. And surely there is no impediment to enforcement against the Government of any narrower injunctive remedy to which plaintiffs may become entitled.[22]

Moreover, in the event that injunctive relief eventuates in this litigation, either as an original matter or to effectuate a declaratory judgment,[23] an order directed against the Government will bind AT&T as well if only it is apprised of it. Federal Civil Rule 65(d) provides that

[e]very order granting an injunction . . . is binding . . . upon the parties to the action, their officers, agents, servants, employees, and attorneys and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.[24]

---

**21.** The Government has taken no position on this issue.

**22.** *See* 28 U.S.C. § 1331(a) (1976).

**23.** *See Powell v. McCormack*, 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491, 504 (1969) ("declaratory judgment can . . . be used as a predicate to further relief, including an injunction"); 10 C. Wright & A. Miller, Federal Practice & Procedure, § 2751 at 866–867 (1973) (declaratory judgment may be "supplemented either by damages or by equitable relief even though coercive relief might have

been available at the time of the declaratory action") (footnotes omitted).

**24.** Emphasis supplied. *See generally Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436–437, 54 S.Ct. 475, 477, 78 L.Ed. 894, 898 (1934); *Environmental Defense Fund v. EPA*, 158 U.S.App.D.C. 1, 5, 485 F.2d 780, 784, aff'd, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973); *Schwartz v. Galveston Independent School Dist.*, 309 F.Supp. 1034, 1038 (S.D.Tex. 1970); *South Cent. Bell Tel. Co. v. Constant, Inc.*, 304 F.Supp. 732 (E.D.La.1969), aff'd, 437 F.2d 1207 (5th Cir. 1971); *SEC v. Meyers*, 285

It is perfectly obvious that the Government cannot gain access to any toll-billing records save through AT&T. By silently delivering those records at the Government's behest, AT&T is plainly in "active concert or participation" with the Government in the activity precipitating plaintiffs' grievance.[25] And if AT&T thus aided the breach of a decree enjoining the Government's unannounced and unapproved acquisition of particular toll-billing records, it would subject itself to appropriate sanctions.[26] It matters not that absent a cause of action against the Government itself AT&T might entirely avoid plaintiffs' suit [27]—a matter we do not address. AT&T's amenability to the injunction would arise in consequence of a command properly leveled at the Government, and to assure that it will be truly meaningful.

■ Because, then, plaintiffs can secure directly from the Government any injunctive relief obtainable from AT&T and since obedience to any injunction running against the Government can be exacted from AT&T on a nonconstitutional basis,[28] we perceive

no compulsion to ascertain whether AT&T's conduct is constitutionally the equivalent of governmental action for purposes of this case. We adhere, then, to the settled principle that courts are not to indulge in constitutional rulings absent "strict adjudicative necessity," [29] which we are unable to discern here.[30]

## III. PLAINTIFFS' FOURTH AMENDMENT CLAIM

Plaintiffs contend that AT&T's policy in certain felony cases of releasing toll-call records to investigators without prior notice to the subscriber violates their Fourth Amendment rights.[31] This claim clearly lacks any merit.

■ The Fourth Amendment strikes a balance between the individual citizen's interest in conducting certain affairs in private and the general public's interest in subjecting possible criminal activity to intensive investigation. It strikes this balance by securing for each individual a private enclave—a "zone" bounded by the in-

---

F.Supp. 743, 750 (D.Md.1968); 7 J. Moore, Federal Practice Digest ¶ 65.13 (2d ed. 1975).

**25.** See authorities cited *supra* note 24.

**26.** See authorities cited *supra* note 24, particularly *South Cent. Bell Tel. Co. v. Constant.* There, prior to litigation, one firm obtained a consent injunction prohibiting another firm from employing the former's name in advertisements or statements to customers. The issue was whether a telephone company with knowledge of the injunction was obligated to take steps to prevent transmission, by use of its equipment, of statements breaching the terms of the order. The District Court held that it was, stating:

> As soon as South Central Bell was apprised of the fact that its subscriber, Constant, was by use of South Central Bell's equipment, violating the injunction imposed by the Court, it had a duty not to act in any way in concert with Constant to effectuate or perpetuate the violation. South Central Bell had the means to prevent its equipment from being used to violate the injunction, and its failure to do so would, at the very least, have amounted to a passive participation in the violation.

304 F.Supp. at 736. On appeal, the Fifth Circuit affirmed without opinion. *See* note 24 *supra.*

**27.** See note 26 *supra.*

**28.** To repeat, plaintiffs' cause of action against the Government, of course, is constitutional in nature, but the restraint upon AT&T from Rule 65(d) would merely be incidental to effectuation of appellants' substantive claim. *See* text *supra* following note 27.

**29.** *Langston v. Johnson,* 156 U.S.App.D.C. 5, 7, 478 F.2d 915, 917 (1973); see, e. g., *Ashwander v. TVA,* 297 U.S. 288, 346–347, 56 S.Ct. 466, 483, 80 L.Ed. 688, 711 (1936) (Brandeis, J., concurring).

**30.** The District Court made a conclusory finding that there was "state action" in the adoption of AT&T's policy. We have no occasion to determine whether or not this conclusion was correct.

**31.** This Fourth Amendment claim was pressed in the District Court, but plaintiffs seem to have largely abandoned it on this appeal. However, this case involves the interplay of First and Fourth Amendment protections and, therefore, a thorough discussion of Fourth Amendment aspects of the case is desirable in order to lay the groundwork for analysis of plaintiffs' First Amendment claims in the ensuing section.

dividual's own reasonable expectations of privacy.[32] So long as the individual acts within this "zone of privacy", his activities are shielded from unreasonable Government investigation;[33] any attempt by the Government to search for or seize evidence from *within* this zone must be based on "probable cause" and usually must be preceded by a judicial determination that "probable cause" exists.[34] However, the protections afforded the privacy interests of the individual by the Fourth Amendment are necessarily limited by the public's interest in effective law enforcement; the Fourth Amendment does not insulate *all* personal activity from official scrutiny. Just as it creates "zones of privacy", it also demarcates appropriate areas for investigation, in the sense that it allows the Government relatively free access to evidence located *outside* the individual's "zone of privacy."[35]

■ Every individual must from time to time reach beyond his private enclave, draw other people into his activities, and expose his activities to public view.[36] In any normal life, even in pursuing his most private purposes, the individual must occasionally transact business with other people. When he does so, he leaves behind, as evidence of his activity, the records and recollections of others. He cannot expect that these activities are his private affair. *To the extent an individual knowingly exposes his activities to third parties, he surrenders Fourth Amendment protections, and, if the Government is subsequently called upon to investigate his activities for possible violations of the law, it is free to seek out these third parties, to inspect their records, and to probe their recollections for evidence.*[37]

■ In a sense, then, the Fourth Amendment carries with it both a promise and a warning. It *promises* each individual that there is a zone in which he may conduct his affairs in private, shielded from unwarranted investigative scrutiny, and yet it *warns* each individual that, once he projects his activities beyond this private enclave, the Government is free to scrutinize them for law enforcement purpose.

■ These principles, consistently adhered to by the Supreme Court, are the basis for the well-settled rule that a person has no expectation of privacy in the busi-

---

**32.** *See, e. g., Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) ("[W]herever an individual may harbor a reasonable 'expectation of privacy' . . . , he is entitled to be free from unreasonable governmental intrusion"); *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected"); *Warden v. Hayden*, 387 U.S. 294, 301–304, 87 S.Ct. 1642, 1647, 18 L.Ed.2d 782 (1967) ("[The Fourth Amendment] was intended to protect against invasions of 'the sanctity of a man's home and the privacies of life' from searches under indiscriminate, general authority. . . [T]he principal object of the Fourth Amendment is the protection of privacy rather than property. . . .").

**33.** *See, e. g., Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Government eavesdropping violated privacy upon which petitioner justifiably relied while using a public telephone booth).

**34.** *See, e. g., United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (Fourth Amendment requires prior judicial issuance of warrant for domestic security electronic surveillance).

**35.** *See, e. g., United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (compelled furnishing of voice exemplars did not violate Fourth Amendment since no person has reasonable expectation of privacy in physical characteristics of his own voice); *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (use of informants' and undercover agents' testimony does not violate Fourth Amendment protections since "inescapably, one . . . must realize and risk that his companions may be reporting to the police").

**36.** "No man is an island, entire of itself; every man is a piece of the Continent, a part of the main."—John Donne (*Devotions XVII*).

**37.** *See, e. g., United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *Lewis v. United States*, 385 U.S. 206 (1966); *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

ness records of a third party and, therefore, has no interest protected by the Fourth Amendment in such records.[38] Accordingly, it has been consistently held by the Supreme Court[39] and the Courts of Appeals[40] that a person has no Fourth Amendment basis for challenging subpoenas directed at the business records of a third party, and, hence, has no right to notice of such subpoenas.

In the most recent Supreme Court case of *United States v. Miller*,[41] the Treasury De-partment presented to banks at which respondent maintained accounts grand jury subpoenas requiring the production of "all records of [respondent's] accounts." The banks promptly complied, though no notice of the subpoenas had been given respondent. Upon being charged with conspiracy to defraud the United States of tax revenues, respondent made a pre-trial motion to suppress the bank documents, urging that the subpoenas were defective. The District Court denied respondent's motion but was reversed by the Court of Appeals which

---

**38.** *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

**39.** *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (bank depositor has no Fourth Amendment interest in bank records relating to his transactions); *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971) (taxpayer has no standing to challenge IRS summons directed at employer's records relating to taxpayer); *id.* at 537, 91 S.Ct. at 545 (Douglas, J., concurring) ("[I]t is difficult to see how the summoning of a third party, and the records of a third party, can violate the rights of a taxpayer, even if a criminal prosecution is contemplated or in progress. There is no right to be free from incrimination by the records or testimony of others."); *First National Bank v. United States*, 267 U.S. 576, 45 S.Ct. 231, 69 L.Ed. 796 (1925), *aff'g without opinion* 295 F. 142 (S.D.Ala.1924) (taxpayer has no Fourth Amendment basis for challenging internal revenue summons directed at third-party bank records relating to taxpayer). *Cf. California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (taxpayer has no Fourth or Fifth Amendment right to contest a third party summons directed at taxpayer's accountant, even when it required production of taxpayer's own records); *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911) (corporation president has no Fourth Amendment interest in corporation's business records).

**40.** *United States v. House*, 524 F.2d 1035, 1044 (3rd Cir. 1975) (use of evidence obtained through seizure of bank records without summons did not violate bank depositors' Fourth or Fifth Amendment rights: "Certainly it would be difficult . . . to imagine on what basis we could hold that the taxpayers, when they made their bank deposits and invoked the bank's assistance in collecting third party negotiable instruments, entered a constitutionally protected zone of privacy."); *United States v. Continental Bank & Trust Co.*, 503 F.2d 45 (10th Cir. 1974) (taxpayers not entitled to no-tice of IRS summons directed at bank records relating to them, since they had no interest in such records that could be vindicated through intervention); *Scarafiotti v. Shea*, 456 F.2d 1052 (10th Cir. 1972) (mandamus unavailable to compel revenue agent to provide notice of investigative activities involving third parties); *Harris v. United States*, 413 F.2d 316 (9th Cir. 1969) (bank depositor had no constitutional basis for challenging summons directed at bank records relating to him); *Galbraith v. United States*, 387 F.2d 617, 618 (10th Cir.1968) (bank customer had no constitutional standing to challenge SEC administrative summons of bank records relating to him: "The guarantees of the Fourth and Fifth Amendment are essentially personal privileges that cannot be projected to the seizure of papers and effects of another or to suppress incriminating aspects of such records"); *Application of Cole*, 342 F.2d 5, 7–8 (2d Cir.), *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965) (IRS was not obligated to notify taxpayers of an administrative summons which called for the production of bank records relating to them: "[A]ll of the records, documents and papers which were the subject matter of the summons were the property of the Bank on whom the summons was served. None of the material sought belonged to the taxpayers or involved the work product of their attorneys. They have no interest in any of them in the sense that they had a right to any of them. *Under these circumstances the Commissioner had no duty to give advance notice to the taxpayers or their counsel of his intention to examine a third party and the third party's own records and papers.*") (emphasis supplied); *McMann v. SEC*, 87 F.2d 377 (2d Cir.) (L. Hand, J.), *cert. denied*, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937) (customer held not entitled to prevent brokers from complying with SEC subpoenas for copy of customer's account on grounds that subpoenas infringed constitutional rights of customer).

**41.** 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

held that the Government had violated respondents' Fourth Amendment rights. The Supreme Court reversed the Court of Appeals, holding that the District Court had properly denied respondent's motion to suppress since respondent possessed no Fourth Amendment interest in the bank documents.[42] The Court further concluded that, *since respondent had no interest that could be vindicated by a challenge to the subpoena, respondent had no right to notice of the subpoenas.*[43]

The Court's decision highlights the principle that "what a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection":[44]

Respondent urges that he has a Fourth Amendment interest in the records kept by the banks because they are merely copies of personal records that were made available to the banks for a limited purpose and in which he has a reasonable expectation of privacy . . . . But in *Katz* the Court . . . stressed that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."

Even if we direct our attention to the original checks and deposit slips, rather than to the microfilm copies actually viewed and obtained by means of the subpoena, we perceive no legitimate "expectation of privacy" in their contents.

. . .

*The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the government. This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to government authorities, even if the information is revealed on the assumption that it will be used only for a*

*limited purpose and the confidence placed in the third party will not be betrayed.*

. . . . .

Since no Fourth Amendment interests of the depositor are implicated here, this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the time the subpoena is issued.[45]

The general rule that a person has no Fourth Amendment basis for challenging subpoenas directed at the business records of third parties has been directly applied to toll-billing records maintained by telephone companies.[46] A telephone subscriber is fully aware when he places a long distance call that the telephone company will make a record of the call, that the record is the company's property, and that the Government has ready access to the record for law enforcement purposes. On this basis the courts have uniformly held that subscribers have no Fourth Amendment basis for challenging Government inspection of their toll records, since subscribers, like bank depositors, have taken the risk in revealing their affairs to third parties that the information will be conveyed by that person to law enforcement officials, either voluntarily or in response to compulsory process.

Accordingly, in upholding a felony conviction based in part on evidence derived from toll-call records, the Ninth Circuit in *United States v. Fithian*[47] stated:

The introduction into evidence of telephone company records of calls from appellant's residence did not violate his Fourth Amendment rights. The expectation of privacy attaching to telephone conversations relates to the content of

---

42. *Id.* at 442–45, 96 S.Ct. 1619.

43. *Id.* at 443 n.5; 445, 96 S.Ct. 1619.

44. *Katz v. United States,* 389 U.S. at 351, 88 S.Ct. at 511.

45. *United States v. Miller,* 425 U.S. at 442–44, 96 S.Ct. at 1623–24 (citations and footnotes omitted) (emphasis added).

46. *See* cases cited at note 49, *infra.*

47. 452 F.2d 505 (9th Cir. 1971).

the conversations themselves and not to the fact that a conversation took place. No one justifiably could expect that the fact that a particular call was placed will remain his private affair when business records necessarily must contain this information.[48]

The courts have invariably taken this position.[49] These precedents soundly dispose of plaintiffs' Fourth Amendment claim.

## IV. PLAINTIFFS' FIRST AMENDMENT CLAIMS [50]

Plaintiffs contend that, as journalists, they are entitled under the First Amendment to prior notice of toll-call-record subpoenas issued in the course of felony investigations, *even if citizens in general have no such right.*[51] Plaintiffs base this claim on two separate and distinct theories.

The first theory relates to the impact of *good faith* toll-call-record subpoenas on plaintiffs' First Amendment rights and the need for judicial *balancing* before such records are released to Government investigators. Plaintiffs develop this theory as follows:

(1) The First Amendment guarantees journalists the freedom to gather information from clandestine sources.

(2) Because toll-call records may disclose the identity of a clandestine source, this

---

**48.** *Id.* at 506.

**49.** *United States v. Lustig*, 555 F.2d 737, 747 n.10 (9th Cir. 1977), *cert. denied*, 434 U.S. 1043, 98 S.Ct. 889, 54 L.Ed.2d 796 (1978) ("It is well established that the 'expectation of privacy' only extends to the content of telephone conversations, not to records that conversations took place."); *United States v. Baxter*, 492 F.2d 150, 167 (9th Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974) ("[T]he test of whether a seizure prior to adherence to judicial processes violates the Fourth Amendment is whether there is an invasion of the defendant's 'constitutionally justifiable expectations of privacy'. . . . Telephone subscribers are fully aware that records will be made of their toll calls. This Court has held that the expectation of privacy protected by the Fourth Amendment attaches to the content of a telephone conversation not to the fact that a conversation took place. The defendants have failed to show a violation of their Fourth Amendment rights."); *United States v. Fithian*, 452 F.2d 505 (9th Cir. 1971); *Nolan v. United States*, 423 F.2d 1031 (10th Cir. 1969), *cert. denied*, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970) (use of telephone company toll records at trial and before grand jury to show interstate calls between defendant's telephone and that of an alleged co-conspirator did not constitute a violation of the Fourth Amendment); *United States v. Covello*, 410 F.2d 536, 542 (2d Cir.), *cert. denied*, 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969) ("[T]he keeping of toll records is a necessary part of the ordinary course of the telephone company's business and is necessary in order that the company may substantiate its charges to its customers. Toll records are kept for all telephone subscribers and are not kept just for subscribers being investigated by officers of the law, or ones suspected of criminal proclivities. The subscriber is fully aware that such records will be made . . . and the records of the telephone company so kept in the ordinary course of the company's business are entitled to the same evidentiary treatment as the records of other businesses."); *United States v. Gallo*, 123 F.2d 229 (2nd Cir. 1941) (L. Hand, Swan, A. Hand, JJ.) ("When a person takes up a telephone he knows that the company will make, or may make, some kind of a record of the event, and he must be deemed to consent to whatever record the business convenience of the company requires."); *United States v. Kohne*, 347 F.Supp. 1178 (W.D.Pa.1972). See also the following cases upholding admissibility of toll-call-billing records in criminal trials: *Wood v. United States*, 84 F.2d 749 (5th Cir.), *cert. denied*, 299 U.S. 589, 57 S.Ct. 116, 81 L.Ed. 434 (1936); *Brink v. United States*, 60 F.2d 231 (6th Cir.), *cert. denied*, 287 U.S. 667, 53 S.Ct. 291, 77 L.Ed. 575 (1932); *United States v. Radov*, 44 F.2d 155 (3rd Cir. 1930); *Blakeslee v. United States*, 32 F.2d 15 (1st Cir. 1929).

It has also been held that a telephone subscriber has no Fourth Amendment interest in local call records obtained by means of a pen register installed *without his knowledge*. *Hodge v. Mountain States Tel. & Tel. Co.*, 555 F.2d 254 (9th Cir. 1977); *United States v. Clegg*, 509 F.2d 605 (5th Cir. 1975).

**50.** Judge Robinson concurs in all of Part IV, with the exception of my analysis of the relationship between the First, Fourth, and Fifth Amendments (subsection IV.A.1.b.) which he finds unnecessary to our decision. While there may be slight differences in emphasis on the First Amendment issues between my opinion for the Court and Judge Robinson's concurring opinion, we believe our views are basically consistent. I am in fundamental agreement with Judge Robinson's discussion of the remedial issue (Part II of the concurring opinion) which amplifies my own (Part IV.B of this opinion).

**51.** Brief for Appellants at 21–28.

freedom is abridged *whenever* the Government gains access to a journalist's toll records, even where access is gained in the course of a *good faith* felony investigation.

(3) In order to determine whether this infringement on First Amendment rights is justified, the Government's investigation "interests" must be judicially *balanced in each case* against the journalist's First Amendment "interests".

(4) A journalist, therefore, must receive prior notice of a toll-record subpoena so that he may challenge the subpoena and thus prompt the requisite judicial *balancing* before the records are released.

The second theory relates to the impact of *bad faith* toll-call-record subpoenas on plaintiffs' First Amendment rights and the need for judicial *screening* before such records are released to Government investigators. Plaintiffs develop this theory as follows:

(1) Government investigators have in the past subpoenaed journalists' toll-call records, not in furtherance of good faith felony investigations, but as part of politically-motivated efforts to interfere with their news-gathering activities.

(2) Such *bad faith* subpoenas abridge journalists' First Amendment right to gather information from clandestine sources.

(3) In order to protect journalists from such infringements in the future, it is necessary for the *judiciary to superintend investigations* of journalists in order to *screen out* bad faith subpoenas.

(4) A journalist, therefore, must receive prior notice of a toll-call-record subpoena so that he may challenge the subpoena and thus prompt the requisite judicial *screening* before the records are released.

Common to both theories is the proposition that journalists have a right under the First Amendment to gather information from clandestine sources. *However, there is a clear distinction between the two theories, regarding both the type of Government action which supposedly abridges this right and the kind of judicial action necessary to remedy the abridgment.* According to the first theory, plaintiffs' rights are abridged by *any and all* toll-call-record subpoenas, and the appropriate remedy is a judicial *balancing* of legitimate interests of the Government against those of the journalist. According to the second theory, plaintiffs' rights are abridged by *bad faith* toll-call-record subpoenas and the appropriate remedy is a judicial *screening* of all subpoenas in order to winnow those issued for illegitimate reasons.[52] Each theory involves separate and distinct issues.

Unfortunately, plaintiffs have quite confounded the two, repeatedly carrying over considerations relevant to one in an effort to bolster the other. This totally ignores the principle the Supreme Court specifically noted in *Branzburg v. Hayes*[53] that First Amendment challenges to *good faith* investigative action and First Amendment challenges to *bad faith* investigative action "pose wholly different issues for resolution."[54] This opinion follows the Supreme Court, analyzing each of plaintiffs' theories separately.

Before proceeding, however, it is important to note that the dissent apparently does not grasp the significance of this bifurcated analysis. It suggests that all it is required to do here is to declare that plaintiffs are entitled to prior notice of toll-record subpoenas. Apparently, it believes that it can make this pronouncement *in vacuo*, without addressing whether or not there is actually a need for case-by-case judicial balancing or screening. In the dissent's view, these latter issues are not immediately rele-

---

**52.** By use of the term "bad faith" we mean to include not only investigations actuated by bad intentions but also investigations that probe at will *without relation* to law enforcement needs and that expose for the sake of exposure. *See Branzburg v. Hayes*, 408 U.S. 665, 700, 92 S.Ct. 2646, 23 L.Ed.2d 646 (1972).

**53.** 408 U.S. 665, 92 S.Ct. 2646, 23 L.Ed.2d 646 (1972).

**54.** *Id.* at 707, 92 S.Ct. at 267.

vant and can be left to future resolution. Yet, this is placing the cart before the horse. *The existence of a right to prior notice is predicated precisely on the supposed need for case-by-case judicial balancing or screening.* Prior notice is merely a procedural device, the only function of which is to trigger judicial supervision of subpoenas—supervision that necessarily involves either the balancing or screening functions of the court.

Accordingly, if it can be demonstrated that there is *no need* for case-by-case balancing and *no warrant* for case-by-case screening, then the rationale for providing prior notice evanesces. We conclude first, that there is no need for case-by-case balancing in criminal investigations and, second, that no justification for case-by-case screening has been made thus far in this case.

### A. Plaintiffs' "Balancing" Theory

In treating plaintiffs' first theory, two issues must be addressed: first, whether Government access to toll-call records in the course of a *good faith* felony investigation actually *"abridges"* a *"freedom"* guaranteed plaintiffs under the First Amendment; and second, if so, whether prior *judicial balancing* on a case-by-case basis is an appropriate judicial response.

### 1. No Abridgment of Any Special Journalistic Right or Privilege by Good Faith Subpoenas

#### a. Relationship of First Amendment to Good Faith Investigation

Plaintiffs contend that the First Amendment guarantees "journalists" the right to gather information from secret sources, and that this right implies a further right to maintain the secrecy of those sources.[55]

They assert that these rights are abridged *whenever* the Government gains access to toll-call records, or presumably to any other third-party information which might disclose the identity of their secret sources.[56] Thus, plaintiffs, who have neither a property nor a privacy interest in the business records of the defendant telephone companies,[57] claim nevertheless to have a "First Amendment interest" in these records. This "interest", according to plaintiffs, entitles them to bar Government access to these records even during *good faith* felony investigations.

The enormity of this claim can best be comprehended by considering the following fact situation which, though hypothetical, is patterned after the five actual instances of toll-call-record subpoenas presented in this case.

Suppose that an employee in the Internal Revenue Service's regional office in Atlanta, Georgia, decides that he is going to make public embarrassing information from the income tax return of a highly prominent citizen. He knows that it is a felony for an IRS employee to disclose tax return information to an unauthorized person,[58] and that it is also a felony for any person to whom such information has been disclosed thereafter to publish it.[59] Therefore, the employee naturally desires to avoid detection and plans to act cautiously. He places a long distance telephone call to a journalist in Washington, D. C., informing him of his designs, and the journalist says he will consider the matter. Later, the journalist calls the employee and sets up a meeting in Washington. On the agreed date, the employee takes a plane to Washington, and registers in a local hotel. Later, he takes a taxicab from the hotel to a rendezvous at the journalist's own home. He is seen by

---

**55.** Brief for Appellants at 14: "The Supreme Court in *Branzburg* explicitly recognized that reporters have a First Amendment interest, personal to themselves, in maintaining the confidentiality of their news sources."

**56.** Brief for Appellants at 11: "The Court [in *Branzburg*] recognized that valid First Amendment interests are involved *whenever* the confi-

dentiality of a journalist's sources are threatened. . . ." (emphasis added).

**57.** See Part III of this opinion.

**58.** *See* 26 U.S.C.A. § 7213(a)(1) (West Supp. 1977).

**59.** *See id.* § 7213(a)(3) (West Supp. 1977).

one of the journalist's neighbors as he enters the journalist's home. During his meeting with the journalist, the employee asks for and receives the journalist's assurances that he will not disclose the employee's identity even under compulsion. On this basis, the employee delivers the information to the journalist who subsequently publishes it.

When the information appears in the journalist's column, it is obvious to Government law enforcement officials that at least one and possibly two felonies have been committed, and appropriate officers set about investigating the suspected crimes. From the nature of the published information itself, the investigators ascertain that the unauthorized disclosure was made from the Atlanta office. The investigatory problem becomes linking an employee at that office with the Washington journalist.

There are two ways in which this can be done. The most direct way is to have the grand jury subpoena the journalist and compel him to disclose his source. The Supreme Court in *Branzburg v. Hayes*[60] expressly held that this may be done—that the journalist may not refuse to disclose his source. According to the Court, the journalist may be *required to testify in any and all good faith criminal investigations* —there is no case-by-case consideration given to a claim of privilege. *Good faith investigation interests always override a journalist's interest in protecting his source.*[61]

There is also a more indirect way for the investigators to proceed. They can seek out third-party information connecting the journalist with an employee in the Atlanta office. Here, *there are at least five sets of third-party business records* which, to varying degrees, provide evidence of such a link: (1) the journalist's toll-call records, (2) the toll-call records of employees in the Atlanta office, (3) the airline records for Atlanta to Washington flights, (4) the Washington hotel records, and (5) the taxicab company's records. There are also at least two witnesses whose personal recollections may provide evidence of such a link: (1) the taxicab driver, and (2) the journalist's neighbor.

Plaintiffs' position is that the journalist in this hypothetical situation has "First Amendment interests" in these five sets of business records and the testimony of these two witnesses, and that his "interests" may outweigh the Government's need for this evidence. Thus, according to plaintiffs the Government would be required to notify the journalist before it could seek access to any of these records or witnesses, in order to give the journalist the opportunity to vindicate his supposed First Amendment right to maintain the secrecy of his sources. In short, plaintiffs claim that journalists have the unprecedented privilege of suppressing the records and testimony of third parties to whom they and their sources have carelessly revealed incriminating information.

In our view, plaintiffs' position is based on erroneous propositions. First, the so-called right of journalists to gather information from secret sources does not include a right to maintain the secrecy of sources in the face of good faith felony investigations. Second, Government access to third-party evidence in the course of a good faith felony investigation in no sense "abridges" plaintiffs information-gathering activities.

*Branzburg v. Hayes* is dispositive on the first point. In *Branzburg* journalists had established confidential relationships with certain sources. Through grand jury subpoenas *ad testificandum*, the Government sought to compel the journalists to betray these confidences and to disclose the identity of their sources. The journalists moved to quash the subpoenas, contending that the First Amendment gave rise to a testimonial privilege, that is, *a right to protect the secrecy of their sources.* The journalists contended, just as plaintiffs here contend, that if journalists were compelled to identi-

**60.** 408 U.S. 665, 92 S.Ct. 2646, 23 L.Ed.2d 646 (1972).

**61.** 408 U.S. at 690, 92 S.Ct. at 2661.

fy their sources, informants would refuse to furnish information in the future, and that this would interfere with the free flow of information protected by the First Amendment.

The Court expressly rejected this claim, holding that journalists had no special First Amendment right to maintain the secrecy of their sources in the face of a *good faith* felony investigation.[62] The Court found that the possibility that a source might refuse or be reluctant to furnish information to a journalist out of fear that his identity might be revealed was at best a "burden" on the First Amendment right to gather news.[63] The Court further stated that "[i]t is clear that the First Amendment does not invalidate every incidental burdening of the press . . .," [64] and that the "burden" of disclosing the identity of a source was not constitutionally suspect and therefore did not require a privileged position for newsmen.[65]

*Branzburg* involved good faith subpoenas *ad testificandum* directed at the journalists themselves. It is logically inescapable that if, as held, journalists have no right to resist such subpoenas, then they certainly have no right to resist *good faith* subpoenas *duces tecum* directed at a third-party's business records. Not only is the logic inescapable, but, in fact, the Court in *Branzburg* did specifically uphold the propriety of identifying sources through such independent means. The Court stated:

. . . [I]f the authorities independently identify the informant, neither his

own reluctance to testify nor the objection of the newsman would shield him . . ., whatever the impact on the flow of news or on his future usefulness as a secret informant.[66]

Thus, both logic and the Court's plain statement clearly refute plaintiffs' claim that "journalists" have a special right to resist good faith subpoenas directed at third-party records.

 There is another reason that plaintiffs' reliance on *Branzburg v. Hayes,* for the principle that journalists have a right to protect the secrecy of their sources from identification by third parties, is so ironic. The journalists in *Branzburg* did not assert an absolute testimonial privilege, but asserted, *inter alia,* that the Government should be *required* to seek out *third party sources of evidence before* being permitted to compel the journalists themselves to identify their sources. In other words, the journalists in *Branzburg* sought protection only from being themselves compelled to disclose their sources; they did not claim any right to prevent third parties from identifying their sources; indeed, they insisted that the Government be forced to seek out third parties from whom they could obtain the necessary evidence. It is curious, then, that plaintiffs here rely on *Branzburg* for the proposition that the First Amendment entitles them to reach out and suppress the testimony of third parties whom they have injudiciously made witting of their secrets.[67]

---

**62.** *Id.*

**63.** *Id.* at 682, 92 S.Ct. 2646, 2657.

**64.** *Id.*

**65.** *Id.* at 682, 698–99, 92 S.Ct. 2646.

**66.** *Id.* at 695, 92 S.Ct. at 2664.

**67.** Plaintiffs and the dissent characterize the instant case as involving the integrity of "confidential relationships" between journalists and their sources and contend that the journalists' right to notice of third-party subpoenas derives from a right to preserve the "confidentiality" of their sources. For example, plaintiffs assert:

It is the confidentiality of their news sources that plaintiffs are entitled to protect. Plain-

tiffs have been injured by the invasion of confidentiality that resulted from previous disclosures of toll records. (Reply Brief of Appellants at 16.)

In the same vein, the dissent states:

. . . [T]here [can be no] doubt that newsgathering encompasses contacts with confidential sources of information . . . . . And the circumstances of this case, more strikingly than testimony before a grand jury, betray the potential for substantial infringement of this confidentiality . . . . (Dissent at —— of 192 U.S.App.D.C., at 1085 of 593 F.2d.)

These characterizations are disingenuous and seriously misleading. In point of fact, *this*

It is thus clear from *Branzburg* and related cases that the freedom to gather information guaranteed by the First Amendment is the freedom to gather information *subject to* the general and incidental burdens that arise from good faith enforcement of otherwise valid criminal and civil laws that are not themselves solely directed at curtailing the free flow of information.[68] The broad scope of acceptable government investigation, so necessary to the secure enjoyment of *all* liberties, unavoidably places a burden on *all* citizens. It is difficult, though not impossible, to establish absolutely secret contacts with other people. The freedom that "journalists" enjoy with respect to their news gathering is subject to this burden. *The First Amendment does not guarantee plaintiff "journalists," or other citizens, a special right to immunize themselves from good faith investigation simply because they may be engaged in gathering information.* Thus, the Government's good faith inspection of defendant

*case, unlike Branzburg v. Hayes, does not involve "confidential relationships"; it involves non-confidential third-party information.*

A "confidential" relationship exists in the law only where parties undertake to keep some matter secret from the rest of the world, and "confidentiality" exists only between those parties. Ordinarily mutual promises of secrecy have no legal significance; the state may compel each party to betray the confidence of the other in order *to obtain evidence in criminal proceedings.* In a very narrow class of cases, however, mutual promises of secrecy are respected in order to foster certain socially important relationships. In these cases, *the law will protect one party to the relationship from voluntary or compelled betrayal by the other;* that is, it recognizes only that one party has the "privilege" of preventing *the other party* from testifying about the secret matter. This is a "testimonial privilege," and this is the privilege that journalists unsuccessfully claimed in *Branzburg v. Hayes.* That case involved Government efforts *to compel journalists themselves to betray their sources' confidences.* Here, there is no such compulsion; neither journalists nor their sources are being compelled to reveal any confidence. Rather, the Government is collecting third-party information. *The law does not protect parties to a "confidential" relationship from compromise by neutral third-parties to whom they have knowingly imparted their secret. This risk of compromise is entirely within the parties' own control.* It is an elementary principle that when parties to a "confidential" relationship reveal their secret to third parties, the confidentiality is destroyed, and the Government is free to exact the information from third parties without violating any of the policies which may have initially given rise to a testimonial privilege. In short, the law will only go so far as to protect each party from betrayal *by the other,* but it will not extend the web of secrecy to third parties.

In this case, plaintiffs claim that the mere fact of their relationship with certain sources is "confidential". If this is true, then plaintiffs must keep this fact secret in order to preserve "confidentiality". However, plaintiffs and their sources have contacted each other through the facilities of third parties, without taking available precautions to protect their identities. In so doing, they have knowingly assumed the risk of disclosure by placing in the hands of those third parties documentary evidence that their relationship exists. Under these circumstances, plaintiffs cannot appeal to the "confidentiality" of their relationships to bar Government access to this third-party evidence. *See generally* 8 Wigmore, Evidence §§ 2285–2241 (McNaughten rev.ed. 1961).

**68.** *See Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) (rejecting journalists' assertion that search of newspaper office for mere evidence pursuant to a warrant violated First Amendment); *Pell v. Procunier,* 417 U.S. 817, 833, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974) (rejecting media plaintiffs' assertion that face-to-face interviews with designated prison inmates were such an effective and superior method of news-gathering that its curtailment amounted to unconstitutional state interference with a free press: "It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally," *quoting Branzburg*); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974); *Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 1280, 14 L.Ed.2d 179 (1965) (sustaining Government refusal to validate passports to Cuba even though that restriction "rendered less than wholly free the flow of information concerning that country") ("[T]he right to speak and publish does not carry with it the unrestrained right to gather information."); *Estes v. Texas,* 381 U.S. 532, 539–40, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Associated Press v. NLRB,* 301 U.S. 103, 132–33, 57 S.Ct. 650, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. He has no special privilege to invade the rights and liberties of others. He must answer for libel. He may be punished for contempt of court. He is subject to the antitrust laws. Like others he must pay equitable and non-discriminatory taxes on his business.")

telephone companies' toll call records does not infringe on plaintiffs' First Amendment rights, because that Amendment guarantees no freedom from such investigation.

 Moreover, it is clear that Government access to defendants' toll-call records in no sense "abridges" plaintiffs' news-gathering activities within the meaning of the First Amendment. Not every Government action that affects, has an impact on, or indeed inhibits First Amendment activity constitutes the kind of "abridgment" condemned by the First Amendment. Historically considered, freedom of the press means primarily, although not exclusively, immunity from prior restraints or censorship,[69] but the guarantee also affords protection from the imposition of post-publication sanctions and punishments.[70] Additionally, in recent years, the Supreme Court has found in a number of cases that constitutional violations may arise from the deterrent, or "chilling", effect of governmental action that falls short of a direct prohibition against the exercise of First Amendment rights.[71] Yet not every Government action that has an inhibiting or constrictive impact on First Amendment activity is said therefore to have an impermissible "chilling effect." The constrictive impact must arise from the present or future exercise, or threatened exercise, of coercive power.[72]

As the Supreme Court stated in *Laird v. Tatum:* [73]

In none of these [previous "chilling effect"] cases, however, did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

In the instant case, the Government action challenged by plaintiffs is the mere gathering of evidence from third parties. As the Supreme Court expressly stated in *Branzburg*, such investigation imposes no restrictions, prior restraint, or sanctions on journalists' information-gathering.[74] Furthermore, in this case, unlike *Branzburg*, there is no effort to compel the journalists themselves to disclose the identity of their sources. Plaintiffs in this case are neither presently or prospectively subject to "regulation, proscription or compulsion" as a result of the Government action they here, challenge. Consequently, it cannot be asserted that Government access to defendants' toll-call records "abridges" plaintiffs' First Amendment news-gathering rights.

**69.** See *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Schenk v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

**70.** *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572 n.3, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

**71.** *E. g., Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Baggett v. Bullitt,* 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

**72.** *E. g., N.A.A.C.P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (contempt citation); *Dombrowski v. Pfister,* 380 U.S. 479,

85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (criminal prosecution); *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971) (exclusion from profession).

**73.** 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972).

**74.** 408 U.S. at 680–81, 699–700, 92 S.Ct. 2318. See *Zurcher v. Stanford Daily,* 436 U.S. at 567, 98 S.Ct. at 1982 (1978) ("Not every such seizure, and not even most, will impose a prior restraint. And surely a warrant to search newspaper premises for criminal evidence . . . carries no realistic threat of prior restraint or of any direct restraint whatsoever").

In sum, then, the two propositions underlying plaintiffs' first theory are erroneous. The First Amendment does not guarantee journalists the right to preserve the secrecy of their sources in the face of *good faith* criminal investigation. Moreover, Government inspection of third-party records, while it may inhibit plaintiffs' news-gathering activity, does not impermissibly abridge such activity. Hence, journalists in this context have no "First Amendment interest" in third-party records which disclose the identity of a secret source and, consequently, have no First Amendment right to notice of subpoenas directed at such records.[75] In other words, the First Amendment does not guarantee a journalist, or any other citizen, the freedom to collect information immune from *good faith* criminal investigation by means which accord with Fourth and Fifth Amendment protections. Nor does it insulate a journalist, or any other citizen, from the general and subjective inhibitions that naturally arise from the prospect of such investigation—inhibitions to which all citizens are subject in every field of endeavor.

### b. *Relationship of First, Fourth, and Fifth Amendments* [76]

The issues raised by plaintiffs' first theory may be viewed from a somewhat different perspective. I believe that plaintiffs' claims pose fundamental questions concerning the interplay of First, Fourth and Fifth Amendment protections. Essentially, plaintiffs contend that particular *good faith* investigative actions inhibit, and thereby infringe upon, their information-gathering activities. Specifically, plaintiffs complain that the investigative action has "intruded

---

**75.** The dissent's reasoning proceeds in three steps. First, it contends that plaintiffs have a First Amendment right to gather information; second, it asserts that this information-gathering right includes a right to collect information from secret sources; and, third, it reasons that any government action which threatens to compromise the secrecy of a source necessarily invades the right to collect information from secret sources. The dissent discusses these points in terms of "interests." Thus, it concludes that plaintiffs have First Amendment "interests" in their toll-call records and that these "interests" are implicated whenever the Government obtains access to these records. Further, the dissent suggests that we in the majority must agree that plaintiffs' First Amendment "interests" are threatened by the Government's toll-record subpoena practice. Dissent at —— —— ——, —— of 192 U.S.App. D.C., at 1086–1087, 1093 of 593 F.2d. In fact, we do not agree and, in our view, the dissent's conclusions gloss over the truly difficult issues posed.

When the dissent speaks in terms of First Amendment *"interests,"* we assume it is referring to First Amendment *"rights."* We agree with the dissent that the First Amendment extends *some* protection to news-gathering. To this extent, it may be said that plaintiffs have First Amendment "rights" or "interests" in news-gathering. But the existence of this right does not necessarily mean that plaintiffs have a First Amendment "right" or "interest" in using their telephones immune from the prospect of good faith toll-record subpoenas. The issue in this case is precisely whether or not toll-record subpoenas *abridge* the right to gather information that is guaranteed by the First Amend-

ment. If these subpoenas abridge that right, then plaintiffs would have a First Amendment "interest" in their toll-call records, and the procedural protections called for by the dissent would be appropriate. However, if these subpoenas do not abridge the right to gather information, then plaintiffs would not have a First Amendment "interest" in their toll-call records. It is our position that the subpoena practices reflected in this record *do not abridge* the right to gather information that is guaranteed by the First Amendment. Hence, in the factual circumstances of this case, we do not agree with the dissent that plaintiffs have First Amendment "interests" in their toll-call records. We have reached this conclusion through a two-part analysis by which we have focused, first, on the scope of the right to gather information itself and, second, on the nature of the impact that the challenged government practice has on that right.

The dissent has attempted to magnify the impact that the Government's subpoena practice has on plaintiffs news-gathering, claiming that plaintiffs have been "restrained" and "foreclosed" from using the telephone. Dissent at —— of 192 U.S.App.D.C., at 1090 of 593 F.2d. This claim is simply not true. Plaintiffs are no more foreclosed from using the telephone by the prospect of toll-record subpoenas than they are foreclosed from using the streets by the prospect of physical surveillance. See footnote 54 of Judge Robinson's concurring opinion.

**76.** Judge Robinson does not join in the analysis in this particular subsection IV.A.1.b., finding it unnecessary to our decision.

into", "invaded" or "penetrated" activity which is secret or private.

As already demonstrated, to the extent plaintiffs have exposed their activities to third parties they had no protectable privacy interests in them under the Fourth Amendment.[77] The crux of plaintiffs' argument, then, is that they have a right to establish relationships in secret under circumstances in which the Fourth Amendment ensures no secrecy and that they have a right to engage in furtive action free from investigative scrutiny within an arena ordinarily open to such scrutiny. In short, plaintiffs claim that the zone of privacy guaranteed them by the Fourth and Fifth Amendments does not give them adequate privacy within which to conduct clandestine collection and that they, apart from other citizens, must have a broader zone of privacy.

The question thus presented is this: Does the First Amendment afford plaintiffs this extra margin of privacy by imposing substantive or procedural limitations on *good faith* criminal investigative action above and beyond the limitations imposed by the Fourth and Fifth Amendments? I believe the answer must be no.

█ The Supreme Court has repeatedly emphasized that one of the main reasons for adoption of the Fourth Amendment was to provide citizens with the privacy protection necessary for secure enjoyment of First Amendment liberties.[78] First Amendment values permeate the Fourth Amendment. To a somewhat lesser extent, the same can be said of the Fifth Amendment.[79] In my view, the guarantees of the Fourth and Fifth Amendments achieve their purpose and provide every individual with sufficient protection against good faith investigative action for the full enjoyment of his First Amendment rights of expression. *To the extent an individual insists that he must shield himself from the prospect of good faith investigation and operate in secrecy in order to exercise effectively particular First Amendment liberties, he must find that shield and establish that secrecy within the framework of Fourth and Fifth Amendment protections.* This is not to say that the First Amendment never gives rise to any privacy-type interests apart from those secured by the Fourth and Fifth Amendments. It does mean, however, that such interests are overridden *in criminal cases* by the public's interest in effective law enforcement investigation at least insofar as they go beyond protections already afforded by the Fourth and Fifth Amendments.

In several cases the Supreme Court has dealt with situations in which law enforcement investigative action undertaken in *good faith* has had an impact on First Amendment activity.[80] In these cases involving "a convergence of First and Fourth Amendment values", the Court has held that First Amendment interests are to be safeguarded by strict adherence to Fourth Amendment standards.[81] Significantly, the Court has not concluded that the First Amendment interests themselves give rise to *additional* protections against *good faith* investigative action above and beyond those afforded by the Fourth Amendment.[82] Nor

77. See Part III of this Opinion.

78. *See Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

79. *See generally* 8 Wigmore, Evidence §§ 2214, 2251 (McNaughton rev. ed. 1961).

80. *E. g., Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *United States v. United States District Court,* 407

U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). *See also United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 612 (1977); *Roaden v. Kentucky,* 413 U.S. 496, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973).

81. *See* cases cited at note 78, *supra. See also In re Possible Violations of 18 U.S.C. 371, 641, 1503,* 184 U.S.App.D.C. 82, 564 F.2d 567 (1977).

82. To be distinguished are two lines of cases: One line of cases deals with the use of warrants, not as means of investigation, but rather as direct means of prior restraint. In these cases the seizures were not to obtain evidence,

has the Court concluded that persons engaging in certain types of First Amendment activity have *broader* Fourth Amendment rights than other citizens.

The proposition that the First Amendment offers no procedural or substantive protections against good faith criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments is directly supported by the Supreme Court's recent decision in *Zurcher v. Stanford Daily*.[83] Indeed, this seems to be the tacit basis of the decision. In that case police had searched the offices of the Stanford Daily newspaper pursuant to a warrant issued on probable cause to believe that there were photographs on the premises that would identify the perpetrators of certain felonies. The members of the Daily staff were not themselves involved in the criminal activity under investigation. After the search, the Daily and members of its staff brought a civil action seeking declaratory and injunctive relief under 42 U.S.C. § 1983 against the police. The complaint alleged that the search of the Daily's office had deprived the newsmen under color of state law of rights secured them by the First, Fourth, and Fourteenth Amendments. The journalists asserted, *inter alia*, that where an innocent object of a third-party search is a newspaper, the First Amendment requires that evidence in the newspaper's possession be obtained by a subpoena *duces tecum* rather than by a search warrant unless the police make a clear showing that the evidence would be destroyed. The district court granted the journalists declaratory relief, and the court of appeals affirmed. The Supreme Court reversed.

Significantly, the Supreme Court's decision analyzes the protections available to the journalists entirely within the framework of the Fourth Amendment. Observing that the Fourth Amendment was adopted largely in response to a history of conflict between the Crown and the press, the Court reaffirmed the principle that "[w]here the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous ex-

---

but directly to suppress the circulation of printed matter. *See, e. g., Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) (seizure of 11,000 copies of 280 allegedly "obscene" publications); *A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 268, 11 L.Ed.2d 163 (1964) (seizure of 1,715 copies of 31 allegedly obscene publications). These cases, therefore, do not apply to *investigative action* that *effects no prior restraint* on First Amendment activity.

The second line of cases deals with associational privacy. The First Amendment prohibits the use of compulsion to exact from individuals (or groups) the wholesale disclosure of their associational ties where such inquiry is *not germane* to the determination of whether a crime has been committed. *See, e. g., DeGregory v. Attorney General of New Hampshire,* 383 U.S. 825, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *N. A. A. C. P. v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). In such cases, the challenged governmental action is not strictly investigative; the probing is not germane to the detection of specific criminal conduct and is frequently conducted in public so that the information obtained by the government is simultaneously and indiscriminately broadcast to the public at large. In these cases, the First Amendment gives rise to a *personal testimonial privilege*, similar to the privilege against self-incrimination, by which the individual or group can fend off such interrogation. *See* 8 Wigmore, Evidence §§ 2214, 2251. These cases have no applicability to good faith criminal investigative efforts. *Branzburg v. Hayes,* 408 U.S. 665, 700, 92 S.Ct. 2646, 23 L.Ed.2d 626 (1972). *Cf. Wilkinson v. United States,* 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961); *Barenblatt v. United States,* 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Moreover, these cases recognize only a *personal* testimonial privilege to resist compelled self-disclosure. They do not apply to the good faith collection of information from *third parties*. If they were so construed, it would be *impossible* for law enforcement officials to investigate organizations suspected of criminal activity or individuals who could be linked to such organizations. Closely related to this line of cases are cases involving sweeping legislative investigations of First Amendment activity. *See United States v. Rumely,* 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953).

**83.** 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

actitude' ".[84] Thus, the Court held that the protections to be afforded the journalists were to be found in rigorous application of Fourth Amendment standards. Implicit in this decision is the conclusion that, in this type of case, the existence of First Amendment "interests" does not give rise to any substantive or procedural protections above and beyond those afforded by the Fourth Amendment. The Court stated:

> Neither the Fourth Amendment nor the cases requiring consideration of First Amendment values in issuing search warrants, however, call for imposing the regime ordered by the District Court. Aware of the long struggle between Crown and press and desiring to curb unjustified official intrusions, the Framers took the enormously important step of subjecting searches to the test of reasonableness and to the general rule requiring search warrants issued by neutral magistrates. They nevertheless did not forbid warrants where the press was involved, did not require special showings that subpoenas would be impractical, and did not insist that the owner of the place to be searched, if connected with the press, must be shown to be implicated in the offense being investigated. Further, the prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search.[85]

Justice Powell's concurring opinion is even more explicit:

> If the Framers had believed that the press was entitled to a special procedure, not available to others, when government authorities required evidence in its possession, one would have expected the terms of the Fourth Amendment to reflect that belief. As the opinion of the Court points out, the struggle from which

the Fourth Amendment emerged was that between Crown and press. The Framers were painfully aware of that history, and their response to it was the Fourth Amendment. Hence, there is every reason to believe that the usual procedures contemplated by the Fourth Amendment do indeed apply to the press, as to every other person.

> . . . . .

> . . . [C]onsiderations such as these are the province of the Fourth Amendment. There is no authority either in history or in the Constitution itself for exempting certain classes of persons or entities from its reach.[86]

Circuit court cases also support the proposition that the First Amendment affords no procedural or substantive protection against *good faith* criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments. Most analogous to the case at hand are the so-called "mail cover" cases. A "mail cover" is an investigative technique involving the screening and analysis of the envelope exteriors of all mail addressed to a particular recipient. By this means, investigators can determine, for each item of mail, the city from which the mail was sent, the date on which it was sent, and, if a return address is provided, the name and address of the sender. No warrants are required to initiate a "mail cover". Thus, *"mail covers" provide essentially the same information concerning mail communication as toll-call record inspections provide concerning long distance telephone communication.* Criminal defendants have attempted to suppress evidence derived from mail covers on the grounds that such warrantless mail surveillance violated their Fourth Amendment rights.

 The courts have uniformly rejected this argument.[87] Just as courts have held

---

84. *See id.*, 436 U.S. at 564, 98 S.Ct. at 1981.

85. *See id.*, 436 U.S. at 565, 98 S.Ct. at 1981-1982.

86. *See id.*, 436 U.S. at 569-70, 98 S.Ct. at 1984 (concurring opinion).

87. *Lustiger v. United States,* 386 F.2d 132, 139 (9th Cir. 1967) ("[T]he Fourth Amendment does not preclude postal inspectors from copying information contained on the outside of sealed envelopes in the mail"); *Cohen v. United States,* 378 F.2d 751, 760 (9th Cir. 1967); *Cana-*

that a person's expectations of privacy concerning telephone communication attach only to the *contents* of the conversation and not to the fact the communication was made, so also the courts have held that a person may reasonably expect privacy only with respect to the contents of an envelope and *not* with respect to information knowingly exposed to third parties on the envelope's exterior. Anticipating plaintiffs' argument in this case, individuals have argued that, even though "mail covers" may not violate the Fourth Amendment, they nevertheless violate the First Amendment by "chilling" free communication through the mails. There is no doubt that communication through the mails is a First Amendment right guaranteed by both the free speech and press guarantees [88] and is "almost as much a part of free speech as the right to use our tongues." [89] Nevertheless, the courts have held that "mail covers" violate no First Amendment right. [90]

The principle that the First Amendment offers no procedural or substantive protection from *good faith* criminal investigation beyond that afforded by the Fourth and Fifth Amendments is also reflected in cases involving informants and undercover agents. [91] Law enforcement investigators regularly collect information from informants and undercover agents concerning the activities, conversations, and associations of individuals and groups. [92] No warrant is required when Government investigators solicit information from an informant or place an undercover agent. This practice was challenged in a series of Supreme Court cases. In *Lopez v. United States*, [93] defendant in a bribery trial objected to the introduction into evidence of tape recordings of an incriminating conversation between himself and an IRS agent in defendant's private office. The recordings were made by a tape recorder in the agent's pocket. Justice Brennan argued, in dissent, that such covert investigative practices threatened First Amendment liberties: "[T]here is a grave danger of chilling all private, free, and unconstrained communication if secret recordings, turned over to law enforcement officers by one party to a conversation, are competent evidence of any self-incriminating statements the speaker may have made." [94] Implicitly rejecting this position, the majority held that the recordings of defendant's conversation were properly admitted into evidence and that the secret recording of defendant did not violate defendant's constitutional rights.

Similarly, in *United States v. White*, [95] Justice Douglas argued that a criminal suspect's First Amendment rights were violated when his conversations with an informant were electronically monitored by

*day v. United States,* 354 F.2d 849, 856–57 (8th Cir. 1966); *United States v. Shwartz,* 283 F.2d 107 (3rd Cir. 1960); *United States v. Costello,* 255 F.2d 876 (2d Cir. 1958).

**88.** *See Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965).

**89.** *Milwaukee Social Democratic Club Pub. Co. v. Burleson,* 255 U.S. 407, 437, 49 S.Ct. 352, 65 L.Ed. 704 (1921) (Holmes, J., dissenting) *quoted with approval in Blount v. Rizzi,* 400 U.S. 410, 416, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

**90.** *Cohen v. United States,* 378 F.2d 751, 760 (9th Cir. 1967).

**91.** *See United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

**92.** For example, informants are the primary source of information in approximately 85 percent of intelligence investigations conducted by the Federal Bureau of Investigation, as compared with 5 percent in which the primary source is electronic surveillance. Senate Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Supplementary Detailed Staff Reports on Intelligence Activities and the Rights of Americans, S.Rep.No. 755, 94th Cong., 2d Sess. 228 (1976).

**93.** 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963).

**94.** *See id.,* 373 U.S. at 452, 469–71, 83 S.Ct. at 1395.

**95.** 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

Government agents through a transmitter installed on the informant:

> Monitoring, if prevalent, certainly kills free discourse and spontaneous utterances. Free discourse—a First Amendment value—may be frivolous or serious, humble or defiant, reactionary or revolutionary, profane or in good taste; but it is not free if there is surveillance.
>
> . . . . .
>
> . . . [M]ust everyone live in fear that every word he speaks may be transmitted or recorded and later repeated to the entire world? I can imagine nothing that has a more chilling effect on people speaking their minds and expressing their views on important matters.[96]

The Court implicitly rejected this First Amendment argument in upholding the constitutionality of employing "wired" informants,[97] stating: "Inescapably, one contemplating illegal activities must realize and risk that his companions may be reporting to the police."[98]

Finally, cases involving physical surveillance support the principle that the First Amendment affords no protection against *good faith* criminal investigative activity beyond that afforded by the Fourth and Fifth Amendments. Courts have held that physical surveillance consistent with Fourth Amendment protections and in connection with a bona fide law enforcement investigation does not violate First Amendment rights, even though it may be directed at communicative or associative activities and even though it may inhibit such activities.[99]

Thus, in *Oaks v. United States*,[100] the Ninth Circuit upheld the conviction of a leader of a tax rebellion group for failure to file an income tax return, rejecting defendant's contention that IRS surveillance had violated his First Amendment rights. IRS undercover agents had infiltrated the Tax Rebellion Committee of which defendant was a member, attended various meetings of the Committee, and submitted reports on the activities of the Committee and its members, including defendant. The Court stated:

> Nor do we find that the surveillance of the meetings of the Tax Rebellion Committee by the undercover agents was improper. The meetings were open to the public and the participants were openly advocating the willful violation of Internal Revenue laws. The risk of surveillance of meetings of this type must be assumed. No interest legitimately protected by the First and Fifth Amendments is involved.[101]

The principle is clear. To the extent individuals desire to exercise their First Amendment rights in private, free from possible good faith law enforcement investigation, they must operate within the zone of privacy secured by the Fourth Amendment. When individuals expose their activities to third parties, they similarly expose these activities to possible Government scrutiny. The mere prospect that such investigation may occur or, indeed, the actual conduct of such investigation does not "chill" or otherwise abridge First Amendment rights, even though it may give rise to

---

**96.** *See id.*, 401 U.S. at 762–65, 91 S.Ct. at 1131 1132. (Douglas, J., dissenting).

**97.** *See id.*, 401 U.S. at 752–53, 91 S.Ct. 1122.

**98.** *See id.*, 401 U.S. at 752, 91 S.Ct. at 1126.

**99.** *See, e. g., Oaks v. United States,* 527 F.2d 937, 941 (9th Cir. 1975), *cert. denied,* 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976) (surveillance by undercover agent of public meetings of tax rebellion group). *Cf. Fifth Avenue Peace Parade Comm. v. Gray,* 480 F.2d 326 (2d Cir. 1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974) (no justiciable controversy where chilling effect claimed to stem from examination of bank records of antiwar organizer, ascertainment of number of buses

obtained to transport demonstrators, and observation of bus departures); *Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate,* 519 F.2d 1335 (3d Cir. 1975) (no judicially cognizable chilling effect where surveillance activities were limited to police photographing and gathering data at public meetings); *Donahue v. Duling,* 465 F.2d 196 (4th Cir. 1972) (no judicially cognizable chilling effect where uniformed police photographed those present at a public demonstration).

**100.** 527 F.2d 937 (9th Cir. 1975).

**101.** *Id.* at 941.

subjective inhibitions for those who desire to avoid the prospect of investigation altogether.

Plaintiffs in this case insist that the mere fact of a relationship between themselves and certain sources must be secret. If this is so, then plaintiffs and their sources have the burden of establishing that secrecy within the limits of Fourth and Fifth Amendment protections. This may be difficult, but it is not impossible. All citizens when they choose to act surreptitiously are put to some inconvenience; they must lower their voices, put little or nothing in writing, speak and meet outside the presence of third parties; these simple precautions are commonly used, whether the ends be lofty or evil. Plaintiffs are no exception simply because they are "journalists."

The plaintiffs' and the dissent's position is that the First Amendment *does* afford additional protections against *good faith* criminal investigation beyond those provided by the Fourth and Fifth Amendment. In skeletal form, their position is that when particular investigative action "implicates" First Amendment activities, then its utility must be judicially balanced against the First Amendment "interests" it may affect *before* it may be put into effect. However, it is clear from a moment's reflection that this position is wholly untenable.

In *Katz v. United States,* the Supreme Court observed that *all investigative action* intrudes upon privacy to some extent.[102] The same can be said for the relationship between investigation and First Amendment activity; that is, *all investigative action affects or "implicates" First Amendment activity.* After all, *the First Amendment is not the personal preserve of "journalists."* It covers almost all forms of expression; it covers associative activities; it covers religious activities. Each citizen has First Amendment rights and each one's rights are as precious as the other's. Every time law enforcement officers arrest an individual, they place restraints on First Amendment activity. Does this mean that before an arrest can be made there must be a hearing at which the State's "interest" in making the arrest is judicially balanced against the consequent inhibitions on *First Amendment* rights? Each time law enforcement officers place a suspect under physical surveillance or make inquiries and collect information on a suspect, they "implicate" First Amendment rights. Does this mean that before the police can take this fundamental investigative action there must be a hearing at which the particular utility of these acts is judicially balanced against the First Amendment "interests" they may affect? Each time the Government solicits information from an informant or places an undercover agent it "implicates" First Amendment rights. Does this mean that before such action is taken there must be a hearing at which the Government's "interest" in taking these actions is judicially balanced against the First Amendment activities "implicated"? And each time the police obtain a warrant for more intrusive investigation, such as for wiretaps or searches, First Amendment rights are "implicated." Does this mean that *in addition to* determining the probable cause required by the Fourth Amendment the issuing magistrate must *also* balance First Amendment interests? Of course, the practical consequence of such a regime would be the complete and absolute stultification of law enforcement.

If this is indeed what the First Amendment means, then I am surprised we have not heard of it sooner. Think of all those unfortunates in prison who would be free men today if the dissent had its way and if they but had the foresight to anticipate these plaintiffs and base their evidentiary challenges on First rather than Fourth Amendment grounds.

The only way in which plaintiffs and the dissent could avoid this *denouement* is to limit these First Amendment protections only to *some* individuals; or perhaps only to

102. 389 U.S. 347, 350 n.5, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ("Virtually every governmental action interferes with personal privacy to some degree. The question in each case is whether that interference violates a command of the United States Constitution.")

*some* species of First Amendment activities; or perhaps only to *some* individuals in *some* activities. In other words, under plaintiffs' approach the courts would have to decide that certain individuals' First Amendment rights are more important than those of others, and that certain First Amendment activities are more important than others. Presumably, the more significant individuals and the more significant activities would have greater protection from good faith investigation.

How would this gradation be made without doing violence to the First Amendment itself? If the First Amendment protects "journalists" from third-party subpoenas, how about ministers, priests and rabbis? How about authors, teachers, social workers and publishers? How about labor unionites, Democrats, Republicans and sorority sisters? If the First Amendment shields "news gathering" from good faith investigation, how about other kinds of First Amendment activity? How about all forms of associational activity? Are the associational activities of organized crime shielded from good faith investigation? If the police issue third-party subpoenas for information bearing on the "membership" of a suspected organized crime "family," must prior notice be given the "family" so that it can challenge the subpoena in order to preserve the "confidentiality" of its members? Why dismiss this out of hand? Are there no genuine associational rights "implicated" in such a case?

In *Branzburg,* the Supreme Court recognized that it would be improper, as well as impracticable, to define the categories of persons entitled to insist on the balancing procedures sought in that case:

> Sooner or later, it would be necessary to define those categories of newsmen who qualified for the privilege, a questionable procedure in light of the traditional doctrine that liberty of the press is the right of the lonely pamphleteer who uses carbon paper or a mimeograph just as much as of the large metropolitan pub-

lisher who utilizes the latest photo-composition methods. . . . The informative function asserted by representatives of the organized press in the present cases is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists. Almost any author may quite accurately assert that he is contributing to the flow of information to the public, that he relies on confidential sources of information, and that these sources will be silenced if he is forced to make disclosures before a grand jury.[103]

In sum, the approach urged by plaintiffs and the dissent must inevitably result in one of two consequences. *Either all people at all times* will have the First Amendment balancing protection against *good faith* investigation, in which case law enforcement will be completely throttled. *Or, certain people at certain times* will be entitled to such protection, in which event first the police and then the courts will be obliged in each case to delineate the individuals and species of activity entitled to protection, and this, in turn, will necessarily require distinguishing "real" from "sham" First Amendment claims. In my view, neither approach is acceptable, in theory or in practice.

2. *Case-by-Case Judicial Balancing—an Unprecedented, Unnecessary, and Unworkable Remedy*

Even if it is assumed *arguendo* that plaintiffs have established an abridgment of a First Amendment "interest," this does not necessarily mean that the judicial response sought by plaintiffs is appropriate. Plaintiffs contend that there must be a case-by-case balancing of the Government's investigative interests against their First Amendment interests as journalists whenever the Government seeks access to their toll-call records in the course of a good faith felony investigation.[104] We know of no authority supporting the proposition that any such balancing must be performed on a

---

**103.** 408 U.S. at 704–705, 92 S.Ct. at 2668.

**104.** Brief for Appellants at 28–33.

case-by-case basis, and neither plaintiffs nor the dissent cites any.[105]

It is at this point that *plaintiffs' and the dissent's confusion between the balancing function of the court and its screening function becomes evident.* Apparently the source of this confusion is a single paragraph in the *Branzburg* decision. The Court in *Branzburg* determined that *good faith* criminal investigation interests *always* override a journalist's interest in preserving the secrecy of his sources. The Court observed that there was no question but that the particular subpoenas in question were issued in *good faith* and it held that the First Amendment offers *no protection* from such *good faith* investigative efforts. *The Court explicitly rejected a case-by-case balancing approach,* which absolutely refutes the plaintiffs' and the dissent's position on good faith investigations. At the very end of its decision, the Court commented on the possible impact of *bad faith* subpoenas on journalists' First Amendment rights:

> Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.[106]

By these comments, the Court was merely indicating that journalists would have an effective remedy if *bad faith* harassing subpoenas were employed against them. The remedy suggested was a *screening* remedy, *and it was available on a case-by-case basis because the Court would necessarily be called upon to enforce the subpoenas on a case-by-case basis.* Thus, the Court did not contemplate case-by-case *balancing* at all, for if subpoenas were issued in bad faith, there would be no legitimate Government interest *to balance* against the journalist's interests; rather it would be a question of screening out bad faith subpoenas.[107]

---

**105.** The dissent stresses the need for "judicial superintendence" of actions which *may* impinge on First Amendment rights. (Dissent at ——— of 192 U.S.App.D.C., at 1088 of 593 F.2d). It cites, *inter alia,* the following cases: *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Freedman v. Maryland,* 380 U.S. 51, 185 S.Ct. 734, 13 L.Ed.2d 649 (1965). All these cases, however, involved systems of State *regulation* which imposed *prior restraints* on expression predicated on a *factual determination* that the suppressed expression was *not protected by the First Amendment.* These cases stand for the proposition that such systems must assure an almost immediate judicial determination of the validity of the restraint. This determination is a factual determination as to whether a particular form of expression is protected or not under the First Amendment; *it does not involve a case-by-case balancing of the quantum of "interests" in a protected form of expression against the quantum of governmental interests in infringing on that expression.* Thus, in *Bantam Books, Inc.,* the Court did not suggest that the merits of a particular obscene publication be balanced in each case against the Government's interest in suppressing that publication. This was not why the Court stated that "judicial superintendence" was necessary. Rather, it was declared necessary to ensure that either before or soon after a *prior restraint* was placed on an allegedly obscene publication, there be a procedurally adequate hearing at which the *fact* of obscenity could be determined.

**106.** 408 U.S. 707–708, 92 S.Ct. at 2670 (footnote omitted).

**107.** Justice Powell's concurring opinion in *Branzburg* is fully consistent with this analysis. It focuses on the concluding portion of the Court's opinion and reiterates that there is a remedy available to reporters in the event of *bad faith* harassment:

> As indicated in the concluding portion of the opinion, the Court states that *no harassment of newsmen will be tolerated.* If the newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to . . . implicate [ ] confidential source relationships *without a legitimate need of law enforcement,* he will have access to the court on a motion to quash . . . .. 408 U.S. at 709–10, 92 S.Ct. at 2671 (emphasis added).

Although Justice Powell refers to case-by-case "balancing," it is clear that he is actually referring to the availability of judicial case-by-case screening out of *bad faith* "improper and prejudicial" interrogation. Indeed, this court has

 The competing interests assertedly at stake in this case can easily be balanced and resolved once and for all. Indeed, if one reads *Branzburg,* as plaintiffs do, as involving the balancing of interests virtually identical to those here, then it is significant that the Court balanced these interests but once. The question presented in the instant case is simply whether the public interest in ensuring the effectiveness of good faith felony investigations is sufficient to override the burden on newsgathering which is said to result from permitting Government inspection of toll-call records which might disclose the identity of journalists' secret sources. In our view, *Branzburg* dictates an outcome in favor of law-enforcement "interests."

In the first place, the burden placed on journalists by *Branzburg* is substantially more onerous than the burden that would be placed on them by being subject to toll-call-record inspections. There is no way for journalists to circumvent the rigors of *Branzburg.* They can take every secrecy precaution and be as discrete as possible, and still be *directly compelled* to disclose their secrets. In contrast, the real burden that the possibility of toll-call-record inspections places on journalists is mere inconvenience. Journalists and sources can easily take steps to avoid detection. It is therefore highly questionable that existing accessibility of toll-call records deters or inhibits potential sources any more than they are already inhibited by the *Branzburg* rule.

In the second place, it remains unclear how often and to what extent informers are actually deterred from furnishing information by the mere fact that toll-call records may be subpoenaed by the Government. The record does not provide even one genuine instance of such inhibition.[108] More significantly, the plaintiffs' own affidavits indicate that sources generally are apprehensive about the circumspection of the journalists themselves, and cooperate only on the basis of *the journalist's personal assurance* of confidentiality; there is no indication that sources are especially inhibited by the contingency of toll-call-record subpoenas any more than they are by the prospect of third-party detection in general.

Finally, as the *Branzburg* Court pointed out, it is difficult to take seriously claims that toll-record subpoenas will appreciably constrict the flow of information to journalists.[109] Journalists' records have been subject to such subpoenas for 50 years, and during this time, "the press has flourished"[110] and so has its use of confidential sources.[111] Indeed, plaintiffs' own affidavits aver that the number of sources using telephones has steadily and dramatically increased in recent years, belying the notion that the existing accessibility of toll-call records has curtailed the flow of information. It is therefore clear that "existing constitutional rules have not been a serious obstacle to either the development or retention of confidential news sources by the press".[112] In the face of these considerations, if a balance must be struck, then it

---

already so interpreted Justice Powell's opinion in *In re Possible Violations of 371, 641, 1503,* 184 U.S.App.D.C. 82, 564 F.2d 567 (1977):

The *Branzburg* decision did not leave newsmen completely without protection from indiscriminate probing for news sources. In particular, the Court observed that official harassment of the press undertaken solely to disrupt a reporter's relationship with news sources would clearly be subject to judicial control. In a separate opinion, Mr. Justice Powell, who also concurred in the opinion of the Court, emphasized and elaborated upon this aspect of the majority opinion . . . ..

We conclude that *Branzburg* squarely rejected the very privilege appellant asserts that it established. A newsman can claim no general immunity, qualified or otherwise,

from grand jury questioning. On the contrary, like all other witnesses, he must appear and normally must answer. If the grand jury's questions are put in bad faith for the purpose of harassment, he can call on the courts for protection.

**108.** See discussion at pp. ——–—— of 192 U.S.App.D.C., at pp. 1067–1068 of 593 F.2d, *infra.*

**109.** 408 U.S. at 698–699, 92 S.Ct. 2646, 2665.

**110.** *Id.*

**111.** *Id.*

**112.** *Id.*

must be struck in favor of the general public's interest in effective law enforcement investigations.

Under the approach urged by plaintiffs and the dissent, courts will be required to enter into a balancing effort in each case to determine whether a particular journalist's "interest" in suppressing toll-call-record data outweighs the Government's "interest" in gathering such evidence. The Court in *Branzburg* was similarly requested to adopt a case-by-case balancing approach with respect to journalists' claims of testimonial privilege.[113] The Court stated: "We are unwilling to embark the judiciary on a long and difficult journey to such an uncertain destination." [114] The Court realized that administration of such a case-by-case approach "would present practical and conceptual difficulties of a high order." [115]

One problem, as the Court in *Branzburg* recognized, is that a case-by-case balancing approach will require courts to devise criteria for estimating the *relative* exigency of a particular good faith investigation:

> Thus, in the end, by considering whether enforcement of a particular law served a "compelling" governmental interest, the courts would be inextricably involved in distinguishing between the value of enforcing different criminal laws. By requiring testimony from a reporter in investigations involving some crimes but not in others, they would be making a value judgment that a legislature had declined to make, since in each case the criminal law involved would represent a considered legislative judgment, not constitutionally suspect, of what conduct is liable to criminal prosecution. The task of judges, like other officials outside the legislative branch, is not to make the law but to uphold it in accordance with their oaths.[116]

A second problem is that a court will have to devise criteria for estimating the *relative* importance of certain information-

gathering activities.[117] Are a novelist's interests in protecting his sources less compelling than a newspaper's? Is a small-town reporter's interest in protecting his sources as compelling as a national newspaper reporter's? Is the secrecy of a source who provides information on international matters more important than the secrecy of a source who only provides information on national or local affairs? In short, courts will be placed in the position of assigning different "values" to various exercises of First Amendment rights.

Finally, these mystical distinctions and calculations would become even more obscure in the context of the *ex parte* hearing suggested by the dissent. How will the court in an *ex parte* hearing come to know the "quantum" of "press" interests in any particular case? How will the Government necessarily know? How is the court going to balance anything if it does not know what to put on one side of the scale?

■ In sum, then, where the Government subpoenas a journalist's toll-call records in the course of a criminal investigation, there is no need for a case-by-case balancing of the Government's interests against those of the journalist. If any balancing is necessary at all, it has already been done and the balance has been struck in favor of the Government. Therefore, plaintiffs' theory that journalists are entitled to notice of third-party subpoenas in order to secure case-by-case balancing must fail. Since there is no need for case-by-case balancing, there is no need for prior notice.

## B. *Plaintiffs' "Screening" Theory.*

In treating plaintiffs' second theory, two issues must be addressed: first, whether plaintiffs' First Amendment *rights* would be *abridged* by defendant telephone companies' compliance with toll-call-record subpoenas issued in *bad faith* as part of an effort to harass plaintiffs and interfere

---

**113.** *See id.*, 408 U.S. at 680, 92 S.Ct. 2646.

**114.** *See id.*, 408 U.S. at 703–04, 92 S.Ct. at 2668.

**115.** *Id.*

**116.** *See id.*, 408 U.S. at 705, 92 S.Ct. at 2669.

**117.** *See id.*, 408 U.S. at 705 n.40, 92 S.Ct. 2646.

with their sources of information; and second, if so, whether *prior judicial screening* of toll-call-record subpoenas is an appropriate remedy.

### 1. *Abridgment of First Amendment Rights by Bad Faith Subpoenas*

■ When used in good faith, investigative techniques such as physical surveillance, the gathering of third-party information through interrogation or subpoena, the collection of information from informants and the placement of undercover agents are all proper police activities that violate no constitutional rights of the suspects involved. However, all investigative techniques are subject to abuse and can conceivably be used to oppress citizens and groups, rather than to further proper law enforcement goals. In some cases, bad faith use of these techniques may constitute an abridgment of the First Amendment rights of the citizens at whom they are directed, be they "journalists" or less exalted citizens.[118]

Plaintiffs contend that, in the past, the Government has issued subpoenas for their toll-call records, not in furtherance of *bona fide* felony investigations, but in order to harass plaintiffs in their journalistic information-gathering activities. Plaintiffs assert that these bad faith subpoenas violated their First Amendment rights. Whether or not these particular allegations are true, there can be no doubt that, as a general proposition, such *bad faith* action would constitute an abridgment of a journalist's First Amendment rights *at least* in some cases, if not in every case.[119] In *Branzburg,* the Supreme Court specifically stated that the First Amendment protected news-gathering from such abusive assaults:

> [N]ews gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official

harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification.[120]

■ Thus, while the First Amendment does not immunize the information-gathering activities of a journalist or any other citizen from *good faith* law enforcement investigation, it does protect such activities from official harassment. Unlike good faith investigation to which all citizens are subject, official harassment places a *special* burden on information-gathering, for *in such cases the ultimate, though tacit, design is to obstruct rather than to investigate, and the official action is proscriptive rather than observatory in character.* Thus, plaintiffs' initial premise that *bad faith* toll-record subpoenas *may* operate as an abridgment of their First Amendment rights is correct.

### 2. *Prior Judicial Screening—an Equitable Remedy Unjustified Factually on this Summary Judgment Record*

Plaintiffs have not sought damages for the past instances of bad faith harassment which they allege. Rather, plaintiffs have sought extraordinary prospective relief by which they are to be protected from future subpoenas—a procedural remedy by which plaintiffs must be notified of any subpoena directed at their toll-call records so that they may prompt a judicial determination as to whether or not the subpoena has been issued in connection with a *bona fide* investigation. In short, plaintiffs seek an ongoing judicial audit of future government investigations in order to screen out *bad faith* subpoenas.

■ Such extraordinary anticipatory relief cannot be justified merely on the ground that toll-record subpoenas *might possibly* be abused in the future so as to effect an infringement of plaintiffs' First

---

118. *See Allee v. Medrano,* 416 U.S. 802, 92 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1483 (1939).

119. *Branzburg v. Hayes,* 408 U.S. 665, 707–08, 92 S.Ct. 2646, 2670, 23 L.Ed.2d 646 (1972).

120. *Id.* (footnote omitted).

Amendment rights. If the mere possibility of future government misconduct were sufficient to warrant such prophylactic relief, then the courts would be called upon to superintend virtually *all* investigative activity. Much more than the mere possibility of future official misconduct is needed to justify this type of judicial intervention.

■■■ It is fundamental that in order to obtain the kind of equitable relief sought in this case, a plaintiff "must show not only that there is an *imminent threat of harm* but also that the threatened harm is *irreparable.*"[121] A party invoking equitable intervention in the criminal investigative process has a particularly heavy burden. Only the most extraordinary circumstances warrant anticipatory judicial involvement in criminal investigations. Even where federalism concerns are absent, the fundamental concept of separation of powers dictates judicial restraint. The powers of criminal investigation are committed to the Executive branch. The balance between the Executive and Judicial branches would be profoundly upset if the Judiciary assumed superintendence over the law enforcement activities of the Executive branch upon nothing more than a vague fear or suspicion that its officers will be unfaithful to their oaths or unequal to their responsibility. As the Supreme Court stated in *Laird v. Tatum:*

> Carried to its logical end, this approach [of judicial supervision of military intelligence activities] would have the federal courts as virtually continuing monitors of the wisdom and soundness of Executive action; . . . it is not the role of the

judiciary, absent actual present or immediately threatened injury resulting from unlawful governmental action.[122]

■■ Since plaintiffs in this case contend that their First Amendment rights are violated by *bad faith* subpoenas issued for harassment purposes, then in order to justify anticipatory relief *each individual* plaintiff must show (1) that there is an *imminent threat* that the Government will subpoena his toll records in bad faith, (2) that such subpoena will cause him substantial and *irreparable harm,* and (3) that his remedy at law is inadequate. And, still, a grant of anticipatory relief is a matter of equitable discretion and must depend in each case on an assessment of all relevant circumstances. In order to meet this burden, plaintiffs contend that the past instances of toll-record subpoenas reflected in the record establish a pattern of bad faith harassment; that this pattern indicates the imminence of future bad faith subpoenas; that such subpoenas will cause irreparable injury; and that, hence, they are entitled to equitable relief to prevent the recurrence of irreparable injury which is clear and imminent.

This case comes before us on cross motions for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is to be rendered only when there is "no genuine issue as to material fact" and "the moving party is entitled to judgment as a matter of law." As this Court recently stated:

> In assessing the motion, all "inferences to be drawn from the underlying facts con-

---

**121.** O. Fiss, Injunctions 9 (1972) (emphasis added). *See also Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

**122.** 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972). *See also Socialist Workers Party v. Attorney General,* 510 F.2d 253 (2d Cir. 1974) (injunction against FBI surveillance of SWP convention held abuse of discretion), *application for stay denied,* 419 U.S. 1314, 95 S.Ct. 425, 428, 42 L.Ed.2d 627 (1974) (Justice Marshall, as circuit justice) ("[O]ur abhorrence for abuse of governmental investigative authority cannot be permitted to lead to an indiscrimi-

nate willingness to enjoin undercover investigation of any nature, whenever a countervailing First Amendment claim is raised.").

The broad power in the police and the grand jury to probe widely for evidence of crime is vital because the ability of the police to go directly to the suspect or his property for evidence of guilt is significantly limited by Fourth and Fifth Amendment protections. The Government is therefore remitted to more extensive surveillance and circumstantial investigation to detect criminality. A court should not interdict these investigations in the absence of clear proof of bad faith or arbitrariness.

tained in [the movant's] materials must be viewed in the light most favorable to the party opposing the motion." Indeed, "the record must show the movant's right to [summary judgment] 'with such clarity as to leave no room for controversy', and must demonstrate that his opponent 'would not be entitled to [prevail] under any discernible circumstances'."

Summary judgment is unavailable if it depends upon any fact that the record leaves susceptible of dispute. Facts not conclusively demonstrated, but essential to the movant's claim, are not established merely by his opponent's silence; rather, the movant must shoulder the burden of showing affirmatively the absence of any meaningful factual issue. That responsibility may not be relieved through adjudication since "[t]he court's function is limited to ascertaining whether any factual issue pertinent to the controversy exists [and] does not extend to [the] resolution of any such issue." [123]

Applying these principles to the case at bar, it is clear that the District Court was correct in granting defendants' motion for summary judgment with respect to ten of the 15 plaintiffs, namely, The Reporters' Committee for Freedom of the Press, Dow Jones & Co., Inc., Marquis W. Childs, Emmett Dedmon, Morton Mintz, Bruce Morton, John Pierson, Richard Salant, Daniel Schorr, and Frederick Taylor. These plaintiffs failed to adduce *any* evidence from which it could be inferred that their toll-call records had ever been subpoenaed in bad faith in the past or that their records were in imminent danger of being subpoenaed in bad faith in the future. Therefore, the District Court's summary judgment against these ten plaintiffs is affirmed.

■ However, the remaining five plaintiffs have adduced evidence that their toll-call records were inspected by the Government in the past. Viewing this evidence in the light most favorable to plaintiffs, it is at least a possible inference that the Government acted in bad faith in issuing these past subpoenas. Also, it is possible that, upon further proof, the circumstances of these past inspections might indicate the imminence of further abuse. Though it is a close question, it appears that these five plaintiffs have adduced just enough evidence to withstand defendants' motion for summary judgment. Therefore, the District Court's action in granting summary judgment against these five is reversed.

Furthermore, it is clear that the District Court acted properly in denying *plaintiffs'* motion for summary judgment. At this stage, the five remaining plaintiffs have failed to lay an adequate foundation for the exceptional remedy they seek. Since plaintiffs have relied on the occurrence of past abuses to justify equitable intervention, then the critical factual issue in the case is *whether there indeed has been official abuse in the past. Only when this factual issue has been resolved in favor of plaintiffs does the remedial issue arise as to whether the past misconduct is sufficient to warrant the extraordinary relief sought.* Yet, this critical factual issue is in genuine dispute. The defendant United States emphatically claims that the five past subpoenas directed at plaintiffs' toll-call records were all issued in connection with *bona fide* felony investigations, *i. e., there has been no pattern of official abuse in the past* which could possibly justify the anticipatory relief sought by plaintiffs. Affidavits, depositions, and answers to interrogatories all present information supporting this contention. Plaintiffs, on the other hand, assert that in these past instances "the Government had, at most, only a highly tenuous law enforcement justification for seeking to scrutinize plaintiffs' news-gathering activities." [124] Therefore, this case must be remanded to the District Court. If the remaining plaintiffs determine to pursue this suit, then the issue of bad faith must be resolved in the District Court. If on remand the District

---

123. *National Association of Government Employees v. Campbell,* 192 U.S.App.D.C. ——, —— ——, 593 F.2d 1023, 1027 (1978) (footnotes omitted).

124. Brief for Appellants at 8.

Court finds no record of past abuse, and no other basis to anticipate impending future misconduct, then plaintiffs will have failed on their claim for equitable relief. If, however, the District Court finds that there has been a pattern of abuse in the past, then the appropriate judicial response must be determined at that time.

In sum; then, while we accept the notion that otherwise legitimate investigative techniques may be abused in such a way as to abridge the First Amendment rights of the persons at whom they are directed, and while we also accept the proposition that harassing toll-record subpoenas can abridge journalists' First Amendment rights, we believe that there is a genuine dispute in this case as to whether past toll-record subpoenas were in bad faith, and therefore *any equitable relief predicated on a finding of past official abuse is premature.*

It must be stressed that even if the remaining plaintiffs establish, and the District Court finds, that there have been past instances of abuse, it *does not necessarily* mean that each plaintiff will be entitled to prior notice of future subpoenas. As already stated, in order to obtain the kind of anticipatory relief sought in this case, *each individual* plaintiff must show not only that *he personally* faces an *imminent threat of harm* but also that the threatened harm *is irreparable.* In addition, each plaintiff must show that his remedy at law is inadequate. As the record now stands, plaintiffs have not made a sufficient showing as to any of these requirements.

First, there is little indication in the record that plaintiffs have suffered, are suffering, or will suffer substantial and irreparable harm. Plàintiffs have alleged that substantial injury occurs to their journalistic activities by disclosure of their telephone billing records. Plaintiffs have attempted to elevate that allegation to the level of an uncontroverted fact, by stating:

> There can be no question but that serious and irreparable jury [sic] is done to a

reporter's First Amendment rights when the Government obtains unsupervised access to his toll records.[125]

*However, the information developed in the course of discovery so far provides no clear evidence that either past instances of such disclosure or the prospect of future disclosure have caused such injury.* To support an allegation that disclosure of toll-billing records "drastically curtails" plaintiffs' ability to gather news, individual plaintiffs provided only their conclusions of what *would, could,* or *might* happen if sources could not be guaranteed confidentiality. In each case plaintiffs were merely speculating.[126]

Even as to past injury, no plaintiff has demonstrated that he has ever lost a source as a result of a bad faith subpoena of his telephone billing records. The United States directed interrogatories to each plaintiff inquiring as to loss of sources from toll-record inspection. Each plaintiff responded that the inquiry was not applicable.

Two plaintiffs did indicate that information from confidential sources ceased at times coincident with the securing of telephone billing records by federal investigators. In other words, *plaintiffs have provided only two instances over a five-year period* to support their claim that disclosure to others of toll-call records effects a "drastic curtailment" of their journalistic functions.

Even in these two instances, however, the plaintiffs failed to show that the injury *resulted from* federal law enforcement access to telephone toll-billing records. In the first instance, plaintiff David E. Rosenbaum stated:

> In one instance, I *stopped contacting* one source after learning of an Internal Revenue Service subpoena for my telephone records because of concern that our relationship might jeopardize his career.[127]

Clearly this unilateral decision by Mr. Rosenbaum to terminate a reporter-source relationship is not sufficient evidence to support a contention that a source has been chilled.

---

125. Brief for Appellants at 22.

126. J.A. 167–198.

127. J.A. 188.

In the second instance, plaintiff Jack Anderson responded that in the course of a federal law enforcement investigation in which toll-billing records were utilized, some of his sources were questioned. He further stated that: "With only one exception, I never received any information from any of the sources again." [128] However, in responding to inquiry as to whether the refusal of any source to provide further information could be attributed to this disclosure he responded, "I do not know whether these sources stopped or refused to provide further information, or whether they simply never again had any information which they wished to provide to me." [129] This conclusion certainly does not support an allegation of injury as to his ability to gather and disseminate news as a result of governmental access to toll-billing records.

As exemplified by the foregoing references to the record, it is clear that plaintiffs have thus far failed to provide sufficient factual support for their assertion that unsupervised toll-record subpoenas result in substantial and irreparable injury to their news-gathering activities. At this stage, that assertion remains nothing more than speculation.[130]

Moreover, plaintiffs have so far failed to demonstrate an "*imminent* threat of harm." In order to meet the imminency requirement, plaintiffs in general have usually been required to show a pervasive pattern of past abuse such as will indicate a *continuing* program of misconduct.[131] Courts have frequently denied anticipatory relief when plaintiffs have failed to establish such

a pattern.[132] In *Long v. District of Columbia*,[133] the proprietor of a jewelry store had reported to the police that plaintiff, a "suspicious person," was in his store. On the basis of this report, the police initiated an investigation, went to the store and frisked plaintiff. Plaintiff "sought to enjoin the police from stopping and frisking individuals in any manner not in accord with their constitutional rights, alleging the actions complained of . . . to be typical and to be violative of constitutional rights." [134] In denying relief this Court said:

> Considerations of policy dictate that the courts act cautiously in granting injunctions against police action. A court should not bind the hands of the police on the mere possibility that certain conduct may be repeated. To do so would unnecessarily involve the courts in police matters and dictate action in situations in which discretion and flexibility are most important. *In order for a court to grant an injunction, there should be a showing that there is a substantial risk that future violations will occur.*
>
> *In order to show a substantial likelihood of future conduct, a clear pattern of harassment must be shown. Such a pattern should consist of frequent acts of misconduct by police officers,* which acts were known to the superior officers of the police force.[135]

Although establishing a pattern of past abuse has been the most common way of showing imminency, it is by no means the only way to meet that requirement; the appropriate manner of demonstration de-

---

128. J.A. 267.

129. J.A. 267.

130. Cf. *Branzburg v. Hayes,* 408 U.S. at 693–94, 92 S.Ct. 2646.

131. *Rizzo v. Goode,* 423 U.S. 362, 373–75, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Allee v. Medrano,* 416 U.S. 802, 815, 92 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Lewis v. Kugler,* 446 F.2d 1343 (3d Cir. 1971); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966).

132. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Long v. District of Columbia,* 152 U.S.App.D.C. 189, 469 F.2d 927

(1972); *Wilson v. Webster,* 315 F.Supp. 1104 (C.D.Cal.1970), *vacated and remanded,* 467 F.2d 1282 (9th Cir. 1972) (denial of injunction held proper); *Hughes v. Rizzo,* 282 F.Supp. 881 (E.D.Pa.1968).

133. 152 U.S.App.D.C. 187, 469 F.2d 927 (1972).

134. *Id.* 152 U.S.App.D.C. at 189, 469 F.2d at 929.

135. *Id.* 152 U.S.App.D.C. at 192, 469 F.2d at 932 (emphasis added).

pends on the circumstances of each case.[136] Still, the cases involving patterns of past misconduct do illustrate that a clear factual foundation must be laid in order to warrant prospective relief of the kind sought here.

In this case, plaintiffs have alleged only five instances of misconduct over a five-year period.[137] Most significantly, *there have been no toll-record subpoenas directed at plaintiffs,* and—as far as the record indicates—any other journalist, *since 1 March 1974, over four years ago.* Since that date AT&T has had in effect a new policy providing for notice to subscribers of toll-record subpoenas except in cases where the Government certifies that notice could interfere with an *ongoing* investigation. Moreover, the Department of Justice has issued guidelines under which certification generally is not to be made in cases involving *completed offenses.*[138] There is no indication that under this new regime notice will be withheld from journalists in the future. It is thus clear that *plaintiffs have so far failed to demonstrate that the alleged threat of future harm is, in any sense, clear and imminent—for this must be tested relative to the new AT&T policy effective 1 March 1974, not by practices undeniably abandoned.*[139]

Finally, plaintiffs have not shown that their remedy at law is inadequate. Under AT&T's new policy, plaintiffs will *always* be able to discover that a Government subpoena has been issued for their toll-call records. By placing their names on file with their telephone companies, plaintiffs can assure that they will be notified of a certificated subpoena as soon as the 90-day period and subsequent extensions, if any, expire. This guarantees that plaintiffs will

have the opportunity to bring *post hoc Bivens*-type damage suits in any case in which they believe the Government was acting in bad faith. Thus, the inevitability of damage suits would pose a significant deterrent to future Government misconduct, making totally unnecessary any type of equitable relief.

The dissent's position in this regard is unsound. According to the dissent, a plaintiff must show only two things in order to be entitled to the extraordinary prospective relief sought in this case: first, that he has a First Amendment right, and, second, that there exists an investigative technique that *might possibly be used in bad faith* so as to abridge that right. Under this approach, once a plaintiff has shown the existence of a right and the mere possibility of its infringement, he becomes entitled to insist that the Judicial branch superintend government investigations in order to prevent this hypothetical abuse.

■ This position is in direct conflict with the most fundamental tenets of equity and a series of Supreme Court cases, most notably *Rizzo v. Goode,*[140] *Allee v. Medrano,*[141] and *Laird v. Tatum.*[142] These cases reflect the well-established principle that judicial supervision of police activity predicated on the prospect of future abuse *must be based* on the imminence of future misconduct. The mere possibility of future misconduct is simply not enough.

Beyond the fact that it is utterly in conflict with the authorities, the dissent's approach would have the most absurd and pernicious practical consequences. Up until this time, it has been the law that a court would not assume prior review of government investigative action simply because it

**136.** See part II of Judge Robinson's opinion.

**137.** Brief for Appellants at 7.

**138.** J.A. 165.

**139.** *See Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) ("The fact is that respondents . . . have pointed to only a very few instances in the entire United States since 1971 involving the issuance of warrants for searching newspaper premises. This reality hardly suggests abuse; and if

abuse occurs, there will be time enough to deal with it.").

**140.** 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

**141.** 416 U.S. 802, 92 S.Ct. 2191, 40 L.Ed.2d 566 (1974).

**142.** 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

feared future misconduct; it would require a clear showing that such misconduct was a real and imminent prospect. The dissent's position would completely do away with this threshold. It would require only the existence of a constitutional right and the *possibility* of its abridgment. It would not base its anticipatory intervention into police investigative action on an actual past abridgment of rights, nor on a present abridgment of rights, nor on a probability of future abridgment of rights, but rather on a mere possibility of future abridgment of rights. *This approach has no logical stopping-point. There is no person in the United States who cannot meet these criteria.*

Any person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in *bad faith* so as to violate that right. Consider the following example. Suppose that some recognized leader of organized crime in the United States files suit in district court for a declaratory judgment that he must receive prior *notice* of any physical surveillance conducted against him. He claims (1) that he has a First Amendment right to association and (2) that physical surveillance could be used against him in *bad faith,* not for any legitimate law enforcement purpose, but rather to harass him in his personal relationships. He alleges, quite reasonably, that the very possibility of abusive surveillance deters people from associating with him. He alleges further that each time he is placed under physical surveillance he suffers irreparable harm to his associational rights because some of his confidential associates are exposed. He moves for summary judgment. Under the dissent's approach there is no principled reason *why this organized crime figure would not be automatically entitled to precisely the same anticipatory remedy sought by the "conceded journalists" in the instant case.* Why should *he* not be able to insist on prior notice, or at least ex parte judicial oversight, of any physical surveillance directed at *him* ?

It is not normally the role of the courts to hover over law enforcement officers, re-viewing, approving, and monitoring each step of a criminal investigation in order to satisfy itself that the officers are acting in *good faith.* The dissent declares its willingness to engage in this kind of supervision and to assume the administration of criminal investigations based solely on its own suspicion that the officers who are constitutionally charged with law enforcement responsibility will not be equal to the task and will act in *bad faith* as often as not. The dissent seems surprised that we are willing to permit Executive officials to perform their constitutional function and exercise their discretion without a *prior* judicial determination that they are acting in good faith. But in our view it is to these officers that the investigative power is committed in the first instance by law, and *it is in these officers that it should rest in the first instance until an adequate reason for judicial preemption is established.*

### C. *Summary*

Plaintiffs have contended that they have a right to receive prior notice of toll-record subpoenas issued in the course of criminal investigations. They have predicated this right on the supposed necessity for case-by-case judicial balancing (on the theory that good faith subpoenas may abridge their First Amendment rights) and on the supposed necessity for case-by-case judicial screening (on the theory that bad faith subpoenas may abridge their First Amendment rights).

First, by now it is undeniably clear that there is no need for case-by-case balancing where toll-record subpoenas have been issued in criminal investigations. It is undeniably clear because, one, good faith subpoenas do not abridge plaintiffs' First Amendment rights and, two, any judicial balancing of interests that may be called for need only be performed once, and such balance is to be struck in favor of the public's interest in effective law enforcement.

Second, it is also undeniably clear that plaintiffs have not yet established their en-

titlement to a case-by-case screening of toll-record subpoenas. While we have agreed *in theory* that subpoenas issued in bad faith may in some cases abridge First Amendment rights, all precedent forbids the Judiciary to assume superintendence of criminal investigations merely on the suspicion that Executive officers may act in bad faith in the future, and only permits such judicial intervention when a plaintiff establishes a *clear and imminent* threat of such future misconduct. Plaintiffs here have so far failed to lay an adequate foundation for such judicial intervention. The five remaining plaintiffs will have the opportunity to meet this heavy burden on remand.

*Affirmed in part and Remanded in part.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, concurring in part and concurring in the result:

I agree that appellants have not established their entitlement to the broad and extraordinary decree they seek in this litigation. In my view, there has not yet been a showing that the commonplace prohibitory injunction cannot safeguard, to the limit legally warranted, the constitutional interests appellants assert. In the same breath I hasten to acknowledge that certain of the appellants have brought forth enough to demonstrate a need for additional proceedings in the District Court with an eye toward possible equitable relief in the accustomed mode. Accordingly, I join unreservedly in Parts I, II and III, and in much of Part IV,[1] of Judge Wilkey's opinion, and

in the remand he proposes. I write simply to indicate what to me are the decisive elements in the case[2] and what considerations might bear on the proceedings on remand.[3]

## I

As a preliminary matter, I think it is relevant, though by no means dispositive, that appellants lack a constitutionally protectable interest in the privacy—simply for privacy's sake—of their toll records.[4] The proposition that news reporters, who may have occasion to contact confidential sources by long-distance telephone, are without reasonable expectations in that regard may not seem entirely self-evident. But as, by my reading, the Supreme Court's decision in *Miller*[5] inescapably applies to the situation at bar,[6] I need only say that the records do not fall within the purview of the Fourth Amendment.

What appellants do maintain is that prior notice and an opportunity to be heard, or at least some form of judicial oversight akin to that exercised over warrant applications,[7] is essential to protect the First Amendment interests they associate with their records. I think Judge Wilkey has correctly identified balancing and screening as the two principal aspects of the sought-after remedy.[8] I agree also that under *Branzburg*[9] a reporter's claim to anonymity of his news sources must yield to a good faith governmental request for the records in the context of a felony investigation.[10] No more

1. The divergence of my view from Part IV of Judge Wilkey's opinion is identified in note 4 *infra*.

2. In Part I *infra*.

3. In Part II *infra*.

4. I do not join in Part IV(A)(1)(b) of Judge Wilkey's opinion because the decisional alternative there discussed is unnecessary to disposition of this appeal. Moreover, the analysis appropriate for First Amendment issues concentrates on the burden inflicted on protected activities, and the result may not always coincide with that attained by application of Fourth Amendment doctrine.

5. *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976).

6. See Part III of Judge Wilkey's opinion.

7. See *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

8. See Part IV of Judge Wilkey's opinion.

9. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

10. Compare *Anderson v. Sills:*
The investigatory obligation of the police is surely no less extensive than the grand jury's. Indeed, the preventive role of the

than grand jury inquiries can governmental investigations into criminality be halted by impenetrable walls thrown up about reporters and their secret sources.[11] I would add that the breadth of the Government's demand is material only to the extent that it might evidence possible bad faith; an overly-broad inquiry per se would impose, from aught that appears, no constitutionally significant burden on newsgathering.[12] Accordingly, judicial oversight would be justified, if at all, solely to ferret out bad faith requests. By the same token, the question for decision boils down to whether judicial prescreening of the records-demands stemming from felony investigations can be justified on the theory that all may not be properly motivated.

Even the narrowest possible requisition of toll-billing records may result in disclosure of scores of telephone numbers completely unrelated to the investigation.[13] Information that a reporter-informant contact was made sometime during a given period, for example, normally would necessitate examination of the reporter's records for the entire period, though only one—and possibly none—of the many listings will bear directly on the subject of the investigation. Inevitably facing that prospect, it seems unlikely that an anonymous informant will be incrementally deterred by the realization that any records-request may be somewhat broader than is actually necessary.[14] The situation before us is unlike

> police necessarily implies a duty to gather data along a still wider range.
> 56 N.J. 210, 265 A.2d 678, 688 (1970).

11. I am unmoved by appellants' contention that, as a matter of Fifth Amendment due process, they are entitled to notice of individual records-requests and a pre-release opportunity to be heard. In the ordinary due process situation what may trigger a notice-hearing requirement is the well-nigh certainty that governmental action, unless stopped or set for naught, will devastate a protected liberty or property interest, and it matters not whether the action working the destruction was taken in good faith or bad. For example, dismissal from a tenured position deprives the employee of his job, whether or not the firing was proper, and it is that deprivation that engenders the right to be heard. See *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Sherrill v. Knight*, 186 U.S.App.D.C. 293, 569 F.2d 124 (1977). In the situation confronting us, however, particular divulgences of toll-billing records will not predictably impose a burden upon appellants' First Amendment newsgathering activities—their liberty interest. Certainly, the common knowledge that toll records are utilized by federal investigators, and the resultant general deterrence to informants desiring anonymity, would not necessitate due-process procedures accompanying records-releasing—for the simple reason that the burden does not emanate from each individual records-request, but from the Government's general and broad-ranging practice. It is, moreover, unlikely that each request will become known to the implicated informants or that, even if so apprised, they will with any regularity discontinue telephonic communication with the reporter as a result. Though reporters assuredly might face burdens from harassment of sources by officials who learn their identities through toll records, such isolated impairment of the protected activity would not, under traditional doctrine, entitle the reporters to due process proceedings with respect to all of the requests, but only to case-by-case compensatory or preventive relief, see Part III *infra*. Compare *Sherrill v. Knight, supra* (denial of White House press pass, plainly inhibiting newsgathering activities, summons due process protections). See also *Zurcher v. Stanford Daily, supra* note 7 (police search of newsroom files does not constitute a prior restraint on press activities mandating notice and opportunity to be heard).

12. See text *infra* at notes 13–19.

13. Compare *Zurcher v. Stanford Daily, supra* note 7. That consequence may not be so readily tolerable outside the context of criminal investigation. The record in this case, however, does not sufficiently implicate noncriminal administrative investigations, see text of Judge Wilkey's opinion at notes 6–10, so I need not elaborate.

14. See *Branzburg v. Hayes, supra* note 9, 408 U.S. at 702, 92 S.Ct. at 2667–2668, 33 L.Ed.2d at 652–653 ("[i]f newsmen's confidential sources are as sensitive as they are claimed to be, the prospect of being unmasked whenever a judge determines the situation justifies it is hardly a satisfactory solution to the problem[;] [f]or them, it would appear that only an absolute privilege would suffice"), citing Note, *Reporters and Their Sources: The Constitutional Right to a Confidential Relationship:*

> Under the case-by-case method of developing rules, it will be difficult for potential informants and reporters to predict whether testimony will be compelled since the decision will turn on the judge's ad hoc assessment in

that in *Branzburg*,[15] where questions put directly to reporters might occasion a breach of the trust inspiring the confidential relationships with their sources, thus impairing the reporter's credibility—and hence their ability to deal—with informants so betrayed.[16] In that context, extensive inquiries would impose a much clearer burden on newsgathering than is discernible here. Nor does disclosure of toll records involve an appreciable likelihood of public exposure, subjecting implicated sources to the kind of community chastisement, loss of employment or simply dreaded notoriety [17] that might attach substantial constitutional importance to the divulgence of each and every listing.[18]

On the other hand, records-requests "bearing only a remote and tenuous relationship" [19] to a proper subject of investigation would become significant in the circumstances at bar insofar as they might engender an inference of bad faith. Indeed, appellants complain most staunchly about past instances of allegedly bad faith investigation, so characterized partly by the scope of the intrusion, and possible future repetition of the supposed abuses. To ensure detection of such instances and an opportunity to nip such conduct then in the bud, as well as to alleviate any chilling effect on covert news sources emanating from the prospect of harassment, appellants

different fact settings of "importance" or "relevance" in relation to the free press interests. A "general" deterrent effect is likely to result. . . . Leaving substantial discretion with judges to delineate those "situations" in which rules of "relevance" or "importance" apply would therefore seem to undermine significantly the effectiveness of a reporter-informer privilege.
80 Yale L.J. 317, 341 (1970). See also *Zurcher v. Stanford Daily, supra* note 7, 436 U.S. at 563–564, 98 S.Ct. at 1982, 56 L.Ed.2d at 542.

15. *Branzburg v. Hayes, supra* note 9.

16. Additionally, the only way a reporter could possibly protect confidential informants from discovery through his own compelled testimony would be to remain ignorant of the informant's identity or identifying characteristics, knowledge of which likely would be essential to enable the reporter to confirm the reliability of the source.

It is true, as the dissent points out, that our holding precludes a reporter from assuring his sources that judicial procedures will invariably be exhausted prior to release of toll billing records. See 192 U.S.App.D.C. at ——, 593 F.2d at 1091, (dissenting opinion). That observation, however, simply does not address the issue whether governmental acquisition of toll records burdens news-gathering as severely as does compelling reporters personally to betray their sources, so as to *justify* provision of judicial procedures at all.

17. Though the general public may not gain knowledge of informants' identities, the records-requesting officials may, but apart from the general deterrence problem, see text *supra* at note 9, that itself would impose no burden unless the officials act on their knowledge. Of course, investigative officers may pursue leads obtained from the records and, in so doing, contact reporters' informants, with a resultant chilling effect on those particular sources. But

it is not likely that investigators will with any frequency indiscriminately *contact* informants *not possibly possessing* relevant information, both because of the risk of impeding the investigation by undue publicity and simply because of the *administrative disutility. The record on* appeal does not indicate that the contrary proposition is a realistic or substantial contingency. Nor is the likelihood of avoidable mistaken follow-ups sufficiently great to imbue each request for records with constitutional significance. See generally note 11 *supra.*

18. Compare *Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Watkins v. United States,* 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *Sweezy v. New Hampshire,* 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957). See also *Buckley v. Valeo,* 424 U.S. 1, 64–74, 96 S.Ct. 612, 656–661, 46 L.Ed.2d 659, 713–719 (1976).

Appellants have averred, however, that many of the released toll-records remain in government files, freely accessible to governmental agents. Reply Brief for Appellants at 15. The proper vehicle for ventilation of that grievance is a suit for expungement of the records, or perhaps some lesser limitation on dissemination. See, e. g., *Peters v. Hobby,* 349 U.S. 331, 348–349, 75 S.Ct. 790, 799, 99 L.Ed. 1129, 1142 (1955); *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 58, 478 F.2d 938, 968, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); *Finley v. Hampton,* 154 U.S.App.D.C. 50, 473 F.2d 180 (1972); *United States v. McLeod,* 385 F.2d 734, 749–750 (5th Cir. 1967); *Wilson v. Webster,* 467 F.2d 1282, 1283–1284 (9th Cir. 1972).

19. *Branzburg v. Hayes, supra* note 9, 408 U.S. at 710, 92 S.Ct. at 2671, 33 L.Ed.2d at 656 (Powell, J., concurring).

seek certain procedural safeguards. Specifically, they ask for notice and the privilege of a hearing, or at least ex parte judicial scrutiny when exigent circumstances foreclose adversary proceedings,[20] prior to release of any toll-billing record.

One difficulty is that the same remedy is logically invokable by an untold number of others in an intolerable number of constitutionally-indistinguishable situations. It seems apparent that anyone engaged in gathering information from those who wish to remain anonymous can equally claim protection against governmental inquiries designed to harass either party. Similarly, everyone who is party to any legitimate and sensitive association with another would under appellants' theory be entitled to a judicial prescreening of toll-record requests designed to eliminate bad faith probes into those associations and dissipate fears that such transgressions might occur. One would be hard put in any effort to justify for reporters a special safeguard not available to other citizens enjoying comparably vulnerable First Amendment relationships.[21]

Nor is there any satisfying reason why judicial screening, if appropriate here, should be limited to attempts to obtain toll-billing records. Without an arbitrarily-drawn line, at least an ex parte judicial procedure would logically become a precondition to any governmental investigative activity that might, if conducted in bad faith, inhibit First Amendment freedoms— or, at a minimum, confidential information-gathering and associational relationships. If judicial prescreening of governmental operations is justified by no more than a

possibility of harassment of a legitimate confidential alliance susceptible to impairment, a wide range of investigative pursuits would become subject to a general requirement of prior authorization. For quite often investigation into criminality unavoidably touches on sensitive noncriminal associations, and any such enterprise could have been initiated in bad faith.

Not only does appellants' thesis portend these consequences but it would also obliterate every semblance of the showing ordinarily prerequisite to injunctive protection by the judiciary.[22] And, equally disturbing, the blanket prescreening mechanism appellants advocate is not even remotely tailored to the size of the problem supposedly occasioning its adoption. To detect and prevent abuses at best shown to occur but rarely, appellants would involve the judiciary in an ongoing audit of governmental felony investigations,[23] a safeguard not withholdable from countless others engaged in First Amendment activities without judicial endorsement of distinctions themselves repugnant to the First Amendment. Throughout our national history the press has flourished without absolute safeguards against governmental misconduct.[24] The judicial process has always provided, and doubtless will continue to afford, a measure of protection that hardly can be deemed either inadequate or unwholesome; and if every jeopardy to the press heightens, the traditional process will rise to quell it. I am not yet ready to give up on orthodox legal doctrine as the vehicle capable of maintaining a reasonable and workable accommodation between the justifiable needs of reporters and the functional needs of their government.

---

**20.** The realities of the situation would probably make resort to ex parte proceedings the rule rather than the exception because most likely the Government would establish a reasonable need for secrecy in the vast majority of cases.

**21.** See, e. g., Zurcher v. Stanford Daily, supra note 7; First Nat'l Bank v. Bellotti, 435 U.S. 765, 796–802, 98 S.Ct. 1407, 1426–1429, 55 L.Ed.2d 707, 730–733 (1978) (concurring opinion); Pell v. Procunier, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); Branzburg v. Hayes, supra note 9.

**22.** See Part II infra.

**23.** See note 26 infra.

**24.** See Branzburg v. Hayes, supra note 9, 408 U.S. at 698–699, 92 S.Ct. at 2665, 33 L.Ed.2d at 649 ("[f]rom the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished"); id. at 706, 92 S.Ct. at 2669, 33 L.Ed.2d at 654 ("the press has at its disposal powerful mechanisms of communication and is far from helpless to protect itself from harassment or substantial harm").

## II

To avoid overly-extensive judicial involvement in investigative activities, courts ordinarily demand a showing that constitutional interests are threatened imminently, and not just speculatively, as a prerequisite to injunctive imposition of prospective restrictions.[25] On the one hand, a vague possibility of bad-faith governmental conduct—though perhaps projecting some chill on First Amendment activity—usually will not prompt extraordinary relief.[26] On the other hand, demonstration of a "reasonable probability" of impending and irreparable injury will invite an injunctive order to bar its occurrence.[27] My view is that within this doctrinal framework appellants, like others similarly situated, can obtain adequate protection against undue incursions upon their First Amendment pursuits. If and when appellants establish a threat to newsgathering that has crystallized substantially beyond a general and undifferentiated apprehension of possible future harassment, prospective relief fully commensurate with their needs is obtainable.[28] For the injunctive process is a highly flexible one, always sensitive and responsive to the exigencies of particular situations.

Indisputably, equitable relief can, and indeed unfailingly should, be "molded and adapted to the circumstances of the case."[29] Put another way, "since injunctive relief should be equitable above all else, it must always be a question of balancing and of choosing the remedy."[30] Very importantly for this litigation, the extent and character of the anticipated injury naturally influences the readiness with which relief will be

**25.** See, e. g., *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Socialist Worker's Party v. Attorney General,* 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Marshall, J., as circuit justice) (application for stay); *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974); *Sullivan v. Murphy, supra* note 18, 156 U.S.App.D.C. at 55, 478 F.2d at 965; *Gomez v. Wilson,* 155 U.S.App. D.C. 242, 246–247, 477 F.2d 411, 415–416 (1973); *Long v. District of Columbia,* 152 U.S. App.D.C. 187, 469 F.2d 927 (1972). See generally, e. g., *Connecticut v. Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602, 609 (1930); *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 307 (D.D.C.), aff'd, 179 U.S.App. D.C. 22, 548 F.2d 977 (1976); 11 C. Wright & A. Miller, Federal Practice & Procedure, § 2942 at 369 (1973). See also *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

**26.** See, e. g., *Socialist Worker's Party v. Attorney General, supra* note 25; *Laird v. Tatum, supra* note 25; *Washington Free Community, Inc. v. Wilson,* 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973); *Philadelphia Yearly Meeting of the Religious Soc'y of Friends v. Tate,* 519 F.2d 1335 (3d Cir. 1975); *Anderson v. Sills, supra* note 10; cf. *Allee v. Medrano, supra* note 25.

**27.** *Carroll v. Associated Musicians,* 206 F.Supp. 462, 478 (S.D.N.Y.), aff'd, 316 F.2d 574 (2d Cir. 1962); see, e. g., *SEC v. Culpepper,* 270 F.2d 241, 249–250 (2d Cir. 1959); *SEC v. Okin,* 139 F.2d 87, 88 (2d Cir. 1943); *United States v. Sars of La., Inc.,* 324 F.Supp. 307, 310 (E.D.La. 1971); *SEC v. Dott,* 302 F.Supp. 169, 171 (S.D. N.Y.1969); *United States ex rel. Brown Bros.*

*Grading Co. v. F. D. Rich Co.,* 285 F.Supp. 572, 577 (D.S.C.1968); *First Nat'l Bank v. First Bank Stock Corp.,* 197 F.Supp. 417, 428 (D.Mont.1961).

**28.** I divorce myself at the outset from any notion that the prescreening device appellants contend for would summon any really novel exertion of judicial authority. A prescreening remedy, in my view, would constitute no more or less than an exercise of the "large discretion" of the district courts "to model their judgments to fit the exigencies of the particular case." *International Salt Co. v. United States,* 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20, 28 (1947). See also *United States v. Crescent Amusement Co.,* 323 U.S. 173, 185, 65 S.Ct. 254, 260, 89 L.Ed. 160, 170 (1944). The scope of an equitable decree is to be measured by the needs of the successful litigant for remediation, see *infra,* and the basic problem here is the caliber of the showing on that score, not the power of the judiciary to fashion effective relief.

**29.** 7 J. Moore, Federal Practice Digest ¶ 65.-18[3] at 65–133 (2d ed. 1975); see e. g., *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754, 760 (1974); *Harrisonville v. W. S. Dickey Clay Mfg. Co.,* 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933); *Sterling v. Constantin,* 287 U.S. 378, 403–404, 53 S.Ct. 190, 197, 77 L.Ed. 375, 388 (1932); 11 Wright & Miller, *supra* note 25, § 2942 at 367–368.

**30.** *Acevedo v. Bookbinders & Mach. Operators,* 196 F.Supp. 308, 314 (S.D.N.Y.1961).

afforded.[31] Indeed, the calculus includes "the nature of the case, the probability of future violations, the probable extent of future damage reasonably to be anticipated, and the extent of the impairment of . . constitutionally guaranteed rights as balanced against" countervailing interests.[32]

Appellants have asserted, not unreasonably, that the harms ensuing from official misuse of their toll-billing records will be irremediable and unusually severe. More precisely, governmental harassment of newsgathering through bad-faith investigation, so they say, expectably would inflict an enduring burden on that First Amendment activity, and the public's interest in getting all of the news, insofar as appellants' sources might thenceforth decline to communicate valuable information.[33] The consequences appellants describe would

more predictably occur in some situations than in others, and well-founded apprehensions are susceptible to proof in some degree, at least circumstantially. At the same time, judges should recognize the not infrequent difficulty of translating anticipation into probable fact, and should weigh the evidence in that light in determining whether appellants' asserted interests, as well as the comparable interests of others, are deserving of solicitude. An objective · and commonsense approach will do much to shape the kind of showing justifying an award of equitable relief.[34]

Surely, proof of a pattern of past harassment ordinarily calls forth preventive measures.[35] But an actionable threat, capable of supporting prospective relief to the extent necessary to dispel it,[36] may in some cases

31. See *Harris Stanley Cole & Land Co. v. Chesapeake & O. Ry. Co.,* 154 F.2d 450, 453 (6th Cir.), *cert. denied,* 329 U.S. 761, 67 S.Ct. 111, 91 L.Ed. 656 (1946); *Clemmons v. Congress of Racial Equality,* 201 F.Supp. 737, 752 (E.D.La. 1962). See also *Brick v. Hirsch,* 331 F.2d 251, 255 (7th Cir. 1964); *cf. Conservation Counsel of N.C. v. Costanzo,* 398 F.Supp. 653, 674 (E.D. N.C.), *aff'd,* 528 F.2d 250 (4th Cir. 1975).

32. *Clemmons v. Congress of Racial Equality, supra* note 31, 201 F.Supp. at 752.

33. The possible long-term effects of harassment in the context at bar might satisfy the irreparability requirement, and provide as well some justification for less hesitant judicial action. Perpetration of a pattern of intrusions, each exacting a permanent and egregious injury to appellants and the public, is a result to be vigorously resisted rather than invariably demanded before relief will be afforded. To be sure, a factual presentation convincingly depicting a reasonable likelihood of imminent, not distant, danger is an indispensable prerequisite to prospective relief. See text *supra* at note 27. But the requirement might be met in particular cases by advertence to all the facts and circumstances, see text *infra* at notes 35–39, and when that is possible a supplicant should not be sent away to incur repetitive and crippling injury before "preventive" measures are taken.

If appellants can substantiate their claims of probable and severe long-term impairment of their newsgathering operations, they might have an even stronger case than the appellees in *Allee v. Medrano, supra* note 25. Efforts to organize a union were temporarily suspended through persistent police harassment, but injunctive relief would enable the appellees "to regain [their First Amendment] rights and con-

tinue furthering their cause by constitutional means" 416 U.S. at 815, 94 S.Ct. at 2200, 40 L.Ed.2d at 580.

34. See note 33 *supra.*

35. See, *e. g., Rizzo v. Goode, supra* note 25; *Allee v. Medrano, supra* note 25; *Sullivan v. Murphy, supra* note 18; *Gomez v. Wilson, supra* note 25; *Long v. District of Columbia, supra* note 25; *cf. Louis v. S.S. Baune,* 534 F.2d 1115, 1122 (5th Cir. 1976).

36. See text *infra* at notes 44–48. The cases demanding proof of a pattern generally involve requests for orders broadly enjoining an entire agency of Government rather than simply the wrongdoing officers. See authorities cited *supra* note 35. Even absent a demonstration of repetitive violations, though, an evidentiary showing may be strong enough to implicate high-level officials, see text *infra* at notes 44–48, but ordinarily that will not be so. See Note, *The Federal Injunction as a Remedy for Unconstitutional Police Conduct,* 78 Yale L.J. 143, 151–152 (1968). Apart from the problem of ensuring that only those who are culpable will be enjoined, broad department-wide relief carries a greater risk of undue intrusion on governmental affairs. That may be of decisional importance in particular cases. See *Rizzo v. Goode, supra* note 25. The remedy found too extensive there, "significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's 'latitude in the "dispatch of its own internal affairs." ' " 423 U.S. at 379, 96 S.Ct. at 608, 46 L.Ed.2d at 574, quoting *Sampson v. Murray,* 415 U.S. 61, 83, 94 S.Ct. 937, 950, 39 L.Ed.2d 166, 183 (1974), in turn

be indicated well enough by less than that. To illustrate, if the Government obtained for purposes of persecution the toll-billing records of a reporter's colleague at work on a mutual or related story sharply critical of the requesting agency, a reasonable likelihood of impending injury—at least at the hands of the official who perpetrated the original misdeed—may be inferrible so long as the news project continues. Of course, a showing by the Government that illicit event was an unfortunate and isolated incident, the better to be dealt with internally, could embarrass the reporter's claim to equitable relief, even against the wayward official.[37] But, as the Supreme Court has admonished, courts should "beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of resumption."[38] If past incidents are to be discarded judicially, "the court must be satisfied that there is no reasonable expectation of future injurious conduct."[39]

Moreover, an actual instance of harassment might summon the equitable powers of the court in another respect. As we ourselves have declared, "[a]ssuming a determination of constitutional violations, it is undeniable that the Federal courts having subject-matter jurisdiction also have broad equitable power to remedy and obviate all traces of the constitutional wrong."[40] In so saying, we simply echoed the Supreme Court's pronouncement that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad"[41]—because "breadth and flexibility are inherent in equitable remedies."[42] Consonantly with these principles, a reporter may be able to establish that an incident of harassment was so disruptive of his ongoing newsgathering activities—by virtue of the reluctance of his informants to communicate with him—that some assurance to assuage them against recurrence of the act is essential to effective pursuit of his reporting functions. The peculiar and devastating propensity of

quoting, *Cafeteria Workers v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230, 1237 (1961). See also *Lewis v. Hyland,* 554 F.2d 93, 101 n.24 (3d Cir.), *cert. denied,* 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977).

Additionally, the pattern cases generally have had *no occasion to consider whether the peculiarities and circumstantial context of a single instance* of harassment can ever substantiate an inference that the event was not isolated—*in the sense of aberrational and nonrecurrent*—but instead was the first, or indeed the first-detected, transgression in a likely succession of serious violations. A facts-and-circumstances analysis was *suggested by the Third Circuit in Lewis, supra,* which declined to rule that a district court abused its discretion in denying injunctive relief against individual troopers when the record suggested that *violations by them had been no more than "random acts,"* 554 F.2d at 101 & n.24. Moreover, an injunction against individual police officers in that case *would have impinged intolerably on their* daily law-enforcement functions. See *id.* at n.24. The court quoted the district court approvingly, however, to the effect that "the court would [not] hesitate to shape such relief if future misconduct on the part of the named defendants is brought to its attention." *Id.*

**37.** See text *infra* at notes 44–48.

**38.** *United States v. Oregon State Medical Soc'y,* 343 U.S. 326, 333, 72 S.Ct. 690, 696, 96 L.Ed. 978, 988 (1952); accord, *United States v.*

*Richberg,* 398 F.2d 523, 530 (5th Cir. 1971); *United States v. Sars of La., Inc., supra* note 27, 324 F.Supp. at 310; 11 C. Wright & A. Miller, *supra* note 25, § 2942 at 371–372.

**39.** 11 C. Wright & A. Miller, *supra* note 25, § 2942 at 371–372. See also note 27 *supra* and accompanying text.

**40.** *Sullivan v. Murphy, supra* note 18, 156 U.S. App.D.C. at 56, 478 F.2d at 966.

**41.** *Swann v. Charlotte-Mechlenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566 (1971); *cf. Rizzo v. Goode, supra* note 25, 423 U.S. at 377, 96 S.Ct. at 607, 46 L.Ed.2d at 573 (*Swann* does not support the imposition of prophylactic measures following constitutional wrongs when the decree interferes with internal policies of an executive department and the order ensnares officials not implicated in the violations, because federal "judicial powers may be exercised only on the basis of a constitutional violation," quoting *Swann v. Charlotte-Mechlenburg Bd. of Educ., supra,* 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d at 566).

**42.** *Swann v. Charlotte-Mechlenburg Bd. of Educ., supra* note 41, 402 U.S. at 15, 91 S.Ct. at 1276, 28 L.Ed.2d at 566.

the injury alleged and substantiated, then, may justify some guaranty of prior notice, or even some amount of ex parte judicial oversight as an appropriate grant of equitable remediation, for as long as seems necessary to dissipate the impact of the wrongful conduct.[43]

In still another respect, available relief will be shaped by the magnitude of the constitutional violation portended. It is well settled that a prospective order may run against only those who are privy to the violation.[44] Accordingly, before an injunction may be entered against an agency— qua agency—of the Government, involvement of its policymaking officials must ordinarily be shown.[45] In circumstances suggesting politically-motivated action—appellants' principal concern—an inference of high-level participation might readily arise. The burden of producing evidence to dispel that inference would then fall upon the Government[46] and, within bounds,[47] the ultimate determination would be a factual one for the court. And even when a plaintiff is able to establish no more than involvement of a lone employee of the agency, he may have earned a conventional decree warding off future transgressions by that employee, and incidentally by any and all those "in active concert or participation" with knowledge of the court's order.[48]

I do not mean, of course, to suggest that a district court should ever award injunctive relief[49] when not persuaded that the exigencies of the case demand it. Without doubt, "unduly obstrusive or hasty judicial intervention can undermine the important values of [official] self-restraint and self-respect."[50] I wish simply to emphasize the self-evident proposition that when "plaintiffs establish that a substantial threat of . . . constitutional violations exist," the importance of preserving official initiative "is not the sole consideration for the court."[51] I think it bears elaboration, too, that the substantiality and imminency of the threat are not to be determined by talismanic rules, but—in the centuries-old equitable tradition—by careful examination and weighing of all relevant facts, tempered by a pragmatic sensitivity to what is at stake. If any one principle is paramount, it is that the hand of the judiciary will move no more or less surely or intrusively than the circumstances dictate, for only in this fashion courts can "protect the constitutional rights of citizens, while preserving the integrity and efficiency of the law enforcement authorities."[52]

---

**43.** "[T]he *prospective* features of a *final* injunctive decree are subject to vacation or modification when warranted by equitable principles in the light of changed conditions." 7 J. Moore, *supra* note 29 ¶ 65.08 at 87–88 (emphasis in original); see Fed.R.Civ.P. 60(b)(5).

**44.** See note 41 *supra*.

**45.** See *Rizzo v. Goode, supra* note 25; *Long v. District of Columbia, supra* note 25; *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966). See generally Note, *supra* note 36.

**46.** Compare *Sullivan v. Murphy, supra* note 18, 156 U.S.App.D.C. at 29, 32, 478 F.2d at 967, 970.

**47.** Compare *Rizzo v. Goode, supra* note 25, with *id.,* 423 U.S. at 381–387, 96 S.Ct. at 609–612, 46 L.Ed.2d at 575–579 (dissenting opinion).

**48.** See Fed.R.Civ.P. 65(d). See also *Lewis v. Kugler,* 446 F.2d 1343, 1351 n.17 (3d Cir. 1971) ("should the court find that, unknown to their superiors, deprivations of constitutional rights are perpetrated by only a few [officers], it might be possible to fashion a remedial order only with respect to those defendants").

**49.** Worth mentioning is that in some circumstances a declaratory judgment might serve a plaintiff nearly as well as a more coercive remedy. Of course, equitable principles have a role in the grant of declaratory relief, and an injunction may follow on its heels. See *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). More usually, however, since the plaintiff's legal rights would be well settled, the action would be for an injunction to enforce their threatened breach.

**50.** *Long v. District of Columbia, supra* note 25, 152 U.S.App.D.C. at 194, 469 F.2d at 934 (concurring opinion); accord, *Washington Free Community, Inc. v. Wilson, supra* note 26, 157 U.S.App.D.C. at 364, 484 F.2d at 1082.

**51.** *Lewis v. Kugler, supra* note 48, 446 F.2d at 1352.

**52.** *Id.*

In this doctrinal milieu, I think appellants can adequately guard against any appreciable inhibition on their newsgathering activities from ill-motivated governmental attempts to peruse their toll-billing records. Only five of the appellants, however, have endeavored to substantiate, or even to aver, any singular threat to their newsgathering efforts, and thus far have made only a lukewarm showing at that. All five allege that on one occasion, their records were obtained for political purposes, but none has recounted any substantial withering of confidential sources or even a single instance of informant-withdrawal clearly attributable to assertedly illegal conduct.[53] Indeed, the record evinces on the whole a strikingly meager impact on appellants' constitutionally-protected endeavors stemming from governmental uses of toll-billing records in the course of criminal investigations.[54] Nonetheless, viewed liberally, the evidentiary showings of these five appellants are enough to entitle them to the opportunity to a fuller presentation at trial, and resultantly summary judgment as to them was inappropriate. Dismissal of the suit with respect to the others is, of course, without prejudice to any future attempt by them to obtain similar relief on a more particularized basis. So, as qualified by these observations, I concur in partial affirmance and remand of this case.

J. SKELLY WRIGHT, Chief Judge, dissenting:

Appellants, twelve professional journalists,[1] two corporations which publish newspapers,[2] and the Reporters Committee for Freedom of the Press, a legal research and defense fund, brought suit in the District Court for declaratory and injunctive relief on the basis of their claim that the First Amendment requires that prior judicial supervision be afforded before the American Telephone & Telegraph Company (AT&T) turns over their long distance telephone billing records to Government officials. The District Court granted summary judgment in favor of the defendants in this action, AT&T and the United States, and dismissed the suit. This appeal followed.

Relying on the Supreme Court's decisions in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), and *Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), the majority today holds that appellants are not entitled under the First Amendment to any prior judicial supervision of Government de-

---

**53.** See 192 U.S.App.D.C. at ——, 593 F.2d at 1067–1068 (Wilkey opinion).

**54.** See Parts I(C)(D), IV(D)(2) of Judge Wilkey's opinion. Assuredly, appellants manifestly have failed to establish a need for the across-the-board prescreening remedy they seek. From all that appears, the practice appellants challenge operates neither directly nor indirectly "to foreclose them from engaging in newsgathering activities," as the dissent suggests. See —— U.S.App.D.C. at ——, 593 F.2d at 1091. The Government has not undertaken to forbid or even to regulate appellants' use of the telephone. And the record reflects little more than appellants' surmise that informants generally will decline to respond to reporter-initiated long-distance calls unless we construct prospective protections. Indeed, appellants' averments that they can and do engage often in telephonic communication with sources evidence an absence of ill effects from the disputed practice on their newsgathering pursuits. I realize that it may be difficult to establish the evils of chill and harassment in the ordinary evidentiary way, but when a substantial impairment of First Amendment activities is not fairly evident on the face of the challenged practice, courts need more than broad unsupported assertions by the parties regarding how others might react. Compare *Buckley v. Valeo,* supra note 18, 424 U.S. at 73–74, 96 S.Ct. at 660–661, 46 L.Ed.2d at 718–719. My observations concern, of course, appellants' insistence upon a prescreening remedy available even to those among them who have stated no facts indicating actual adverse experiences. The allegations of those remaining—while, as they now stand, are inadequate to justify prescreening, either for themselves individually or as a matter of general applicability—are sufficient to survive summary judgment.

**1.** Jack Anderson, Marquis W. Childs, Emmett Dedmon, Richard Dudman, Morton Mintz, Bruce Morton, John Pierson, James R. Polk, David E. Rosenbaum, Richard Salant, Daniel Schorr, and Frederick Taylor.

**2.** Dow Jones & Co., Inc. and The Knight Newspaper Group of Knight-Ridder Newspapers, Inc.

mands for their toll billing records. Both of these decisions, however, far from holding that the First Amendment rights involved were deserving of no procedural protections, turned explicitly on the determination that the prior judicial scrutiny on a case-by-case basis which *was* afforded was sufficient to protect the First Amendment rights at stake. In the instant case, on the other hand, no form of judicial scrutiny at all is provided.

In view of these decisions, and taking account of the interests asserted here by both the Government and the appellants, it is my opinion that some opportunity for judicial scrutiny such as that afforded in *Branzburg* and *Stanford Daily* must be provided here as well. In rejecting this conclusion the majority fails to accord adequate weight to the critical First Amendment interests at issue here, and fails to provide appellants with the protection of prior judicial scrutiny which has long been recognized to be appropriate where First Amendment rights are at stake. I therefore respectfully dissent.

## I. BACKGROUND

Prior to 1974 AT&T had no formal policy governing provision of long distance toll billing records to Government investigators. Instead, the decisions were left to individual operating companies,[3] whose general practice was to provide such records when-

ever requested with no notice afforded to the subscriber by either the Government or the companies.[4] On at least five, and allegedly six, occasions[5] the toll billing records of appellants were provided to the Government in accordance with this general practice. During the summer of 1971, for example, after the printing of portions of the Pentagon Papers in publications with which Richard Dudman and Knight Newspapers were affiliated, the Chesapeake & Potomac Telephone Company (C&P) provided agents of the Federal Bureau of Investigation (FBI) involved in the Daniel Ellsberg-Pentagon Papers investigation with the long distance records for telephones listed to Dudman and Knight Newspapers. Joint Appendix (JA) 268–270. That same summer the FBI, acting on a White House request that it learn the sources of a column by Jack Anderson about an official of the Agency for International Development who had "crashed" a party for Vice President Agnew which, in the words of a State Department cable quoted by Anderson, "culminated in his getting sloshed," secured from C&P toll records for telephones listed to Anderson and three of his employees. JA 168–171, 219–221.[6] A final example worthy of note occurred in early 1974 and involved David Rosenbaum of the New York Times. A taxpayer complained to the Internal Revenue Service (IRS) that Rosenbaum knew about an investigation of

---

**3.** AT&T and the associated companies of the Bell System operate a nationwide telecommunications system. Actual telephone service is provided by the individual associated companies, which also maintain their subscribers' toll billing records.

**4.** Letter of F. Mark Garlinghouse, Vice President and General Counsel, AT&T, to Lloyd N. Cutler, December 28, 1973, JA 25–26 ("You are correct that no notice is given to any subscriber whose billing records are the subject of process. * * * Nor do we believe the law requires or indeed permits notification of a third party prior to compliance with legal process.").

**5.** Apart from the five incidents admitted by appellees, discussed in text and footnote in this section, appellants alleged and introduced documentary evidence to prove that in February 1973 the federal government obtained James Polk's residential toll records without any form

of judicial or administrative process. According to the documentary evidence introduced, the records were sought at the request of a White House official as part of a larger effort to learn embarrassing personal and financial information about Polk which could be used to halt his stories relating to Herbert Kalmbach's campaign contribution activities. JA 181–186.

**6.** On another occasion the FBI obtained toll records of Anderson and one of his employees while investigating an informant's report that Mr. Anderson had arranged to obtain documents removed from the Bureau of Indian Affairs by members of a militant Indian group. JA 127–129, 261–264. These records comprised approximately 1,500 toll calls including some, in accordance with the FBI request, made as many as three months before the documents were removed. JA 264–265.

the taxpayer being conducted by the IRS, and that Rosenbaum had suggested to the taxpayer that the investigation was being suppressed for political reasons. Although the IRS knew the identity of the agent likely to be Rosenbaum's source, it nonetheless requested and received from C&P the toll billing records, not only for Mr. Rosenbaum's telephone, but for all the telephones of the entire staff of the Washington Bureau of the New York Times for a six-month period. JA 241–246, 289–291.[7]

In none of these or the other admitted cases of Government requests for appellants' phone records was the Government agency involved required to establish probable cause for its request or to secure any form of judicial approval. Nor did the telephone companies in any way challenge the Government's authority to obtain the requested information. And neither the Government nor the telephone companies made any effort in any of these cases to notify the reporter or newspaper whose records were being sought of the request. As a result, at no time was the validity or constitutionality of the Government requests subject to any form of judicial scrutiny.

In December 1973 appellants wrote to AT&T requesting written assurances that

their toll billing records would no longer be provided to Government investigators without reasonable notice to the journalists involved.[8] In their letter appellants expressed their concern—which underlies this litigation—that listings of dates, times, and long distance telephone numbers called by a reporter could be used by the Government to identify the reporter's confidential sources.[9] Following this request AT&T and its operating companies, after meetings and discussions with Justice Department officials, JA 106–114, adopted a more formal policy governing compliance with Government requests for toll billing records. JA 39–43. Under this policy toll records are to be furnished whenever companies are presented with a Government summons. JA 40. While the policy purports to make notice to subscribers the general rule, it does not require that notice be provided *prior* to the company's compliance with the Government request.[10] Moreover, the AT&T policy allows for deferral of notice for at least 90 days whenever the Government certifies that notice *"could impede* the investigation." JA 40–41 (emphasis added).[11] Significantly, AT&T had originally proposed that notice be deferred only where the Government certified that notice *"would obstruct and impede* the investiga-

---

7. The six-month period chosen was unrelated to the investigation itself; rather, it was based on the IRS inspector's understanding "that they only maintained records for a six-month period of time. * * * [H]ad the phone company had more than just the six-month period of time involved, I would have obtained all of the records." Deposition of Michael De Sanctis, JA 200.

As soon as the New York Times learned of this matter and communicated its concern to IRS Commissioner Alexander, the Commissioner immediately ordered all records returned to the telephone company. JA 194.

8. Letter of Lloyd N. Cutler to John DeButts, Chairman of the Board, AT&T, December 21, 1973, JA 17–21. *See also* JA 22–24 (listing additional names of journalists seeking assurances as to their records).

9. JA 19. The journalists also informed AT&T of their intent to take "appropriate legal action" should AT&T's assurance of reasonable prior notice in the future not be forthcoming. JA 21.

10. The AT&T policy provides:

Except as stated below, the subscriber whose toll billing records are subpoenaed by a government agency or legislative body (Federal, State or Local), in a civil or criminal investigation, shall automatically be notified by telephone, the same day that the subpoena or summons is received (only one attempt by telephone is necessary). This shall be followed by written notification within twenty-four hours after the receipt of the subpoena or summons.

JA 40.

11. The deferral provision applies to requests from legislative bodies and to requests related to felony investigations. Counsel for AT&T at oral argument expressed uncertainty as to whether the deferral provisions were applicable whenever an investigation being conducted might—at some point—lead to criminal charges.

tion being conducted." JA 120 (emphasis added). The language was altered at the Government's request.

In effect, AT&T's formal policy effects no substantial change from pre-1974 practice. During the period from March 1, 1974, when the new policy went into effect, through June 30, 1975, Government investigators on 32,000 occasions sought and received long distance toll records from the telephone companies. In 90 percent of these cases no notice was *ever* given to subscribers. JA 227–229. And, unlike *Branzburg* and *Stanford Daily,* in none of them was judicial approval ever obtained.

## II. THE FIRST AMENDMENT CLAIM

Appellants' claim that they are entitled to notice of Government requests for their toll billing records is founded on the First Amendment.[12] Relying heavily on the Supreme Court's decision in *Branzburg v. Hayes, supra,* appellants argue that their First Amendment rights to gather and dis-

seminate news are implicated when the confidentiality of their sources is threatened. Toll billing records, they point out, can be used by the Government to identify those sources with whom a journalist communicates by long distance telephone [13]—including sources wholly unrelated to the investigation being conducted by the Government. While the presence of these First Amendment interests does not mean that toll billing records may never constitutionally be disclosed, they argue, it does require judicial supervision prior to Government access to ensure that the requests are justified and the scope of disclosure limited in light of the constitutional interests involved.

In evaluating this claim I must begin by pointing out what is not involved here. First, this is not a case in which we are called upon to hold that journalists enjoy protection against certain forms of governmental action above and beyond other citizens. We deal here only with the claims of a discrete group of admittedly professional journalists and publishers continuously en-

---

12. While the majority devotes much attention to the protections afforded by the Fourth Amendment, appellants have raised no claim here for relief under the Fourth Amendment. What appellants seek in this case, at least as against the Government, is not protection of their privacy in and of itself, but rather protection of their newsgathering activities which fall squarely within the First Amendment.

But while appellants have made no claim based on privacy *per se* against the Government, AT&T's disclosure of toll billing records without notice calls into question the company's privacy obligations to its customers. The statutory scheme of the Communications Act regulating common carriers, *see* 47 U.S.C. § 605 (1970), as well as AT&T's own pronouncements and publicly stated policy of respecting subscriber privacy, *see* Washington Post, June 27, 1978, p. El, col. 6, suggest that one of the essential elements in the contractual relationship between the appellants and AT&T is the appellants' expectation of privacy, not only with respect to the content of communications over AT&T lines, but also with respect to the identities of the participants in those communications. And AT&T's responsibility for protecting that privacy is intensified by the fact that it is a common carrier with a legal monopoly.

Rather than respecting that responsibility, AT&T in this case entered into an agreement with the Government secretly to disclose records upon Government request. It has not

insisted that such requests be accompanied by court orders directing disclosure, *cf. United States v. New York Telephone Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (warrant and court order required by New York Telephone before it would assist FBI in installing pen register devices on subscribers' telephones), nor has it taken upon itself to ensure that notice is actually provided to subscribers of Government requests, even though it recognizes, as it must under our cases, that the appellants would have standing to challenge the Government subpoenas if so notified. By failing to take such steps, AT&T is effectively acting in concert with the Government to deny the appellants the opportunity to protect any rights they may have. Even if there were no First Amendment concerns in this case, AT&T should be precluded from so acting with respect to its own subscribers.

13. Toll billing records, maintained by the operating telephone companies in the AT&T system, contain the date, time, and duration of all toll calls charged to a subscriber's number, and the number called or, if the call is collect, the calling number. Commercially available directories may be, and have been, used by Government investigators to identify individuals according to their telephone numbers. JA 203. These directories, called "Telekeys," list telephone numbers numerically and give the name of the subscriber for each number listed.

gaged in the processes of gathering and distributing news. Whether or under what circumstances procedural protections should be afforded to other individuals on the basis of other First Amendment claims is a decision which is not before us today. Nor is this a case which requires us to establish new standards for balancing individual and governmental interests or to decide whether disclosure of toll billing records is justified in any particular case. Appellants seek only a declaration that their constitutional rights are threatened by the disclosure process, and that judicial supervision according to established First Amendment standards is therefore necessary.

The issues which this case does present are twofold: whether appellants possess any First Amendment interest which is threatened by disclosure of their toll billing records to the Government and, if so, whether they are entitled to an opportunity for prior judicial supervision on a case-by-case basis to safeguard that interest.[14] In my view, *Branzburg v. Hayes* and *Zurcher v. Stanford Daily,* considered in light of the circumstances present in this case, mandate an affirmative answer to both questions.

### A. *The First Amendment Interest in Newsgathering*

In *Branzburg* the Supreme Court was confronted with the claims of three reporters that they should not be required either to appear or to testify before a grand jury or at trial unless substantial showings of relevance and need were first made.[15] The "heart of the claim" in *Branzburg,* according to the Court, was "that the burden on news gathering resulting from compelling reporters to disclose confidential informa-

tion outweighs any public interest in obtaining the information." 408 U.S. at 681, 92 S.Ct. at 2656. While the Supreme Court rejected this claim and held that the reporters involved were required to testify, it explicitly recognized that newsgathering does qualify for First Amendment protection. "[W]ithout some protection for seeking out the news," the Court noted, "freedom of the press could be eviscerated." *Id.*

In reaching its conclusion that the public interest in investigating and prosecuting crimes justified any burden imposed on First Amendment rights in *Branzburg,* the Court emphasized the critical role of the grand jury in our system of justice and the limited nature of the intrusion on a reporter's relationship with confidential sources. The grand jury's authority to subpoena witnesses, the Court noted, is not only historic, but essential to its constitutionally mandated task of inquiring into possible criminal conduct and returning only well founded indictments. *Id.* at 688, 92 S.Ct. 2646. And the refusal to create a testimonial privilege for reporters subpoenaed in grand jury investigations does not "threaten the vast bulk of confidential relationships between reporters and their sources. Grand juries address themselves to the issues of whether crimes have been committed and who committed them. Only where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas." *Id.* at 691, 92 S.Ct. at 2661. These were not cases, the Court added, where a governmental institution "has abused its proper function, as a legislative committee does when it 'expose[s] for the sake of exposure.' * *

---

14. I agree with the majority that, while "AT&T is plainly in 'active concert or participation' with the Government in the activity precipitating plaintiffs' grievance," majority op. 192 U.S. App.D.C. at ——, 593 F.2d at 1075 we need not decide whether this participation amounts to governmental action, since adequate injunctive relief and compliance by AT&T does not depend on such a determination, *id.* 192 U.S.App. D.C. at ——, 593 F.2d at 1042.

15. The reporters argued that they should not be required either to appear or to testify "until and unless sufficient grounds are shown for believing that the reporter possesses information relevant to a crime the grand jury is investigating, that the information the reporter has is unavailable from other sources, and that the need for the information is sufficiently compelling to override the claimed invasion of First Amendment interests occasioned by the disclosure." *Branzburg v. Hayes,* 408 U.S. 665, 680, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972).

Nothing in the record indicates that these grand juries were 'prob[ing] at will and without relation to existing need.' * * * Nor did the grand juries attempt to invade protected First Amendment rights by forcing wholesale disclosure of names and organizational affiliations for a purpose that was not germane to the determination of whether crime has been committed * *." Id. at 699–700, 92 S.Ct. at 2666.

The Court's recognition of First Amendment protection for newsgathering and the limitation of *Branzburg's* balance to cases of good faith grand jury investigations were reiterated in the concluding paragraphs of Justice White's opinion for the Court. There he again stated that

news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.

408 U.S. at 707–708, 92 S.Ct. at 2670 (footnote omitted). These same themes, and "the limited nature of the Court's holding," were emphasized more strongly still by Justice Powell—the fifth member of the majority—in his concurring opinion:

The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources. * * *

As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. * * * Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. *The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.*

In short, the courts will be available to newsmen under circumstances where legitimate First Amendment interests require protection.

Id. at 709–710, 92 S.Ct. at 2671 (emphasis added; footnote omitted).

While reporters have, since *Branzburg,* been required on some occasions to disclose confidential sources in grand jury investigations and at trials, the courts have consistently read *Branzburg* as recognizing the First Amendment interests of reporters in confidentiality and as requiring a judicial balancing before disclosure is ordered. For example, in *Farr v. Pitchess,* 522 F.2d 464, 467–468 (9th Cir. 1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976), the Ninth Circuit stated:

It is clear that *Branzburg* recognizes some First Amendment protection of news sources. * * * The precise holding of *Branzburg* subordinated the right of the newsmen to keep secret a source of information in face of the more compelling requirement that a grand jury be able to secure factual data relating to its investigation of serious criminal conduct.

And in *Carey v. Hume,* 160 U.S.App.D.C. 365, 369, 492 F.2d 632, 636, *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974), this court, before upholding an order of disclosure in a civil libel suit, adopted as its approach one in which "the court will look to the facts on a case-by-case basis in the course of weighing the need for the

testimony in question against the claims of the newsman that the public's right to know is impaired." In *Carey* the court found that the information sought "appears to go to the heart of appellee's libel action," *id.; compare Baker v. F & F Investment,* 470 F.2d 778 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973) (disclosure not required); in ordering disclosure, however, it cautioned that "[t]he courts must always be alert to the possibilities of limiting impingements upon press freedom to the minimum; one way of doing so is to make compelled disclosure by a journalist a last resort after pursuit of other opportunities has failed." *Id.* at 639. *See also Cervantes v. Times, Inc.,* 464 F.2d 986 (8th Cir. 1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973); *Bursey v. United States,* 466 F.2d 1059, 1090 (9th Cir. 1972) (contempt convictions for refusal to answer sweeping grand jury questions reversed; rehearing subsequent to *Branzburg* denied); *Morgan v. State,* 337 So.2d 951 (Fla. 1976) (reversing contempt conviction of reporter where grand jury was not investigating a crime).

The First Amendment interests of journalists in gathering and disseminating news were addressed most recently by the Supreme Court in *Zurcher v. Stanford Daily, supra.* In that case the Court upheld the search of a newspaper office on the basis of a warrant issued by a judicial officer after a probable cause showing. In doing so, however, the Court did not deny that the First Amendment was implicated by the search of newspaper offices. Rather, the dispositive factor was that so long as the officer issuing the warrant "take[s] cognizance of the independent values protected by the First Amendment" in determining whether the search is reasonable,[16] the procedures afforded by the warrant requirement are sufficient to protect the newspaper's First Amendment rights.

In light of *Branzburg* and these subsequent decisions, I think there can be no question but that newsgathering does qualify for First Amendment protection. Nor can there be any doubt that newsgathering encompasses contacts with confidential sources of information, who may serve as the first step in the process of gathering, editing, and distributing information to the public. And the circumstances of this case, more strikingly than testimony before a grand jury, betray the potential for substantial infringement of this confidentiality and, with it, substantial burdening of the First Amendment rights of reporters—and of the flow of information to the public.

As a practical matter, appellants may often have little choice but to use long distance telephone lines to communicate with confidential sources outside the immediate area in which they work. Their toll billing records will therefore include information which can easily be used to identify their news sources—including those sources who would refuse to provide information in the absence of solemn and reliable assurances of confidentiality. Release of these records, in contrast to narrow grand jury questioning with regard to a particular crime or crimes, does, in effect, force "wholesale disclosure of names." *Branzburg v. Hayes, supra,* 408 U.S. at 700, 92 S.Ct. 2646. The Government learns not only the names of individuals "implicated in crime or possess[ing] information relevant to the grand jury's task," *id.* at 691, 92 S.Ct. at 2661, but also the names of all the sources with whom the reporter has communicated, many of whom may be individuals who bear no relation to *any* potential criminal investigation and thus would never be subject to disclosure through grand jury proceedings.[17] In-

**16.** *Zurcher v. Stanford Daily,* 436 U.S. 547, 570, 98 S.Ct. 1970, 1984, 56 L.Ed.2d 525 (May 31, 1978) (Powell, J., concurring).

**17.** This factor distinguishes not only the grand jury questioning at issue in *Branzburg,* but also Judge Wilkey's hypothetical questioning of neighbors and taxi drivers as to the identity of a particular source, Wilkey op. 192 U.S.App. D.C. at ——––——, 593 F.2d at 1048–1049. The better hypothetical analogy would be to questioning neighbors and taxicab drivers as to *every individual* with whom a reporter had communicated for as long as a six-month peri-

deed, the possibility that their names may secretly become available to the Government may "chill" sources generally, *see Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Zwickler v. Koota,* 389 U.S. 241, 245–252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Dombrowski v. Pfister,* 380 U.S. 479, 491, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), thus denying the public information by depriving the journalist of one of his more important means of information gathering.

And once a reporter's records are released, the damage is done. The Government can immediately identify all of the reporter's confidential sources, and the subsequent return of the records, or even a monetary award, cannot undo the injury.

Moreover, AT&T's release of toll billing records is not limited to subpoenas from grand juries charged with the "essential task" of investigating crime necessary to "securing the safety of the person and property of the citizen," *Branzburg v. Hayes, supra,* 408 U.S. at 700, 92 S.Ct. at 2666, and subject to judicial supervision. Forty-seven Government agencies, many with jurisdiction unrelated to enforcement of criminal laws, possess authority to request and obtain such records,[18] usually in secret, on their own initiative, and without any judicial control.

B. *Procedural Protections Under the First Amendment*

Having recognized a substantive First Amendment interest on the part of appel-

od—almost all of whom would be unrelated to the events under investigation. The difference between this situation and that suggested by Judge Wilkey, in terms of the burden thereby imposed on newsgathering, may admittedly be more one of degree than of kind. While this is not the time or place to seek to isolate and resolve all of the possible questions which might be raised as to the proper scope of the newsgathering protection afforded by the First Amendment, it does seem clear that a difference in the degree of a burden generally imposed and in the justifications for imposing that burden may be so substantial as to justify different degrees of procedural protections.

18. These agencies are:
1. National Labor Relations Board
2. Nuclear Regulatory Commission (Atomic Energy Commission)
3. Railroad Retirement Board
4. Federal Energy Administration
5. U.S. Tariff Commission
6. National Transportation Safety Board
7. Federal Maritime Commission
8. Federal Power Commission
9. Federal Trade Commission
10. Department of Agriculture
11. Small Business Administration
12. Interstate Commerce Commission
13. Civil Aeronautics Board
14. Securities and Exchange Commission
15. Veterans Administration
16. Coast Guard
17. American Indian Policy Review Commission
18. Council on Wage & Price Stability
19. Federal Election Commission
20. Federal Paper Commission
21. Commission on the Organization of the Government for the Conduct of Foreign Policy

22. Law Enforcement Assistance Administration
23. Department of Transportation
24. National Commission on Electronic Funds Transfers
25. National Transportation Safety Board
26. Environmental Protection Agency
27. National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance
28. National Commission on Consumer Finance
29. Public Land Law Review Commission
30. Subversive Activities Control Board
31. Federal Metal and Nonmetallic Mine Safety Board of Review
32. Interagency Advisory Commission on Compensation for Motor Vehicle Accident Losses
33. Federal Communications Commission
34. Federal Home Loan Bank Board
35. Internal Revenue Service
36. Commission on Civil Rights
37. FBI/Department of Justice
38. Commission on Government Procurement
39. Commission on the Review of the National Policy Toward Gambling
40. Detention Review Board
41. Foreign Claims Settlement Commission
42. Department of Health, Education and Welfare
43. Department of Housing and Urban Development
44. Consumer Product Safety Commission
45. Department of Interior
46. Federal Deposit Insurance Corporation
47. National Commission for Product Safety

List submitted by counsel for appellants at oral argument.

lants here—a recognition which, I think, the majority today must share—the question then becomes whether procedures for prior judicial scrutiny should be afforded appellants as a matter of First Amendment right. As the situation currently stands, no such scrutiny is available. Government summonses are issued without any form of judicial participation, and without any requirement of a showing equivalent to probable cause. The telephone companies themselves have no rights or interests to protect and therefore no basis and little incentive for challenging the scope or substance of the requests they receive. And because no notice is provided, appellants lack the opportunity to protest to a court, a right they would have if, as in *Branzburg*, they themselves were subpoenaed to testify or produce records in their possession.

In theory, of course, I think there can be no question that should appellants learn of government subpoenas for their records, they would have standing to go to court and move that such subpoenas be quashed. While the subpoenas here are addressed to the telephone companies rather than to appellants, the Government's argument that this fact renders them immune from challenge by appellants seems to me clearly without merit.[19] A similar argument was summarily rejected by this court in *United States Servicemen's Fund v. Eastland*, 159 U.S.App.D.C. 352, 488 F.2d 1252 (1973), *rev'd on other grounds*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975), in which a political association sought to enjoin execution of a congressional subpoena for the association's bank records. We stated in that case: "If the forced disclosure of the information concerning contributors to and membership in the appellant association vi-

olates its First Amendment rights, then it is too clearly an aggrieved person when a third person is under compulsion by the defendants to disclose this information to warrant discussion." 159 U.S.App.D.C. at 361, 488 F.2d at 1261. While reversing our decision on the merits on the ground of congressional immunity, the Supreme Court affirmed our holding that the Fund had standing to challenge the subpoena. 421 U.S. at 501 & n.14, 95 S.Ct. 1813. More recently, in *United States v. AT&T*, 185 U.S.App.D.C. 254, 567 F.2d 121 (1977), a suit brought by the Justice Department to enjoin AT&T from complying with a congressional subpoena, this court found that "the fortuity that documents sought by a congressional subpoena are not in the hands of a party claiming injury from the subpoena should not immunize that subpoena from challenge by that party. * * * The fact that the Executive is not in a position to assert its claim of constitutional right by refusing to comply with a subpoena does not bar the challenge * * *." 185 U.S. App.D.C. at 262, 567 F.2d at 129.

But while there can be no doubt that appellants *do* have the right to challenge subpoenas or summonses for their toll billing records, the current practices of the Government and AT&T serve effectively to deprive them of any opportunity to do so. The Government itself does nothing to ensure that notice is provided. And as for AT&T, while its policy purports to make notice to the subscriber the general rule, in 90 percent of the 32,000 instances in which individual toll records were provided to the Government between March 1, 1974 and June 30, 1975, no notice was *ever* given to the subscriber. JA 227–229. The First Amendment rights of appellants in this sit-

---

**19.** Appellees' reliance on such cases as *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); and *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), in support of this argument is clearly misplaced. In each of these cases the Supreme Court determined that the parties seeking standing would suffer no constitutional infringement were the records in question released. It was

the absence of any constitutional interest subject to infringement—rather than the fact that third-party subpoenas were involved—which left the parties in these cases without standing to challenge the subpoenas. Because the appellants here do possess a constitutional interest which will be impaired, at least to some extent, by release of their toll billing records, their situation is clearly distinguishable from those involved in the cases relied upon by appellees.

uation are thus protected only to the extent that they happen to learn of a request for their records either through the unlikely receipt of a phone call from the telephone company—and only one call is made even where notice is provided [20]—or through some other source of their own.

It is this purely random availability of procedural protections for First Amendment rights which I find wholly unacceptable. And, far from representing a safeguard that is in any sense unique, provision of judicial scrutiny has long been recognized as a fundamental element of First Amendment freedoms. Beginning primarily in the obscenity area and extending into other areas where First Amendment rights are at stake, the Supreme Court has insisted on procedural safeguards which demonstrate "the necessary sensitivity to freedom of expression." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 639 (1965). Such procedures do not serve as a form of equitable relief; to the contrary, they are grounded directly on the First Amendment and "assume an importance fully as great as the validity of the substantive rule of law to be applied." *Speiser v. Randall,* 357 U.S. 513, 520, 78 S.Ct. 1332, 1339, 2 L.Ed.2d 1460 (1958).

The critical element in such procedures has been the availability of "judicial superintendence" to ensure that First Amendment rights are protected. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). In *Freedman v. Maryland, supra,* for example, a Maryland statute providing for advance prescreening of motion pictures was struck down on the ground that it did not provide "for judicial participation in the procedure which bars a film, nor even assurance of prompt judicial review. * * * Only a procedure requiring a judicial determination," the Court found, "suffices to impose a valid final re-

straint." 380 U.S. at 58, 85 S.Ct. at 739.[21] And certainly, as Professor Monaghan has noted in detailing the development of First Amendment procedural requirements, "[i]f the Constitution requires elaborate procedural safeguards in the obscenity area, a fortiori it should require equivalent procedural protection when the speech involved—for example, political speech—implicates more central first amendment concerns." Monaghan, *First Amendment "Due Process",* 83 Harv.L.Rev. 518, 519 (1970).

Any lingering doubt as to the importance of judicial scrutiny to protection of First Amendment rights—and, in particular, to newsgathering rights such as those at issue here—must be laid to rest by the Supreme Court's decisions in *Branzburg v. Hayes* and *Zurcher v. Stanford Daily.* The determinative vote in both those decisions was cast by Justice Powell on the basis of his view that the majority opinions did indeed provide for prior judicial scrutiny and thus afforded sufficient protection to the First Amendment rights at stake. The pertinent language from his opinion in *Branzburg* is quoted in full above,[22] and a similar emphasis is found in *Stanford Daily.* There the question was not whether any judicial scrutiny is required where the First Amendment rights of reporters and newspapers are endangered by a search of a newspaper office; rather, the issue was whether the protections afforded by the Fourth Amendment warrant requirement were sufficient for First Amendment purposes as well. The majority, reasoning that the requirements of the Fourth Amendment must be applied with "scrupulous exactitude" where First Amendment rights are at stake, concluded that, if so applied, those requirements were sufficient to protect the constitutional interests of the reporters. 436 U.S. at 547, 98 S.Ct. 1970, *quoting Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13

**20.** *See* at ———— & n.10 of 192 U.S.App. D.C., at 593 F.2d at 1081–1082 & n.10, *supra.*

**21.** *See also Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Carroll v. President and Comr's of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Marcus v. Search Warrant,*

367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).

**22.** *See* 192 U.S.App.D.C., at ———, 593 F.2d at 1084 *supra, quoting* 408 U.S. at 709–710 92 S.Ct. at 2670–2671.

L.Ed.2d 431 (1965). In his concurrence Justice Powell again stressed that the majority's decision did protect First Amendment interests through the obligation imposed on the judicial officer, in determining whether a warrant should issue, to take account of First Amendment interests:

> This is not to say that a warrant which would be sufficient to support the search of an apartment or an automobile necessarily would be reasonable in supporting the search of a newspaper office. As the Court's opinion makes clear * * * the magistrate must judge the reasonableness of every warrant in light of the circumstances of the particular case, carefully considering the description of the evidence sought, the situation of the premises, and the position and interests of the owner or occupant. While there is no justification for the establishment of a separate Fourth Amendment procedure for the press, *a magistrate asked to issue a warrant for the search of press offices can and should take cognizance of the independent values protected by the First Amendment—such as those highlighted by Mr. Justice Stewart—when he weighs such factors.* If the reasonableness and particularity requirements are thus applied, the dangers are likely to be minimal. * * *

436 U.S. at 569–70, 98 S.Ct. at 1984 (emphasis added; footnote omitted). Thus in both *Branzburg* and *Stanford Daily* the decisions of the Supreme Court turned explicitly on the availability of adequate judicial protections to safeguard First Amendment rights. In *Branzburg,* as Justice Powell pointed out, the reporter could seek judicial review of the grand jury subpoena through a motion to quash; at that point the court was charged with "balanc[ing] [the] vital constitutional and societal interests on a case-by-case basis." 408 U.S. at 710, 92 S.Ct. at 2671. Similarly, the warrant procedure, as upheld in *Stanford Daily,* ensures that First Amendment rights of the press will not be jeopardized by searches unless and until a judicial officer has first concluded that the

search is reasonable in light of the First Amendment values at stake. And an initial showing of need is required in both cases: a grand jury must demonstrate a reasonable need for evidence in order to justify production under a subpoena *duces tecum,* and a judicial officer is empowered to issue a warrant only upon a showing of probable cause.[23]

## C. *The First Amendment Balance*

In this case, I think, the record clearly demonstrates that the potential intrusions on the First Amendment rights of the appellants are at least as great as those presented in *Branzburg* and *Stanford Daily.* And I am unable to discern a governmental interest in avoiding any form of judicial scrutiny which would distinguish this case from *Branzburg* and *Stanford Daily.* The procedural protections upon which the Court relied in both *Branzburg* and *Stanford Daily,* however, are completely lacking in this case. Here the question is not whether existing procedures for judicial scrutiny—through motions to quash or a warrant requirement based on probable cause—are sufficient to protect the First Amendment interests of appellants. For no such procedures are available.

In my view, the First Amendment mandates that they must be. While I would not impose protections greater than those available in *Branzburg* and *Stanford Daily,* I think it follows from those two decisions and from the interests asserted before us today that some form of prior judicial scrutiny must be available. Whether this scrutiny is provided by giving notice to the reporter—so as to afford an appellant here, like the reporters in *Branzburg,* an opportunity to file a motion to quash—or by a requirement—like the warrant requirement upheld in *Stanford Daily*—that government receive prior judicial approval before it secures an appellant's records, is not critical. But some judicial scrutiny must be available.

---

**23.** *See* Note, *Search and Seizure of the Media: A Statutory, Fourth Amendment and First* *Amendment Analysis,* 28 Stan.L.Rev. 957, 986 (1976).

In reaching this conclusion, I do not suggest that every government investigative technique which ever poses any threat to First Amendment freedoms necessitates imposition of full procedural protections, no matter what the cost to government. As the Supreme Court's opinions have consistently made clear, what is called for in determining what procedural protections must be afforded is a consideration of the scope of intrusion on First Amendment rights as well as the legitimate interests of government in avoiding whatever costs might accompany imposition of procedural safeguards. In this case, I think, consideration of these factors clearly warrants striking the categorical balance in favor of protection for appellants' interests and thus affording them the same procedural safeguards as those available to the reporters in *Branzburg* and *Stanford Daily*.

### 1. The Scope of the Intrusion

On the one hand, as noted earlier in setting forth the constitutional interest in newsgathering, the record clearly establishes that the danger posed to appellants' First Amendment interests—and to the public interest in learning of the news—by unrestricted Government access to their toll billing records is a substantial one. The reporters, in the conduct of their professional endeavors, are engaging exclusively in activity protected by the First Amendment. Their use of business telephones for long distance calls is primarily if not exclusively for this protected activity—gathering news. See JA 167, 174–180, 195–197. To restrain or foreclose appellants from making use of their telephones for long distance calls is, in effect, to foreclose them from engaging in newsgathering activity; the burden involved is placed squarely and directly—and exclusively—on First Amendment rights.

That the practices of the Government and AT&T for disclosing appellants' toll billing records do impose such a burden is also made clear by the record. The specific incidents of disclosure cited by appellants, it is true, occurred prior to adoption of AT&T's formal policy in 1974. But the figures noted earlier make clear that such disclosure continues to be widespread, and that notice to the subscriber is the rare exception rather than the rule.[24] The continuing and largely secret use of phone billing records in Government investigations on such a substantial scale poses serious obstacles to appellants' performance of their professional duties and may chill their "free and robust exercise of the[ir] First Amendment rights * * * ." *Zweibon v. Mitchell,* 170 U.S. App.D.C. 1, 40, 516 F.2d 594, 633 (1975) *(en banc), cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). And while concrete evidence is difficult to produce without compromising the confidentiality which appellants here seek to protect,[25] the record does contain incidents suggesting real and substantial harm to newsgathering as a result of disclosure without notice.

Appellants have offered a number of affidavits attesting to the critical importance of the telephone to effective newsgathering and asserting that at least some sources will refuse to communicate with reporters by long distance telephone where their confidentiality cannot in any way be protected.[26] Indeed, in at least one case where toll billing records were disclosed in the past, the sources whose telephone numbers appeared on the records, with only one exception, never again provided any information to the journalist involved.[27] Moreover, the

---

24. *See* 192 U.S.App.D.C. at ——————, 593 F.2d at 1081–1082, *supra;* JA 227 229.

25. Introduction of affidavits or depositions of particular sources to ascertain the specific reasons why they ceased providing information to reporters who are appellants in this action would be inherently inconsistent with maintaining the confidentiality of these sources.

26. *See, e. g.,* JA 167 (Jack Anderson); 174–175 (Richard Dudman); 176 (Morton Mintz); 177–180 (Bruce Morton); 195–197 (Daniel Schorr).

27. *See* JA 267 (Jack Anderson). While injury to individuals other than appellants does not, of course, contribute to their standing, it is worth noting, in support of appellants' claims as to how these records are used and their potential effect on newsgathering, that one of Jack Anderson's sources lost his job as a city attorney

possibility that sources will be identified through toll billing records can and does cause reporters to limit their contacts with sources who might otherwise provide newsworthy material, and to curtail their use of an essential newsgathering device, the telephone. Thus David Rosenbaum, after learning of the IRS request for his telephone records, ceased contacting one potentially very useful source because he feared their relationship might become known. JA 183. At the same time, so long as providing information to a reporter by telephone often leads to *automatic* disclosure of one's name to government authorities,[28] many individuals who are potential sources may simply refuse to communicate with reporters, causing the reporters, as well as the public, to lose newsworthy information.

Even apart from the chilling effect of appellees' disclosure practices on appellants' current use of their telephones, a further, continuing burden is imposed by the Government's practices once it secures the records. According to FBI agents, reporters' toll records are kept in files indexed according to the reporter's name, with access to these files available to virtually any FBI agent. JA 214–216. Thus the Jack Anderson toll records acquired by the FBI in 1971 remain on file and generally available to FBI employees. JA 224–225. Moreover, even with respect to the records of David Rosenbaum and the New York Times Washington Bureau, which IRS Commissioner Alexander ordered returned to C&P, some records remain available since the IRS failed to retrieve copies of "collateral requests" containing information from these records from district IRS offices.

## 2. *The Governmental Interest*

In striking a First Amendment balance the legitimate needs and interests of Government investigators must clearly be accorded substantial weight. This is particularly true where, as in at least some of the cases of Government demands for toll records, the Government is conducting investigations of criminal felonies. But this fact alone does not immunize every technique the Government employs in the pursuit of a legitimate investigation from First Amendment scrutiny. It is well established that the First Amendment imposes limits on what would otherwise be considered legitimate techniques of governmental investigation. *See Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). And the "validation of the broad subject matter under investigation does not necessarily carry with it automatic and wholesale validation of all individual questions, subpoenas, and documentary demands." *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963).

In this case the issue is not whether the Government should ever have access to appellants' toll billing records; it is simply whether some form of judicial supervision should be available prior to affording access to the Government. As to this latter question, I am unable to detect any substantial or legitimate Government interest in avoiding judicial scrutiny. For the objects of Government requests in this case—toll billing records—are subject to neither change nor destruction as a result of any delay or breach of secrecy which may accompany judicial supervision; the records are in ev-

following his identification by the FBI as an Anderson source on the basis of Anderson's toll records. *Id.*

**28.** For this reason I must disagree with Judge Robinson's suggestion that the burden in *Branzburg* "where questions put directly to reporters might occasion a breach of the trust inspiring the confidential relationship with their sources" is more substantial than the burden involved in this case. Robinson op., 192 U.S.App.D.C. at ——, 593 F.2d at 1073. So

long as the information in question must be secured directly from the reporter himself, the reporter is able at least to assure his sources that he will exhaust all legal procedures, if not face contempt and imprisonment, rather than reveal their identities. Here, on the other hand, the reporter cannot even assure his sources that judicial procedures will be exhausted to determine whether the Government request is indeed unjustified, let alone that confidentiality will be maintained.

ery sense "frozen" in the hands, not of appellants, but of the telephone companies. Nor does the record suggest that disclosure of the existence of an inquiry which would accompany notice to appellants would generally pose a substantial obstacle to Government investigations. Indeed, the statement of one FBI agent, based on his 23 years of experience, with respect to the investigation of Jack Anderson suggests that this would rarely be the case:

A. Based on my experience as an FBI agent the crime had already been committed. The only thing that could have happened which would have hurt the investigation by notifying him that we subpoenaed his toll records was that we wouldn't get the toll records, that he would some way stop us from getting them. Once we got the toll records, notifying him wouldn't have hurt us at all because he couldn't change anything at that point or impeed [sic] the investigation.

Deposition of James F. Gaffney, JA 216–217.

Once appellants have been notified of Government demands for their toll billing records, the burden of invoking the judicial process to test the appropriateness of disclosure would rest with them. In situations where no tenable First Amendment claim can be made in opposition to disclosure, appellants can be expected to forego the opportunity to initiate fruitless proceedings. Accordingly, a system of prior notice, by placing the burden of going forward on the appellants, would tend to minimize the administrative and legal costs the Government would have to bear. There would be no need for it to establish before a court the legitimacy of every request for toll billing records. On the contrary, only those raising genuine First Amendment issues are likely to be challenged—and those are, of course, precisely the requests that should be screened in light of the constitutional interests at stake.

That a system of prior notice and opportunity to challenge would minimize the burdens imposed on the Government can be seen by reference to other contexts. For example, the House Banking Committee recently approved for inclusion in the Safe Banking Act provisions requiring that notice of most official demands for a bank customer's financial records be given prior to their disclosure so that the customer has a chance to test the validity of the official demand. The provision had the support of Justice Department officials who urged that it would meet the congressional goal of protecting the individual while easing the burdens placed on the Government by discouraging "frivolous" challenges and deliberate stalling tactics.[29] Similarly, Congress in 1976 required the Internal Revenue Service to provide prior notice to taxpayers of various summonses for documents in the possession of third parties.[30] Far from leading to administrative havoc, the response was quite limited. Only about three percent of the thousands of summonses issued by the Service since the law took effect have been challenged and the agency has won those tests in court.[31] In the instant case, there seems to be every reason to suppose that an analogous system of prior notice and opportunity to challenge would be an effective way to accommodate the potentially conflicting interests at play.

While we have been presented with no evidence suggesting any legitimate need for secrecy as a general rule, I recognize the possibility that a case may arise in which disclosure of the existence of a particular investigation occasioned by notice to appellants would substantially impair the conduct of that investigation.[32] Such situa-

---

29. *See* Legal Times of Washington, June 12, 1978, p. 3. *See also* Washington Post, July 13, 1978, p. 1; Washington Post, July 17, 1978, p. A14.

30. 26 U.S.C. § 7609, Added P.L. 94–455, Title XII, § 1205(a), Oct. 4, 1976, 90 Stat. 1699.

31. Washington Post, July 17, 1978, p. A14.

32. This may be true because knowledge of the fact of an investigation would impair other aspects of the investigation or because, in the case of an investigation into a continuing course of conduct, future toll billing records

tions present clear analogies to Fourth Amendment cases, where notice is generally inconsistent with the governmental need to secure records or other materials and *ex parte* warrants are therefore essential to preservation of the objects of government search. In the instant case such dangers are not present: because the records in question relate only to past events, and because they are in the hands of the telephone companies, there is no basis for concern that they will be removed or destroyed if notice is given to appellants. But where notice will in fact generate harms of another sort—where it will substantially hamper a Government investigation which is then at a stage where secrecy as to its existence remains critical—then notice need not be provided.

This does not mean, however, that judicial scrutiny should be avoided as well. In *United States v. United States District Court (Keith)*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), the Supreme Court held that electronic surveillance authorized by the President for internal security matters is not exempt from the Fourth Amendment's requirement of prior judicial approval. 407 U.S. at 321, 92 S.Ct. 2125. In so doing the Court rejected the argument that the warrant requirement is inconsistent with the need to maintain secrecy in national security investigations: "Nor do we believe prior judicial approval will fracture the secrecy essential to official intelligence gathering. The investigation of criminal activity has long involved imparting sensitive information to judicial officers who have respected the confidentialities involved. Judges may be counted upon to be especially conscious of security requirements in national security cases." *Id.* at 320–321, 92 S.Ct. at 2138. And in *Zweibon v. Mitchell, supra,* this court extended *Keith's* holding to surveillance of domestic organizations on foreign affairs grounds. The argument that the need for secrecy is sufficient to vitiate the warrant requirement was rejected in *Zweibon* as "no more

persuasive in the foreign security context" than in the domestic security context involved in *Keith.* 170 U.S.App.D.C. at 54, 516 F.2d at 647. "Since the warrant proceeding is conducted *ex parte,*" the *Zweibon* court reasoned, "disclosure of information can be restricted to the judge; administrative personnel can be provided by the Government should he require clerical or other assistance." *Id.*

These cases clearly establish that, even in the most sensitive circumstances involving domestic security and foreign affairs, the need for secrecy does not foreclose prior judicial scrutiny on an *ex parte* basis. Thus, while notice to appellants of requests for their toll billing records need not be given where it would substantially impair a Government investigation, protection of appellants' constitutional interests requires that these requests be subject to prior judicial scrutiny in *ex parte* proceedings. The need for secrecy may foreclose an adversary hearing accompanied by notice; it does not, however, justify leaving appellants with *no* judicial protection for their constitutional rights.

### III. THE APPROPRIATE REMEDY— THE FUNCTION OF JUDICIAL SUPERVISION

The majority agrees with me, I think, that appellants' newsgathering activities— including their use of the telephone to communicate with confidential sources—are protected by the First Amendment. The majority agrees, too, that in at least some cases Government requests for appellants' toll billing records may unconstitutionally impinge on their First Amendment freedoms. But the majority takes the position that the only purpose which would be served by prior judicial scrutiny would be to "screen" out cases of bad faith harassment by the Government. And since such cases are likely to be rare, the majority concludes that a right to judicial scrutiny is unneces-

which the Government might legitimately secure would be rendered useless if the individual

involved were alerted to the Government's interest in his communications.

sary and should not be recognized. Instead, the majority provides that as a matter of equitable relief, if an individual appellant can establish that he is in imminent danger of being unlawfully deprived of his constitutional rights by disclosure of his records, then and only then he is entitled to notice.

The majority's conclusion here, it seems to me, is based upon a fundamental misconception of the purpose of prior judicial scrutiny. To begin with, as noted earlier, the First Amendment does impose limits on otherwise legitimate government investigative techniques; it does not serve only as a bar to bad faith harassment, which is unlawful in any event without reference to the First Amendment. "Where First Amendment rights are asserted to bar the governmental interrogation," the Supreme Court has held, "resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." *Barenblatt v. United States,* 360 U.S. 109, 126, 79 S.Ct. 1081, 1093, 3 L.Ed.2d 1115 (1959). Indeed, the Supreme Court has gone further, holding that "[i]t is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech, press, association and petition that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling [government] interest." *Gibson v. Florida Legislative Investigation Committee, supra,* 372 U.S. at 546, 83 S.Ct. at 893.

The majority, however, takes the position that *Branzburg* and *Stanford Daily* establish that where what is involved is a good faith criminal investigation, the individual appellant's First Amendment interest in newsgathering must *always* be subordinated to the Government interest so that no purpose would be served by affording judicial scrutiny. But even if correct, the majority's view would not provide an adequate resolution to this suit. For criminal investigations, whether in good or bad faith, represent only one of the myriad subjects of Government investigations for which access to toll billing records is available. If notice or judicial scrutiny is required in noncriminal cases—and I think the majority must acknowledge, consistent with its rationale, that it is—then the Government must provide it in such cases unless it secures prior, *ex parte* judicial approval. The fact that AT&T's policy purports to give notice in noncriminal investigations does not relieve the Government of its obligation to *ensure* that notice is provided or judicial approval secured, particularly where the record discloses so strikingly the practical inefficacy of AT&T's policy in alerting subscribers to requests for their records.

More basically, I must disagree with the majority that *Branzburg* and *Stanford Daily* eliminate the need for any judicial consideration of First Amendment values in a criminal investigation so long as the Government is not acting in bad faith. In his concurrence in *Branzburg* Justice Powell was quite explicit in his statement that balancing on a case-by-case basis, what he termed the "tried and traditional way of adjudicating such questions," was required where reporters claimed a privilege against responding to certain grand jury inquiries. His concern was not simply with whether the Government was seeking to harass a newsman; he also recognized that circumstances might arise in which a newsman "is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation," and that judicial balancing would be necessary to resolve such claims. Similarly, in *Stanford Daily* the Court did not hold that so long as the government was investigating a crime in good faith First Amendment values were irrelevant to the determination whether a warrant should issue; as Justice Powell emphasized, "[A] magistrate asked to issue a warrant for the search of press offices can and should take cognizance of the independent values protected by the First Amendment" in determining whether the requirements for a warrant are met. 436 U.S. at 570, 98 S.Ct. at 1984.

This is not to say that the Government's interest in investigating violations of criminal laws is not a substantial one, sufficiently compelling to allow the Government ac-

cess to toll billing records. Indeed, as the majority so strongly emphasizes, this interest was accorded determinative weight in *Branzburg*.[33] Nonetheless, these decisions do reflect a recognition that, even where a criminal investigation is involved, the function of judicial scrutiny—whether it be in judging motions to quash grand jury subpoenas, structuring Fourth Amendment search warrants, or, I would add, reviewing Government demands for toll billing records—is not simply a screening function. Far from simply deciding whether an investigation is in good or bad faith, or a request correct or mistaken,[34] the court is charged in First Amendment cases with ensuring that the Government action is justified in light of the constitutional interests at stake

**33.** Of course, *Branzburg* did not involve the question whether reporters should be afforded an opportunity to secure prior judicial scrutiny of requests for their testimony to ensure that the requests were justified and properly limited. In *Branzburg*, as in all cases where an individual is subject to a grand jury subpoena, such an opportunity *is* available. It was the correctness of the particular judicial decisions on such motions to quash—rather than any question whether an opportunity to challenge must be available—which the Supreme Court was reviewing in its *Branzburg* decision.

Moreover, on the merits *Branzburg* presented an especially compelling case for disclosure in a number of respects. First, each of the reporters called to testify was himself an eyewitness to the alleged criminal activity under investigation by the grand jury. As a result, the case for disclosure was much stronger than in the more common instance where the reporter has merely been informed of such activity. Indeed, as one commentator has noted, "The Court's reluctance to give up what is probably the best evidence relating to relevant activity and its realization that this piece of evidence available to the newsperson would have existed whether or not the press was involved make this a particularly hard case for allowing a citizen—even a newsperson—to refuse to testify." Note, *supra* note 23, 28 Stan.L.Rev. at 976–977. Moreover, in *Branzburg* all three reporters refused *not merely to respond to specific* questions posed by the grand jury, but even to appear before the grand jury in answer to five of the six subpoenas. Clearly, refusal to appear presents *a far more sweeping claim of* privilege from a citizen's duty to offer evidence than does a refusal to answer selected questions or provide specific documents. *Id.* at 977. Finally, in *Branzburg* there was no question that the grand juries were operating in good faith and were in the process of discharging their legitimate function of investigating crime. 408 U.S. at 699–700, 92 S.Ct. 2666. Should these circumstances later change, the *Branzburg* Court made clear, the reporters involved could avail themselves of judicial processes to secure relief from their obligation to respond. *Id.* at 707–708, 92 S.Ct. 2670.

In focusing on these limiting aspects of *Branzburg,* I do not mean to suggest that a reporter's constitutional interest in confiden-

tiality is of such weight that it should never yield in the face of claims less substantial than those involved in *Branzburg.* To do so would be to ignore subsequent decisions by this and other courts where reporters have in fact been forced to disclose names of sources in circumstances admittedly less compelling than those presented in *Branzburg. See, e. g., Carey v. Hume,* 160 U.S.App.D.C. 365, 492 F.2d 632, *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974); *Tribune Publishing Co. v. Caldero,* 98 Idaho 288, 562 P.2d 791 (1977), *cert. denied,* 434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977). But these decisions neither establish nor even suggest that the reporter's interest is so insubstantial that it should automatically yield in the face of any governmental request. Quite the contrary, our most recent decision on First Amendment protection for newsgathering, *Sherrill v. Knight,* 186 U.S.App. D.C. 293, 569 F.2d 124 (1977), viewed the reporters' First Amendment interest as sufficiently compelling to require procedural safeguards before access to White House press facilities could be denied. There we stated:

White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, *see Branzburg v. Hayes,* 408 U.S. 665, 681, 707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Pell v. Procunier,* 417 U.S. 817, 829–35, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), requires that this access not be denied arbitrarily or for less than compelling reasons. * * * Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information. * *

569 F.2d at 129–130 (footnote omitted).

**34.** Appellant Jack Anderson testified that the FBI, in seeking the toll billing records of his employees, sought and secured the records of one Charles Elliott of Kensington, Maryland, whose only connection to Mr. Anderson was that he had the same name as an Anderson employee. JA 168–171.

and, if so justified, that it is tailored narrowly so as not to infringe unduly on First Amendment freedoms. "An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order. In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In other words, the order must be tailored as precisely as possible to the exact needs of the case." *Carroll v. President & Com'rs of Princess Anne,* 393 U.S. 175, 183–184, 89 S.Ct. 347, 353, 21 L.Ed. 325 (1968).

In this case, then, the task of judicial scrutiny is not only to determine whether a Government investigation is in good or bad faith and whether the Government's interest in securing an appellant's toll billing records outweighs the individual's First Amendment interest in maintaining their confidentiality. Even where the Government investigation, whether civil or criminal, is being conducted in good faith, and even where the court has determined that the Government's interest outweighs the appellant's, the court still retains responsibility to ensure that First Amendment rights are not restricted any more than is necessary to serve the Government interest.[35] This means, first of all, that the scope of the Government request must be considered carefully and limited to the maximum extent possible: the Government's practice, as evidenced by the record in this case, of securing records for time periods or telephones unrelated to the investigation taking place cannot be justified. Nor can the Government's practice of permitting broad access to toll records which have been secured be permitted.[36] Consistent with the First Amendment, there can be no justifica-

tion for making records which have been secured on the basis of one investigation broadly available to other Government officials engaged in wholly unrelated tasks. A court order permitting access should take account of these considerations and should establish limits on both the scope of disclosure and official access to the records once they have been disclosed.

## IV. CONCLUSION

The result reached by the majority today fails to provide any assurance whatever that the rights of appellants will not be violated by future disclosures—either because those disclosures are broader than is necessary to serve the Government interest or because they are wholly unjustified by the investigation involved. Under the majority's solution appellants are not entitled to prior judicial scrutiny unless and until they are able to meet the difficult if not impossible burden of establishing to a court that they are in imminent danger of having their records disclosed as part of a secret bad faith Government investigation undertaken to harass them. While I agree that any individual who can meet this burden should have recourse to the courts, the appropriate remedy in such cases is not an order that the individual receive notice prior to the constitutional violation, but rather an injunction prohibiting the Government official in question from violating his rights. Every individual has a right to be free of bad faith Government harassment, and one need not invoke the First Amendment to protect this right.

Appellants here, however, are not seeking equitable relief to remedy past violations or deter imminent ones. The harms of the past cannot be undone, and those of the future cannot be predicted with the accuracy that the majority's theory would seem to necessitate. What appellants do seek is a declaration that, in the circumstances of

---

**35.** *See United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (requiring that government action imposing incidental restraints on First Amendment rights be narrowly tailored to further an "important or substantial governmental interest" or develop-

ment of categorical "balances" will be required).

**36.** *See* 192 U.S.App.D.C. at ——, 593 F.2d at 1091, *supra; JA* 214–216, 224–225.

this case, judicial scrutiny is available to them to protect their First Amendment rights.

Without attempting in the abstract to apply constitutional standards to classify comprehensively those situations in which disclosure would or would not be appropriate, I think it clear that the record before us contains admitted instances of mistaken or abusive requests where the reporter's interest might well have been found by a court to be weighty enough to foreclose or limit disclosure. While I join with the Government and AT&T in hoping that such mistakes and abuses have permanently ceased, we should not—in view of the record in this case and the lessons of recent years—so trust to the good faith of all that we ignore the need for continuing judicial safeguards to ensure a free and vigorous press. For as the Supreme Court has pointed out in a related context: "History abundantly documents the tendency of Government—however benevolent and benign its motives—to view with suspicion those who most fervently dispute its policies." *United States v. United States District Court (Keith), supra,* 407 U.S. at 314, 92 S.Ct. at 2135. The press, in performing its constitutionally protected functions, may clearly be subject to such suspicion.

In reaching the conclusion that appellants are entitled to judicial safeguards, I do not suggest that journalists generally enjoy greater First Amendment freedoms than the public. The people's right to know is primary. But the function of the journalist in our society is to assist in informing the public—honestly and fairly. And that high calling is diminished when Government, however well intentioned, secretly jeopardizes the journalists' sources of information without prior judicial approval.

I respectfully dissent.